**EXHIBIT 1**

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceeding between

**BOLIVARIAN REPUBLIC OF VENEZUELA**

Applicant

and

**OI EUROPEAN GROUP B.V.**

Respondent on Annulment

**ICSID Case No. ARB/11/25**
**Annulment Proceeding**

---

# DECISION ON THE APPLICATION
# FOR ANNULMENT OF
# THE BOLIVARIAN REPUBLIC OF VENEZUELA

---

*Members of the ad hoc Committee*
Álvaro Castellanos Howell, President of the *ad hoc* Committee
Piero Bernardini, Member of the *ad hoc* Committee
David Pawlak, Member of the *ad hoc* Committee

*Secretary of the ad hoc Committee*
Paul Jean Le Cannu, ICSID

*Date of dispatch to the Parties*: December 6, 2018

## REPRESENTATION OF THE PARTIES

REPRESENTING THE APPLICANT:

Dr. Reinaldo Enrique Muñoz Pedroza
Procurador General de la República (E)
Dr. Henry Rodríguez Facchinetti
Gerente General de Litigio – Coordinación de
Juicios Internacionales
Procuraduría General de la República
Paseo Los Ilustres c/c Av. Lazo Martí
Ed. Sede Procuraduría General de la
República
Piso 8
Urb. Santa Mónica
Caracas 1040
Venezuela

Dr. Osvaldo César Guglielmino
Dra. Mariana Lozza
Dr. Guillermo Moro
Dr. Pablo Parrilla
Dr. Nicolás Bianchi
Dr. Alejandro Vulejser
Guglielmino & Asociados
Cerrito 1320 – Piso 9
C1010ABB
Buenos Aires
Argentina

Dr. Diego Brian Gosis
Dra. Verónica Lavista
175 SW 7th Street, Suite 2110
Miami, FL 33130
United States of America

REPRESENTING THE RESPONDENT ON
ANNULMENT:

Mr. Robert Volterra
Mr. Giorgio Mandelli
Mr. Álvaro Nistal
Mr. Roberto Lupini
Volterra Fietta
8 Mortimer Street
Fitzroy Place
London W1T 3JJ
United Kingdom

Mr. José Antonio Muci Borjas
Escritorio Muci-Abraham & Asociados
Edificio Banco de Lara, Piso 7, Oficinas B-C
Avenida Principal de Urbanización
La Castellana
Caracas 1060
Venezuela

TABLE OF CONTENTS

I.   INTRODUCTION AND OVERVIEW OF THE APPLICATION ....................................... 1

II.  PROCEDURAL HISTORY ..................................................................................... 2

III. THE PARTIES' POSITIONS AND THE ANALYSIS OF THE COMMITTEE ................. 9

   A.  Nature and Scope of the Annulment Mechanism ........................................ 9

      (1)  Applicant's Position ........................................................................ 9

      (2)  Respondent on Annulment's Position .............................................. 11

      (3)  The Committee's Analysis ............................................................... 13

   B.  The Tribunal Was Not Properly Constituted ............................................. 15

      (1)  Legal Standard ............................................................................... 15

         a.  Applicant's Position ............................................................. 15

         b.  Respondent on Annulment's Position .................................... 20

         c.  The Committee's Analysis ..................................................... 27

      (2)  Application of the Legal Standard to the Present Case ..................... 33

         a.  Factual Background .............................................................. 33

         b.  Applicant's Position ............................................................. 37

         c.  Respondent on Annulment's Position .................................... 39

         d.  The Committee's Analysis ..................................................... 46

   C.  The Tribunal Has Manifestly Exceeded Its Powers .................................... 50

      (1)  Legal Standard ............................................................................... 50

         a.  Applicant's Position ............................................................. 50

         b.  Respondent on Annulment's Position .................................... 54

         c.  The Committee's Analysis ..................................................... 57

      (2)  Application of the Legal Standard to the Present Case ..................... 59

         a.  Applicant's Position ............................................................. 59

         b.  Respondent on Annulment's Position .................................... 63

         c.  The Committee's Analysis ..................................................... 67

   D.  Serious Departure from a Fundamental Rule of Procedure ........................ 72

      (1)  Legal Standard ............................................................................... 72

         a.  Applicant's Position ............................................................. 72

         b.  Respondent on Annulment's Position .................................... 74

         c.  The Committee's Analysis ..................................................... 76

      (2)  Application of the Legal Standard to the Present Case ..................... 78

|   |   | a. | Applicant's Position ........................................................................ | 78 |
|   |   | b. | Respondent on Annulment's Position ........................................ | 80 |
|   |   | c. | The Committee's Analysis ............................................................ | 84 |
| E. | The Award Failed to State the Reasons on Which It Is Based ........................... | | | 93 |
|   | (1) | Legal Standard ......................................................................................... | | 93 |
|   |   | a. | Applicant's Position ........................................................................ | 93 |
|   |   | b. | Respondent on Annulment's Position ........................................ | 96 |
|   |   | c. | The Committee's Analysis ............................................................ | 97 |
|   | (2) | Application of the Legal Standard to the Present Case......................... | | 99 |
|   |   | a. | Applicant's Position ........................................................................ | 99 |
|   |   | b. | Respondent on Annulment's Position ........................................ | 102 |
|   |   | c. | The Committee's Analysis ............................................................ | 106 |
| F. | Costs ........................................................................................................... | | | 112 |
|   | (1) | Applicant's Cost Submissions .............................................................. | | 112 |
|   | (2) | Respondent on Annulment's Cost Submissions ................................... | | 115 |
|   | (3) | The Committee's Analysis..................................................................... | | 118 |
|   |   | a. | Costs of Proceeding........................................................................ | 119 |
|   |   | b. | Legal representation fees and expenses....................................... | 120 |
|   |   | c. | Interest ............................................................................................. | 124 |
|   |   | d. | Summary of Determinations ......................................................... | 125 |
| IV. | DECISION .................................................................................................... | | | 126 |

TABLE OF SELECTED ABBREVIATIONS / DEFINED TERMS

| | |
|---|---|
| Applicant or Venezuela | The Bolivarian Republic of Venezuela |
| Application | Application for Annulment and Stay of Enforcement of the Award filed on July 7, 2015 |
| Arbitration Rules | Rules of Procedure for Arbitration Proceedings of the International Centre for Settlement of Investment Disputes |
| Award | Award rendered on March 10, 2015 in the arbitration proceeding between OI European Group B.V. and the Bolivarian Republic of Venezuela (ICSID Case No. ARB/11/25) |
| BIT or Treaty | Agreement on the Encouragement and Reciprocal Protection of Investments between the Bolivarian Republic of Venezuela and the Kingdom of the Netherlands, which entered into force on November 1, 1993 |
| Committee | *Ad hoc* Committee constituted on October 13, 2015 |
| Companies | Fábrica de Vidrios Los Andes, C.A. and Owens-Illinois de Venezuela, C.A. |
| Counter-Memorial on Annulment | Respondent on Annulment's Counter-Memorial on Annulment dated August 5, 2016 |
| DCF | Discounted Cash Flow |
| *Favianca v. Venezuela* | Arbitration proceeding between Fábrica de Vidrios Los Andes C.A. and Owens-Illinois de Venezuela C.A. and the Bolivarian Republic of Venezuela (ICSID Case No. ARB/12/21) |
| First Econ One Report | First Expert Report of Daniel Flores of Econ One Research, Inc. ("Econ One") submitted by Venezuela on April 7, 2016 |
| First Navigant Report | First Expert Report of Brent C. Kaczmarek and Matthew D. Shopp of Navigant Consulting, Inc. |

|  | ("Navigant") submitted by OIEG on August 5, 2016 |
|---|---|
| First Stay Decision | Decision on Stay of Enforcement of the Award dated April 4, 2016 |
| Hearing on Annulment | Hearing on Annulment held on September 25 and 26, 2017 |
| IBA Guidelines | International Bar Association's Guidelines on Conflicts of Interests in International Arbitration |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| *Longreef v. Venezuela* | Arbitration proceeding between Longreef Investments A.V.V. and the Bolivarian Republic of Venezuela (ICSID Case No. ARB/11/5) |
| Memorial on Annulment | Applicant's Memorial on Annulment dated April 7, 2016 |
| OI-[#] | OIEG's Exhibit |
| OIEG or Respondent on Annulment | OI European Group B.V. |
| OILA-[#] | OIEG's Legal Authority |
| Parties | OIEG and Venezuela |
| Plants or Investment | OIEG's investment in two of the largest glass production plants in Venezuela |
| Rejoinder on Annulment | OIEG's Rejoinder on Annulment dated May 25, 2017 |
| Reply on Annulment | Applicant's Reply on Annulment dated September 24, 2016 |
| Second Econ One Report | Second Expert Report of Daniel Flores of Econ One submitted by Venezuela on September 24, 2016 |

| Second Navigant Report | Second Expert Report of Brent C. Kaczmarek and Matthew D. Shopp of Navigant submitted by OIEG on May 25, 2017 |
|---|---|
| Second Stay Decision | Second Decision on Stay of Enforcement of the Award dated September 24, 2018 |
| Second Stay Request | Second Request for Stay of Enforcement of the Award dated July 20, 2018 |
| Tr. Day [#], [Speaker(s)], [page:line] | Transcript of the Hearing on Annulment |
| Tribunal | The Arbitral Tribunal in the arbitration proceeding between OI European Group B.V. and the Bolivarian Republic of Venezuela (ICSID Case No. ARB/11/25) |
| UNCITRAL Arbitration Rules | Rules of Arbitration of the United Nations Commission on International Trade Law |
| Underlying Arbitration | Arbitration proceeding between OI European Group B.V. and the Bolivarian Republic of Venezuela (ICSID Case No. ARB/11/25) |
| V-[#] | Venezuela's Exhibit |
| VCLT | Vienna Convention on the Law of the Treaties |
| VLA-[#] | Venezuela's Legal Authority |

## I.   INTRODUCTION AND OVERVIEW OF THE APPLICATION

1.   This case concerns an application for annulment (the "**Application**") of the award rendered on March 10, 2015 (the "**Award**") in the arbitration proceeding between OI European Group B.V. and the Bolivarian Republic of Venezuela, ICSID Case No. ARB/11/25 (the "**Underlying Arbitration**").

2.   The Award decided a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Agreement on the Encouragement and Reciprocal Protection of Investments between the Bolivarian Republic of Venezuela and the Kingdom of the Netherlands, which entered into force on November 1, 1993 (the "**BIT**" or "**Treaty**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 (the "**ICSID Convention**" or the "**Convention**").

3.   The Application was filed by the Bolivarian Republic of Venezuela (the "**Applicant**" or "**Venezuela**"). The respondent on annulment is OI European Group B.V. ("**OIEG**" or the "**Respondent on Annulment**"). The Applicant and the Respondent on Annulment are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

4.   OIEG initiated the Underlying Arbitration claiming that the Applicant had violated several substantive provisions of the BIT and was liable for its internationally wrongful conduct in relation to OIEG's investment in two of the largest glass production plants in Venezuela (the "**Plants**" or the "**Investment**"). This Investment was held by OIEG through its equity interest in two Venezuelan companies, Fábrica de Vidrios Los Andes, C.A. and Owens-Illinois de Venezuela, C.A. (the "**Companies**").

5.   In the Award, the Tribunal unanimously held that it had jurisdiction to hear the dispute and that the Applicant had violated a number of substantive standards contained in the BIT, namely, (i) that the Applicant had illegally expropriated the Investment in violation of Article 6 of the BIT; and (ii) that the Applicant had violated the fair and equitable treatment

1

standard within the meaning of Article 3(1) of the BIT as well as (iii) its duty to observe obligations entered into with regard to OIEG's Investment under Article 3(4) of the BIT. As a result of these breaches, the Tribunal ordered the Applicant to pay OIEG US$372,461,982 in compensation, as well as compound interest on the principal sum using a LIBOR interest rate for one-year deposits in US dollars, plus a margin of 4 percent. The Tribunal also ordered the Applicant to pay OIEG US$5,750,000 in costs and expenses, with the same compound interest rate.[1]

6.      The Applicant seeks the annulment of the Award on four of the five grounds for annulment set forth in Article 52(1) of the ICSID Convention: (i) the Tribunal was not properly constituted (Article 52(1)(a)); (ii) the Tribunal manifestly exceeded its powers (Article 52(1)(b)); (iii) there was a serious departure from a fundamental rule of procedure (Article 52(1)(d)); and (iv) the Award fails to state the reasons on which it is based (Article 52(1)(e)).

## II.     PROCEDURAL HISTORY

7.      On July 7, 2015, the Applicant filed the Application with the Secretary-General of ICSID. The Application was filed in accordance with Article 52 of the ICSID Convention and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), within 120 days after the date of the Award.

8.      The Application included a request under ICSID Convention Article 52(5) for a stay of enforcement of the Award, pending a decision by the *ad hoc* Committee (the "**Committee**").

9.      On July 17, 2015, the Secretary-General of ICSID registered the Application and at the same time notified the Parties that enforcement of the Award was provisionally stayed, pursuant to Arbitration Rule 54(2).

---

[1] Award, ¶ 984.

10.    By letter of October 13, 2015, the Secretary-General notified the Parties that the Committee had been constituted, in accordance with ICSID Convention Article 52(3), and that the annulment proceeding was deemed to have begun on that date.  The Committee was composed of Dr. Álvaro Castellanos Howell (Guatemalan), President, designated to the ICSID Panel of Arbitrators by the Republic of Guatemala; Prof. Piero Bernardini (Italian), designated to the ICSID Panel of Arbitrators by the Italian Republic, and Mr. David Pawlak (American and Irish), designated to the ICSID Panel of Arbitrators by the Slovak Republic; all members were appointed by the Chairman of ICSID's Administrative Council. Ms. Sara Marzal Yetano, ICSID Legal Counsel, was designated to serve as Secretary of the Committee.

11.    On October 14, 2015, OIEG sent a letter noting that the Applicant bears the burden of specifying the circumstances that require the continuation of the stay of enforcement and that it had failed to provide any type of justification for its request in its Application. On this basis, the Respondent on Annulment argued that the stay of enforcement should be discontinued or allowed to terminate automatically within 30 days of the constitution of the Committee.

12.    On the same day, October 14, 2015, the ICSID Secretariat sent a letter to the Parties requesting an initial advance on costs of US$200,000 from the Applicant, in accordance with Regulation 14(3)(e) of the Administrative and Financial Regulations.

13.    On October 26, 2015, pursuant to the schedule determined by the Committee, as subsequently amended by the Parties, the Applicant filed a first submission in support of its request to maintain the stay of enforcement; on November 12, 2015, the Respondent on Annulment filed observations on the Applicant's first submission; on November 25, 2015, the Applicant filed a second submission on the stay of enforcement of the Award; and on December 8, 2015, the Respondent on Annulment filed its rejoinder.

14.    By letter dated October 27, 2015, the Committee notified the Parties that, as contemplated by Arbitration Rule 54(2), the Committee decided to maintain the provisional stay on the enforcement of the Award until it had an opportunity to review the Parties' submissions and to issue a further decision on the matter.

15.    On December 9, 2015, the Committee held its first session. Given that the Parties had not agreed to hold the first session on any of the dates proposed by the Committee within the 60-day period envisaged in Arbitration Rule 13, and had not agreed to extend such period, the Committee held its first session without the Parties by teleconference as permitted by Arbitration Rule 13.

16.    Following the first session, on December 15, 2015, the Committee issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters, as previously submitted in writing, and the decision of the Committee on disputed issues.

17.    On December 20, 2015, the Committee notified the Parties that it deemed that the two rounds of written submissions had provided ample opportunity for the Parties to present their observations on the issue of the stay of enforcement, and declined the Applicant's November 25, 2015 request for a round of oral submissions.

18.    On March 2, 2016, the Committee informed the Parties by e-mail that, in accordance with Section 16.5 of Procedural Order No. 1, it had decided not to consider the Respondent on Annulment's letter of February 26, 2016, and requested the Parties to abstain from presenting further unsolicited submissions, consistent with the Committee's direction in its letter of October 27, 2015.

19.    On April 1, 2016, the ICSID Secretariat received a wire transfer in the amount of US$121,000 from the Applicant as partial payment of the funds requested in accordance with Regulation 14(3)(e) of the Administrative and Financial Regulations to cover the costs associated with the annulment proceedings.  After an additional amount of US$73,767.29 was received, the ICSID Secretariat sent a letter to the Parties on April 7, 2016, confirming that it had received a total of US$194,767.29 in connection with these proceedings.

20.    On April 4, 2016, the Committee issued a decision rejecting the Applicant's request to continue the stay of enforcement (the "**First Stay Decision**"). The Committee declared the provisional stay terminated.

21.    Pursuant to the pleadings schedule established in Procedural Order No. 1: (i) on April 7, 2016, Venezuela filed its Memorial on Annulment ("**Memorial on Annulment**");

(ii) on August 5, 2016, OIEG filed its Counter-Memorial on Annulment ("**Counter-Memorial on Annulment**"); and (iii) on September 24, 2016, Venezuela filed its Reply on Annulment ("**Reply on Annulment**").

22.   On July 11, 2016, the ICSID Secretariat requested that the Applicant make a second advance payment of US$200,000 to cover administrative costs and expenditures for the next three to six months.  As explained in the ICSID Secretariat's letter, this advance payment was to be paid no later than August 10, 2016.  On July 25, 2016, the Applicant sent a letter in response, requesting that the ICSID Secretariat review and confirm its projected costs. The ICSID Secretariat reviewed and confirmed its projections with respect to these proceedings.  In a letter dated July 30, 2016, the ICSID Secretariat reiterated its request for US$200,000.

23.   On September 7, 2016, the ICSID Secretariat sent a letter to the Parties informing them that no funds had been received.  The ICSID Secretariat invited either Party to make the requested payment as soon as possible and no later than September 22, 2016.  No payment was made, however, by the stipulated date.

24.   By letter of September 28, 2016, the Secretary-General moved that the Committee stay the proceeding for non-payment of the required advances in accordance with ICSID Administrative and Financial Regulation 14(3)(d) and (e).

25.   On October 3, 2016, the Committee informed the Parties that it had decided to extend the deadline for payment until October 14, 2016.  Pursuant to the terms of the Committee's decision, the annulment proceeding would be stayed automatically if payment were not received by this extended deadline.  No payment was made by this extended deadline.

26.   By letter of October 17, 2016, in accordance with its letter of October 3, 2016, the Committee stayed the proceedings for non-payment of the required advances, effective as of October 14, 2016.

27.   On April 4, 2017, the Committee confirmed receipt of full payment of the required advances and, after a stay of nearly six months, the Committee resumed the proceedings.

28.    On May 25, 2017, the Respondent on Annulment filed its Rejoinder on Annulment ("**Rejoinder on Annulment**").

29.    On September 12, 2017, the Committee issued Procedural Order No. 2 in which it ruled on certain pending procedural matters related to the organization of the hearing on annulment.

30.    A hearing on annulment was held at the seat of the Centre in Washington, D.C. on September 26 and 27, 2017 (the "**Hearing on Annulment**"). In addition to the Committee and its Secretary, present at the Hearing on Annulment were:

*For the Applicant*:

| | |
|---|---|
| Mr. Diego B. Gosis | Guglielmino & Asociados, Of Counsel |
| Ms. Verónica Lavista | Guglielmino & Asociados, Of Counsel |
| Ms. Mariana Lozza | Guglielmino & Asociados |
| Mr. Guillermo Moro | Guglielmino & Asociados |
| Mr. Pablo Parrilla | Guglielmino & Asociados |
| Mr. Patricio Grané Riera | Guglielmino & Asociados |
| Ms. Katherine Sanoja | Special Counsel |
| Mr. Henry Rodríguez Facchinetti | Procuraduría General de la República Bolivariana de Venezuela |
| Ms. Thayrin Patricia Díaz Diaz | Procuraduría General de la República Bolivariana de Venezuela |
| Mr. Daniel Flores | Econ One Research, Inc. |
| Mr. Ettore Comi | Econ One Research, Inc. |
| Mr. Jordan Heim | Econ One Research, Inc. |

*For the Respondent on Annulment*:

| | |
|---|---|
| Mr. Robert Volterra | Volterra Fietta |
| Mr. Giorgio Mandelli | Volterra Fietta |
| Mr. Álvaro Nistal | Volterra Fietta |
| Mr. Roberto Lupini | Volterra Fietta |
| Mr. José Antonio Muci | Muci-Abraham & Asociados |
| Ms. MaryBeth Wilkinson | OI European Group B.V. |
| Mr. Brent Kaczmarek | Navigant Consulting, Inc. |
| Mr. Matthew Shopp | Versant Partners (formerly of Navigant Consulting, Inc.) |

*Court Reporters*:

| | |
|---|---|
| Ms. Dawn K. Larson | B&B Reporters |
| Mr. Leandro Iezzi | DR Esteno |

Ms. Marta Rinaldi                DR Esteno

*Interpreters*:

Ms. Silvia Colla
Mr. Daniel Giglio
Mr. Charles H. Roberts

31.   During the Hearing on Annulment, the following persons were examined:

*On behalf of the Applicant*:

Mr. Daniel Flores                Econ One Research, Inc.

*On behalf of the Respondent on Annulment*:

Mr. Brent Kaczmarek              Navigant Consulting, Inc.
Mr. Matthew Shopp                Versant Partners (formerly of Navigant Consulting, Inc.)

32.   On October 30, 2017, the ICSID Secretariat sent a letter to the Parties requesting that the Applicant make a third advance payment of US$200,000 to cover administrative costs and expenditures for the next three to six months no later than November 29, 2017.

33.   On December 1, 2017, the ICSID Secretariat sent a letter to the Parties informing them that no funds had been received.  The ICSID Secretariat invited either Party to make the requested payment as soon as possible and no later than December 18, 2017.  On December 13, 2017, the Applicant informed the ICSID Secretariat that the payment was "in process" and that it anticipated that the payment would be made in "the coming days."

34.   On December 11, 2017, the Parties filed their respective submissions on costs.

35.   On December 13, 2017, the Applicant proposed the disqualification of Dr. Castellanos (the "**Proposal for Disqualification**").

36.     On December 14, 2017, the Secretary of the Committee confirmed that, in accordance with Arbitration Rules 53 and 9(6), the proceeding was suspended until a decision was taken with respect to the Proposal for Disqualification.

37.     On December 18, 2017, Prof. Bernardini and Mr. Pawlak (the "**Two Members**") set a timetable for the Parties' submissions and Dr. Castellanos' explanations.  In accordance with such timetable, the Respondent on Annulment filed a submission on December 26, 2017 and Dr. Castellanos furnished his explanations on January 2, 2018.

38.     On January 9, 2018, both Parties submitted additional observations on the Proposal for Disqualification.

39.     By email of January 11, 2018, the ICSID Secretariat asked the Applicant to provide an update regarding the pending payment.  By email of the same day, the Applicant informed the ICSID Secretariat that the payment was "en route" and that completion of the payment would occur in "the coming days."  On February 8, 2018, the ICSID Secretariat informed the Parties that it had not yet received the Applicant's payment.  On March 8, 2018, the ICSID Secretariat confirmed receipt of the funds from the Respondent on Annulment.

40.     On March 9, 2018 the Two Members issued their decision rejecting the Proposal for Disqualification and the proceeding resumed pursuant to Arbitration Rules 53 and 9(6).

41.     On June 6, 2018, the ICSID Secretariat requested that the Applicant make a fourth advance payment of US$180,000 no later than July 6, 2018 to cover administrative costs and expenditures until the end of the proceedings.

42.     On July 10, 2018, the ICSID Secretariat sent a letter to the Parties informing them that no funds had been received.  The ICSID Secretariat invited either Party to make the requested payment as soon as possible and no later than July 25, 2018.  On July 16, 2018, OIEG sent a letter informing the ICSID Secretariat that it planned to make the payment of US$180,000.  On July 25, 2018, the ICSID Secretariat informed the Parties that US$179,970 had been received from the Respondent on Annulment.

43.     On July 20, 2018, the Applicant submitted a Second Request for Stay of Enforcement of the Award (the "**Second Stay Request**"), in response to which the Respondent on Annulment submitted its Observations on July 31, 2018.

44.     On September 7, 2018, further to the Committee's invitation, each Party submitted its statement of costs associated with the Second Stay Request.

45.     On September 24, 2018, the Committee issued a decision rejecting the Applicant's Second Stay Request (the "**Second Stay Decision**").

46.     The annulment proceeding was declared closed on September 25, 2018.

## III.     THE PARTIES' POSITIONS AND THE ANALYSIS OF THE COMMITTEE

47.     As noted above, the Applicant seeks the annulment of the Award on four of the five grounds for annulment set forth in Article 52(1) of the ICSID Convention: (i) the Tribunal was not properly constituted; (ii) the Tribunal manifestly exceeded its powers; (iii) there was a serious departure from a fundamental rule of procedure; and (iv) the Award fails to state the reasons on which it is based.[2]

48.     Below is a summary of the Parties' arguments and the Committee's analysis on each of the grounds of annulment invoked by the Applicant, preceded by a short discussion on the nature and scope of the annulment mechanism.

### A.     NATURE AND SCOPE OF THE ANNULMENT MECHANISM

### (1)     Applicant's Position

49.     The Applicant disagrees with OIEG's "excessively restrictive interpretation of the provisions contained in the ICSID Convention on the annulment of awards."[3]   According to Venezuela, if ICSID's annulment mechanism had "the features described by OIEG, then

---

[2] Memorial on Annulment, ¶¶ 28, 30.
[3] Reply on Annulment, ¶ 11.

the function of the Committee would be virtually non-existent and this proceeding would be devoid of any sense."[4]

50.   In response to OIEG's argument that the Application is "nothing but an appeal disguised as annulment,"[5] Venezuela contends that its arguments in support of the Application "do not refer to reasonable disagreements in terms of the interpretation of the facts and the law, but are limited to certain defects contained in the Award which are so serious that they fit the specific list included in Article 52(1) of the ICSID Convention as grounds for annulment of the Award."[6]

51.   Opposing OIEG's "mistaken" invocation of a "duty to interpret the grounds for annulment […] in a restrictive manner,"[7] the Applicant maintains that, when examining the grounds for annulment set out in Article 52 of the ICSID Convention, the Committee should not adopt "an extensive or narrow interpretation."[8] In support of this position, the Applicant relies on the decisions in *Mitchell v. Congo*,[9] *Wena Hotels v. Egypt*,[10] and *Consortium R.F.C.C. v. Morocco*.[11] The Applicant also cites the annulment decision in *Soufraki v. UAE*,[12] according to which:

> Article 52 of the ICSID Convention must be read in accordance with the principles of treaty interpretation forming part of general international law, which principles insist on neither restrictive nor

---

[4] Reply on Annulment, ¶ 9.

[5] Reply on Annulment, ¶ 14.

[6] Reply on Annulment, ¶ 16.

[7] Reply on Annulment, ¶ 30.

[8] Reply on Annulment, ¶ 30.

[9] *Mr. Patrick Mitchell v. Democratic Republic of Congo*, ICSID Case No. ARB/99/7 (Dimolitsa, Dossou, Giardina), Decision on the Application for Annulment of the Award, November 1, 2006 ("*Patrick Mitchell v. Congo*"), ¶ 19 (VLA-51).

[10] *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4 (Kerameus, Bucher, Orrego Vicuña), Decision on the Application by the Arab Republic of Egypt for Annulment of the Arbitral Award dated December 8, 2000, January 28, 2002 ("*Wena Hotels v. Egypt*"), ¶ 18 (VLA-29).

[11] *Consortium R.F.C.C. v. Kingdom of Morocco*, ICSID Case No. ARB/00/6 (Hanotiau, Berman, Fatouros), Decision of the *ad hoc* Committee on the Application for Annulment of Consortium R.F.C.C., January 18, 2006 ("*R.F.C.C. v. Morocco*"), ¶ 220 (unofficial translation) (VLA-53).

[12] Reply on Annulment, ¶ 32.

extensive interpretation, but rather on interpretation in accordance with the object and purpose of the treaty.[13]

52.     Finally, the Applicant objects to OIEG's argument "that, even if there were reasons to annul the Award, the Committee has the discretion not to do so."[14] The Applicant contends that "[t]he limited discretion of annulment committees under the ICSID Convention has to do with the evaluation of the arguments and documents submitted to it by the parties for consideration."[15]

53.     The Applicant accepts that committees must carefully assess the circumstances in each case and make sure that they do not annul awards in cases where the defects in the award "might prove not to be such after a more thorough analysis" or "are not a determining factor in the final outcome of the dispute."[16]  However, citing the decision in *Amco v. Indonesia*, the Applicant also argues that this measure of prudence "does not mean that an annulment committee has the discretion not to annul an award where it has defects listed by the ICSID Convention as grounds for annulment and those defects have been determining factors in the final outcome of the dispute between the parties."[17]

### (2)     Respondent on Annulment's Position

54.     OIEG argues that the Applicant has abused "the narrow and exceptional recourse of annulment by submitting claims and arguments that are, at best, an appeal disguised as an application for annulment."[18] This exceptional and narrow nature "is a corollary of the

---

[13] *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7 (Feliciano, Nabulsi, Stern), Decision of the *ad hoc* Committee on the Application for Annulment of Mr. Soufraki, June 5, 2007 ("*Soufraki v. UAE*"), ¶ 21 (VLA-02).

[14] Reply on Annulment, ¶ 33.

[15] Reply on Annulment, ¶ 33.

[16] Reply on Annulment, ¶ 33.

[17] Reply on Annulment, ¶ 34; *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1 (Sucharitkul, Fatouros, Schindler), Decision on the Applications by Indonesia and Amco respectively for Annulment and Partial Annulment of the Arbitral Award of June 5, 1990 and the Application by Indonesia for Annulment of the Supplemental Award of October 17, 1990, December 17, 1992 ("*Amco v. Indonesia*"), ¶ 1.20 (VLA-35). *See also Victor Pey Casado and others v. Republic of Chile*, ICSID Case No. ARB/98/2 (Fortier, Bernardini, El-Kosheri), Decision on the Application for Annulment of the Republic of Chile, December 18, 2012 ("*Pey Casado v. Chile*"), ¶ 80 (VLA-16).

[18] Counter-Memorial on Annulment, ¶ 47.

fundamental and well-established principle of finality of ICSID awards" embodied in Article 53 of the ICSID Convention.[19]

55.   In this sense, OIEG stresses that annulment under the ICSID Convention is not an appeal and therefore is not concerned with the substantive correctness of an award.[20] The purpose of the annulment mechanism is limited to "policing the integrity and fairness of the process leading to the award."[21] Further, the role of annulment committees is confined strictly to the grounds for annulment defined in Article 52(1) of the ICSID Convention.[22]

56.   Finally, OIEG maintains that, even when there are grounds for annulment, *ad hoc* committees have discretion not to annul an award in appropriate cases.[23] This is confirmed, not only by the language of Article 52(3) of the ICSID Convention, but also by previous annulment committees and authoritative commentators.[24]

57.   While OIEG acknowledges that this discretion is not unlimited,[25] it invokes previous annulment decisions[26] to argue that "an award should not be annulled where the relevant breach had little significance to the rights of the parties or no meaningful effect on the

---

[19] Counter-Memorial on Annulment, ¶ 50. *See also id.*, ¶¶ 51-56.

[20] Counter-Memorial on Annulment, ¶¶ 57-64.

[21] Counter-Memorial on Annulment, ¶ 65.

[22] Counter-Memorial on Annulment, ¶¶ 54-56.

[23] Counter-Memorial on Annulment, ¶ 68.

[24] Counter-Memorial on Annulment, ¶¶ 68-70; Rejoinder on Annulment, ¶¶ 366-370, citing *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1 (Zuleta, Castellanos, Cheng), Decision on Annulment, February 1, 2016 ("*Total v. Argentina*"), ¶ 167 (OILA-74); *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23 (Greenwood, Cheng, Taniguchi), Decision on Annulment, February 5, 2016 ("*EDF v. Argentina*"), ¶ 73 (OILA-86); *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28 (Tomka, Booth, Schreuer), Decision on Annulment, December 30, 2015 ("*Tulip Real Estate v. Turkey*"), ¶ 45 (OILA-75); *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19 (Schwebel, Ajibola, McLachlan), Decision of the *ad hoc* Committee, June 14, 2010 ("*Helnan v. Egypt*"), ¶ 55 (OILA-93); *R.F.C.C. v. Morocco*, ¶ 226 (OILA-94); *Amco v. Indonesia*, ¶ 1.20 (VLA-35); *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3 (Fortier, Crawford, Fernández Rozas), Decision on Annulment, July 3, 2002 ("*Vivendi v. Argentina I*"), ¶ 66 (OILA-83); *CDC Group PLC v. Republic of Seychelles*, ICSID Case No. ARB/02/14 (Brower, Hwang, Williams), Decision of the *ad hoc* Committee on the Application for Annulment of the Republic of Seychelles, June 29, 2005 ("*CDC v. Seychelles*"), ¶ 37 (VLA-10); *Patrick Mitchell v. Congo*, ¶ 19 (OILA-95).

[25] Counter-Memorial on Annulment, ¶ 71.

[26] Counter-Memorial on Annulment, ¶¶ 73, 75, citing *Vivendi v. Argentina I*, ¶ 66 (OILA-83) and *R.F.C.C v. Morocco*, ¶ 226 (OILA-94).

award."[27] In this sense, OIEG contends that, even if the Committee in the present case finds that any or all of the grounds invoked by the Applicant meet the threshold (*quod non*), they had no effect on the Tribunal's decision and, therefore, the Committee should not annul the Award.[28]

**(3)    The Committee's Analysis**

58.    As is well known, the permissible challenges to an ICSID award must be brought within the framework of the Convention, and pursuant to its terms. The procedure for the annulment of an award rendered under the ICSID Convention is self-contained, and autonomous from domestic law. The annulment remedy is governed, in particular, by Article 52 of the ICSID Convention, and Arbitration Rules 50, 52, 53, 54 and 55.

59.    In accordance with *Soufraki v. UAE*, as invoked by the Applicant in paragraph 51 above, among other annulment decisions, this Committee agrees that Article 52 of the ICSID Convention should be interpreted neither restrictively nor extensively, but rather in accordance with the object and purpose of the ICSID Convention. As contended by the Respondent on Annulment,[29] one such important purpose – indeed, "a fundamental goal for the ICSID system" – is "assuring the finality of ICSID arbitration awards."[30]

60.    Additionally, according to the Updated Background Paper on Annulment for the Administrative Council of ICSID ("**2016 ICSID Paper**"),

> [t]he function of an *ad hoc* Committee is either to reject the application for annulment or to annul the award or a part thereof on the basis of the grounds enumerated in Article 52. Its function is not to rule on the merits of the parties' dispute if it decides to annul,

---

[27] Counter-Memorial on Annulment, ¶ 76. *See also id.*, ¶¶ 71-76, citing *Helnan v. Egypt*, ¶¶ 55-57 (OILA-93); *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3 (El Kosheri, Dalhuisen, Jacovides), Decision on the Argentine Republic's Request for Annulment of the Award rendered on August 20, 2007, August 10, 2010 ("*Vivendi v. Argentina II*"), ¶¶ 232, 240, 267 (OILA-96) as examples of cases in which annulment committees have exercised their discretion and refused to annul awards despite finding grounds for annulment. *See also generally* Rejoinder on Annulment, ¶¶ 371-378.

[28] Counter-Memorial on Annulment, ¶ 78.

[29] *See* Counter-Memorial on Annulment, ¶¶ 50, 51-56, as summarized *supra* ¶ 54.

[30] Updated Background Paper on Annulment for the Administrative Council of ICSID, May 5, 2016 ("2016 ICSID Paper"), ¶ 71 (OILA-117).

> which would be the task of a new Tribunal should either party
> resubmit the dispute following annulment of the award.[31]

61. Thus, even if an *ad hoc* annulment committee reaches a decision to annul, partially or totally, an ICSID award, that committee does not have the mandate to revisit the merits of the case in which the annulled award was rendered. The above passage of the 2016 ICSID Paper is directly relevant in the case at hand, given that the Parties have presented, for example, expert testimonies during the Hearing on Annulment.

62. It is true that nothing in the ICSID Convention, nor in the Rules, expressly prohibits an *ad hoc* committee from stating its opinion on any issues addressed by an ICSID tribunal in its award. However, this Committee agrees with the proposition stated in various decisions that an *ad hoc* committee should not pronounce upon aspects of the award that are not essential to its decision.[32]

63. As a corollary of the above, this Committee endorses several of the principles established by prior *ad hoc* committees, as expressed in the 2016 ICSID Paper:

> (1) the grounds listed in Article 52(1) are the only grounds on which an award may be annulled;
>
> (2) annulment is an exceptional and narrowly circumscribed remedy and the role of an *ad hoc* Committee is limited;
>
> (3) *ad hoc* Committees are not courts of appeal, annulment is not a remedy against an incorrect decision, and an *ad hoc* Committee cannot substitute the Tribunal's determination on the merits for its own;
>
> (4) *ad hoc* Committees should exercise their discretion not to defeat the object and purpose of the remedy or erode the binding force and finality of awards;
>
> (5) Article 52 should be interpreted in accordance with its object and purpose, neither narrowly nor broadly; and

---

[31] 2016 ICSID Paper, ¶ 35 (OILA-117) (internal references omitted).

[32] 2016 ICSID Paper, ¶ 64 and footnote 118 (and the authorities cited therein) (OILA-117).

> (6) an *ad hoc* Committee's authority to annul is circumscribed by
> the Article 52 grounds specified in the application for annulment,
> but an *ad hoc* Committee has discretion with respect to the extent of
> an annulment, *i.e.*, either partial or full.[33]

64.     It is within the framework for the Committee's analysis described in paragraphs 58 *et seq.* above that the Committee will examine OIEG's argument that this Application is "at best, an appeal disguised as an application for annulment,"[34] and the Applicant's position that its arguments in support of the Application "do not refer to reasonable disagreements in terms of the interpretation of the facts and the law, but are limited to certain defects contained in the Award which are so serious that they fit the specific list included in Article 52(1) of the ICSID Convention as grounds for annulment of the Award." [35]

65.     Thus, in the sections of this Decision that follow, with an understanding that the Parties are in agreement that annulment is not an appeal, but an exceptional remedy, the Committee will address the alleged defects in the Award from this cardinal point of view.

## B.     THE TRIBUNAL WAS NOT PROPERLY CONSTITUTED

### (1)     Legal Standard

#### a.   *Applicant's Position*

66.     In seeking annulment under Article 52(1)(a) relating to the improper constitution of the Tribunal, Venezuela complains that prior to the Award's issuance Mr. Mourre lost the requisite qualities of impartiality and independence under the Convention given that he had entered into negotiations regarding a consultancy with Dechert LLP ("**Dechert**"), a law firm which, the Applicant maintains, was adverse to it in several international and domestic disputes.[36] Further, the Applicant complains that the timing of (i) the revelation of Mr. Mourre's professional contacts with Dechert and (ii) the closing of the proceedings in

---

[33] 2016 ICSID Paper, ¶ 74 (OILA-117).

[34] Counter-Memorial on Annulment, ¶ 47.

[35] Reply on Annulment, ¶¶ 14, 16. For the avoidance of doubt, despite the Applicant's broad reference to Article 52(1), the Applicant did not raise the ground contemplated in Article 52(1)(c) (regarding corruption).

[36] Memorial on Annulment, ¶¶ 47, 62.

the Underlying Arbitration "precluded the Republic from exercising its right to […] eventually propose [his] disqualification pursuant to the ICSID Convention."[37]

67.     Accordingly, on the basis of Articles 52(1), 14, 40(2) and 57 of the ICSID Convention, the Applicant argues that "if a member of a tribunal may not be relied upon to exercise independent judgment, the tribunal is not properly constituted and, therefore, a potential award rendered by it will not be valid."[38] The Applicant relies on the annulment decisions in *Vivendi v. Argentina II*[39] and *EDF v. Argentina*[40] which held that an arbitrator's lack of the qualities set forth in Article 14(1) of the ICSID Convention constitutes a ground for annulment pursuant to Article 52(1) of the ICSID Convention.[41]

68.     The Applicant points out that the ability to exercise independent and impartial judgment is continuous in nature. In this regard, when considering whether a tribunal has been properly constituted, the requirements in Article 14 of the ICSID Convention "must not only be satisfied at the time when the tribunal is actually constituted but must also continue to be met at all times,"[42] that is, until the date of the award. Therefore, there may be cases in which a tribunal is properly constituted "but–due to a change in circumstances–it subsequently ceased to be properly constituted," giving rise to a ground for annulment.[43]

69.     The Applicant also argues that the ability to reach a decision in an independent and impartial manner must not be assessed in an abstract or general way, but must be judged in a concrete and specific manner, on a case by case basis.[44]

70.     Relying again on *Vivendi v. Argentina II* and *EDF v. Argentina*, the Applicant further contends that a party is entitled to seek disqualification during the annulment proceeding if the circumstances prevented it from doing so during the pendency of the arbitration

---

[37] Memorial on Annulment, ¶ 55. *See also id.*, ¶¶ 53-54.
[38] Memorial on Annulment, ¶ 35. *See also* Reply on Annulment, ¶ 41.
[39] *Vivendi v. Argentina II*, ¶ 232 (VLA-01).
[40] *EDF v. Argentina*, ¶ 127 (VLA-03).
[41] Memorial on Annulment, ¶¶ 36, 37.
[42] Memorial on Annulment, ¶ 38. *See also* Reply on Annulment, ¶ 73.
[43] Memorial on Annulment, ¶ 64.
[44] Memorial on Annulment, ¶ 39.

proceeding.[45] In such case, the Applicant argues, the annulment committee must conduct a *de novo* review of the disqualification proposal.[46] The Applicant asserts that this is the only avenue for its challenge to be heard, and further that the purported conflict and denial of the right to be heard regarding same are also grounds for annulment under Article 52(1)(d).[47]

71.     Regarding the standard applicable to disqualification requests, the Applicant relies on the disqualification decision issued by the Chairman of the ICSID Administrative Council in *Blue Bank v. Venezuela*, which is based on the "objective perspective of an impartial and sufficiently informed third party:"[48]

> The applicable legal standard is an objective standard based on a reasonable evaluation of the evidence by a third party. As a consequence, the subjective belief of the party requesting the disqualification is not enough to satisfy the requirements of the Convention.[49]

72.     In this same regard, the Applicant also cites the *EDF v. Argentina* annulment committee, which held that:

> [T]he standard applied under Article 14(1) is whether a reasonable third party, with knowledge of all the facts, would consider that there were reasonable grounds for doubting that an arbitrator possessed the requisite qualities of independence and impartiality.[50]

73.     On this basis, the Applicant highlights that proof of actual dependence or bias is not required, "it is sufficient to establish the appearance of dependence or bias."[51] This principle of the "avoidance of appearance of impropriety" is generally applied in both

---

[45] Memorial on Annulment, ¶¶ 42-44.

[46] Memorial on Annulment, ¶ 44.

[47] Reply on Annulment, ¶ 53; Rejoinder on Annulment, ¶ 35; *see infra* Section III.D.

[48] Reply on Annulment, ¶¶ 67, 75.

[49] *Blue Bank International & Trust (Barbados) Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/20 (Kim), Decision on the Parties' Proposal to Disqualify a Majority of the Tribunal, November 12, 2013 ("*Blue Bank v. Venezuela*"), ¶ 60 (VLA-05) (internal references omitted).

[50] Memorial on Annulment, ¶ 64; *EDF v. Argentina*, ¶ 111 (VLA-03). *See also* Reply on Annulment, ¶¶ 77-79.

[51] Memorial on Annulment, ¶ 64; *EDF v. Argentina*, ¶ 109 (VLA-03).

domestic and international law, and reflected in the International Bar Association's Guidelines on Conflicts of Interest in International Arbitration (the "**IBA Guidelines**"):

> Doubts are justifiable if a reasonable third person, having knowledge of the relevant facts and circumstances, would reach the conclusion that there is a likelihood that the arbitrator may be influenced by factors other than the merits of the case as presented by the parties in reaching his or her decision.[52]

74.   In support of its Application, the Applicant cites several cases in which a party sought the disqualification of an arbitrator:

- In *Blue Bank v. Venezuela*,[53] arbitrator José María Alonso was disqualified given that he was a member of a law firm in Madrid, whose New York and Caracas offices were handling an international arbitration against Venezuela addressing similar issues.[54]

- In *Burlington v. Ecuador*,[55] the Chairman of the ICSID Administrative Council found that a sentence in one of the explanations provided by arbitrator Francisco Orrego Vicuña concerning the alleged conflict would lead a third party making a reasonable evaluation to manifestly perceive an appearance of lack of impartiality.[56]

- In *Perenco v. Ecuador*,[57] the Secretary-General of the Permanent Court of Arbitration considered that Judge Brower's words in a journalistic interview created an unfavorable opinion against Ecuador, thus giving a reasonable third party justifiable doubts about his impartiality.[58]

---

[52] IBA Guidelines, General Standard 2(c) (VLA-61).

[53] *Blue Bank v. Venezuela*, ¶¶ 66-69 (VLA-05).

[54] Reply on Annulment, ¶ 82.

[55] *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5 (Kim), Decision on the Proposal for Disqualification of Arbitrator Francisco Orrego Vicuña, December 13, 2013 ("*Burlington v. Ecuador*"), ¶¶ 79, 80 (VLA-06).

[56] Reply on Annulment, ¶ 83.

[57] *Perenco Ecuador Ltd. v. Republic of Ecuador*, PCA Case No. IR-2009/1 (Kröner), Decision on Challenge to Arbitrator, December 8, 2009 ("*Perenco v. Ecuador*"), ¶¶ 48-58 (VLA-62).

[58] Reply on Annulment, ¶ 84.

- In *Caratube v. Kazakhstan*,[59] the other members of the tribunal found that a reasonable third party would find it very likely that, in view of arbitrator Bruno Boesch's work in a prior case that involved similar parties and facts, his objectivity and open-mindedness regarding the facts and issues to be decided upon would be tainted.[60]

- In *Vito Gallo v. Canada*,[61] it was established that the conflict of interest created by a professional relationship between an arbitrator and a firm with an interest in the outcome of the dispute could not be side-stepped by the mere fact that this work was not substantial or current.[62]

- In *Alpha Projekt v. Ukraine*,[63] it was established that failure to disclose the relationship between an arbitrator and a third party with an interest in the dispute could constitute evidence of bias, if the relationship was recent and professional.[64]

75.     Finally, relying on *EDF v. Argentina*, the Applicant states that the party seeking annulment is not required to prove that a lack of impartiality or independence did in fact have a material effect on the award, but merely that it could have done so.[65] In this regard, the Applicant explains that the fact that an award is unanimous, as in the present case, cannot in itself "constitute an indicator that the award cannot be annulled."[66] For Venezuela, "[i]t is sufficient for one of the members of the tribunal to fail to meet the requirements in Article 14 of the Convention for the tribunal to be deemed improperly constituted."[67]

---

[59] *Caratube International Oil Company LLP & Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No ARB/13/13 (Lévy, Aynès), Decision on the Proposal for Disqualification of Mr. Bruno Boesch, March 20, 2014 ("*Caratube Decision on Disqualification*"), ¶¶ 89-91 (VLA-63).

[60] Reply on Annulment, ¶ 85.

[61] *Vito Gallo v. Canada*, UNCITRAL, PCA Case No. 55798 (Ziadé), Decision on the Challenge to Mr. Christopher Thomas, October 14, 2009 ("*Vito Gallo v. Canada*"), ¶ 32 (VLA-64).

[62] Reply on Annulment, ¶ 86.

[63] *Alpha Projekt Holding v. Ukraine*, ICSID Case No. ARB/07/16 (Robinson, Alexandrov), Decision on Respondent's Proposal to Disqualify Arbitrator Dr. Yoram Turbowicz, March 19, 2010 ("*Alpha Projekt v. Ukraine*"), ¶ 63 (VLA-65).

[64] Reply on Annulment, ¶ 87.

[65] Memorial on Annulment, ¶ 67; *EDF v. Argentina*, ¶ 134 (VLA-03).

[66] Reply on Annulment, ¶ 91.

[67] Reply on Annulment, ¶ 91.

### b. *Respondent on Annulment's Position*

76.    OIEG argues that the threshold for annulling an award on the basis of Article 52(1)(a) of the ICSID Convention is exceptionally high, as illustrated by the fact that this provision has only been invoked in three cases and none of them resulted in annulment.[68]

77.    The Respondent on Annulment further contends that (i) annulment is not the proper means to seek the disqualification of an arbitrator;[69] (ii) even under the Applicant's interpretation of Article 52(1)(a), it must establish a manifest lack of impartiality or independence as required under Articles 14 and 57; which (iii) should lead to annulment only if it would have altered the outcome of the award.

### (i) *Annulment is not the proper means to seek the disqualification of an arbitrator*

78.    For OIEG, Article 52(1)(a) should be interpreted in accordance with the customary international law rule enshrined in Article 31(1) of the Vienna Convention on the Law of Treaties (the "**VCLT**").[70] Thus, "the Committee's starting point should be to discern the ordinary meaning of the terms 'that the Tribunal was not properly constituted'" and such interpretation must lead to the conclusion that Article 52(1)(a) only covers breaches of the rules governing the process of constitution of tribunals, *i.e.*, Section 2 of Chapter IV of the ICSID Convention, Articles 37 to 40, entitled the "Constitution of the Tribunal."[71]

79.    OIEG further argues that, even if the Committee were to resort to the "supplementary means of interpretation" referred to in Article 32 of the VCLT, the end result would be the same, since the drafting history of the ICSID Convention confirms the Respondent on Annulment's interpretation of Article 52(1)(a).[72] In this regard, OIEG explains that

---

[68] Counter-Memorial on Annulment, ¶¶ 83, 84.

[69] Counter-Memorial on Annulment, ¶ 86; Rejoinder on Annulment, ¶ 21.

[70] Rejoinder on Annulment, ¶ 24.

[71] Rejoinder on Annulment, ¶ 27.

[72] Rejoinder on Annulment, ¶¶ 29, 31, 32.

"[d]uring the drafting of the ICSID Convention a proposal similar to what the Applicant is now advancing was rejected."[73]

80.     OIEG finds additional support in the decision of the committee in *Azurix v. Argentina*. There, the committee explained that the role of an annulment committee in relation to arbitrator challenges brought under Articles 57 and 58 of the ICSID Convention is limited to examining under Article 52(1)(d) whether or not there was a serious departure from a fundamental rule of procedure in the way in which the challenge was addressed; and that a challenge to an arbitrator brought for the first time on annulment is inadmissible under Article 52(1)(a).[74] For OIEG, the legal authorities on which the Applicant relies – *EDF v. Argentina* and *Vivendi v. Argentina II* – are unpersuasive on this particular issue and the Committee should adhere to the more judicious and reasoned view expressed by *Azurix v. Argentina*.[75]

81.     OIEG objects to the Applicant's assertion that the only possibility to challenge arbitrators in relation to facts discovered after the closure of the Underlying Arbitration is to request the annulment of the award under Article 52(1)(a) or (d).[76] First, if a party discovers any such facts between the closure of a proceeding and the issuance of the award, it can request that the proceeding be reopened pursuant to Arbitration Rule 38.[77] Second, if the grounds for disqualification only become known after the award is rendered, the relevant party can request the revision of the award under Article 51 of the ICSID Convention.[78]

82.     OIEG cites Mr. Broches, who stated that "if the grounds for disqualification only became known after the award was rendered, this would be a new fact which would enable a

---

[73] Counter-Memorial on Annulment, ¶ 93, citing the *History of the ICSID Convention*, Volume II, p. 872 ("*History*") (VLA-47).

[74] Counter-Memorial on Annulment, ¶¶ 87, 91, citing *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12 (Griffith, Ajibola, Hwang), Decision on the Application for Annulment of the Argentine Republic, September 1, 2009 ("*Azurix v. Argentina*"), ¶¶ 280, 281 (OILA-89); Rejoinder on Annulment, ¶ 33.

[75] Counter-Memorial on Annulment, ¶¶ 89, 92; Rejoinder on Annulment, ¶ 52.

[76] Rejoinder on Annulment, ¶ 35.

[77] Rejoinder on Annulment, ¶ 36.

[78] Counter-Memorial on Annulment, ¶¶ 90, 91; Rejoinder on Annulment, ¶ 37.

revision of the award."[79] Similarly, OIEG notes, the *Azurix v. Argentina* committee stated that:

> In the event that the party only became aware of the grounds for disqualification of the arbitrator after the award was rendered, this newly discovered fact may provide a basis for revision of the award under Article 51 […] but […] such a newly discovered fact would not provide a ground of annulment under Article 52(1)(a).[80]

83.     In sum, the Respondent on Annulment states that the Applicant's reliance on Article 52(1)(a) to raise its alleged concerns regarding Mr. Mourre's impartiality and independence is contrary to the proper interpretation of that Article.[81]

> *(ii) Under the Applicant's interpretation of Article 52(1)(a), it must establish a manifest lack of impartiality or independence as required under Articles 14 and 57*

84.     OIEG argues that, even if the Committee were to accept the Applicant's interpretation of Article 52(1)(a), the Applicant would still have the burden to prove that Mr. Mourre manifestly lacked the independence and impartiality required under Articles 14(1) and 57.[82]

85.     OIEG contends that, contrary to the Applicant's assertion, the applicable standard under Article 57 requires the applicant to adduce direct evidence of a "manifest" lack of the qualities required by Article 14(1).[83] This standard must not be confused with the "reasonable doubts" standard applicable under the UNCITRAL Arbitration Rules or the

---

[79] Counter-Memorial on Annulment, ¶ 91, citing *History*, p. 872 (VLA-47).

[80] *Azurix v. Argentina*, ¶ 281 (OILA-89). OIEG also relies on *Kardassopoulos v. Georgia*, which stated that "the revision and annulment remedies are compartmentalized. The discovery of a new fact does not come under one of the grounds for annulment listed at Article 52(1), so that there can be no overlapping between a ground for annulment and a ground for revision." *See* Rejoinder on Annulment, ¶ 39, citing *Ioannis Kardassopoulos and Ron Fuchs v. Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15 (Hascher, Abraham, Böckstiegel), Decision of the *ad hoc* Committee to Suspend the Annulment Proceeding, March 21, 2011 ("*Kardassopoulos v. Georgia*"), ¶ 13 (OILA-98).

[81] Rejoinder on Annulment, ¶ 50.

[82] Counter-Memorial on Annulment, ¶ 95; Rejoinder on Annulment, ¶¶ 22, 55.

[83] Counter-Memorial on Annulment, ¶ 95. *See also* Rejoinder on Annulment, ¶ 61.

IBA Guidelines,[84] which standard was expressly rejected in *Nations Energy v. Panama*, *Universal Compression v. Venezuela*, and *OPIC v. Venezuela*, among others.[85]

86.   OIEG states that the relevant standard under Article 57 of the ICSID Convention is an objective one and imposes a high burden of proof on the Applicant.[86] As succinctly stated in *ConocoPhillips v. Venezuela*:[87]

> The standard to be applied […] is whether a reasonable third person, with knowledge of all the facts, would conclude, on an objective basis, that the challenged arbitrator is manifestly lacking in the ability to act impartially (Article 14 read with Article 57 of the ICSID Convention).[88]

87.   Also relying on *ConocoPhillips v. Venezuela*, OIEG argues that under this standard it is not enough for the applicant to show that the challenged arbitrator may harbour a proclivity of bias in general. Rather, "it must establish facts indicating that [Mr. Mourre] would have a manifest bias in relation to the outcome of the present case."[89] The Respondent on Annulment cites the following passage from the *ConocoPhillips Decision on Disqualification II*:

> The allegation that serves as the basis for the challenge, assuming it can be established, must be capable of being related to the present case, that is, that the particular facts must give rise to a manifest lack of independence and impartiality in this case.[90]

---

[84] Counter-Memorial on Annulment, ¶ 96. *See also* Rejoinder on Annulment, ¶¶ 63-67.

[85] *See Nations Energy, Inc. and others v. Republic of Panama*, ICSID Case No. ARB/06/19 (Gómez-Pinzón, Irarrázabal), Decision on the Proposal to Disqualify Dr. Stanimir A. Alexandrov (on the Annulment Committee), September 7, 2011, ¶ 31 (OILA-99); *Universal Compression International Holdings, S.L.U. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/9 (Zoellick), Decision on the Proposal to Disqualify Prof. Brigitte Stern and Prof. Guido Santiago Tawil, Arbitrators, May 20, 2011, ¶¶ 21, 29, 71, 74 (OILA-100); *OPIC Karimum Corporation v. Bolivarian Republic Venezuela*, ICSID Case No ARB/10/14 (Jones, Tawil), Decision on the Proposal to Disqualify Professor Philippe Sands, Arbitrator, May 5, 2011, ¶¶ 16, 26, 53, 57 (OILA-101).

[86] Counter-Memorial on Annulment, ¶¶ 98, 99. *See also* Rejoinder on Annulment, ¶ 60.

[87] Counter-Memorial on Annulment, ¶ 97.

[88] *ConocoPhillips Company and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30 (Zuleta, Bucher), Decision on the Proposal to Disqualify L. Yves Fortier, Q.C., Arbitrator, July 26, 2016 ("*ConocoPhillips Decision on Disqualification II*"), ¶ 12(b) (OILA-102).

[89] Counter-Memorial on Annulment, ¶ 101.

[90] *ConocoPhillips Decision on Disqualification II*, ¶ 12(c) (OILA-102).

88.     With respect to the requirement of "manifest," OIEG maintains that, as confirmed by "ICSID jurisprudence" and commentary, "manifest" means "evident" or "obvious" and related to the "ease with which the alleged lack of the qualities can be perceived."[91] According to OIEG, this high standard has been applied in *Blue Bank v. Venezuela*, *Burlington Resources v. Ecuador*, *Caratube v. Kazakhstan*, *Abaclat v. Argentina*, and *ConocoPhillips v. Venezuela*.[92]

89.     OIEG contends that the Applicant's reliance on the disqualification decisions it cites in support of its Application is misplaced:

- In *Blue Bank v. Venezuela*,[93] the facts are "starkly different from those in the *OIEG* Arbitration."[94] In contrast with the situation of Mr. Mourre:

> (a) Arbitrator Alonso was a partner in Baker McKenzie Madrid; (b) Baker McKenzie New York and Baker McKenzie Caracas represented the claimant in a parallel and similar ICSID proceeding against Venezuela (i.e., in *Longreef v. Venezuela*); (c) Arbitrator Alonso likely would have had to decide issues in *Blue Bank v. Venezuela* relevant to *Longreef v. Venezuela*; (d) Arbitrator Alonso was a member of Baker McKenzie's International Arbitration Steering Committee; and (e) Arbitrator Alonso stated that the result in *Longreef v. Venezuela* could have an effect on his remuneration […].[95]

- In *Burlington v. Ecuador*,[96] the Chairman of the ICSID Administrative Council based his decision on the fact that, in the context of a disqualification proceeding, arbitrator Francisco Orrego Vicuña "made 'allegations about the ethics of counsel for the

---

[91] Counter-Memorial on Annulment, ¶ 102.

[92] Counter-Memorial on Annulment, ¶ 104; *Blue Bank v. Venezuela*, ¶ 61 (VLA-05); *Burlington v. Ecuador*, ¶¶ 65-68 (VLA-06); *Caratube Decision on Disqualification*, ¶ 57 (OILA-106); *Abaclat and others v. Argentine Republic*, ICSID Case No. ARB/07/5 (Kim), Decision on the Proposal to Disqualify a Majority of the Tribunal, February 4, 2014, ¶¶ 70-78 (OILA-107); *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30 (Kim), Decision on the Proposal to Disqualify a Majority of the Tribunal, May 5, 2014, ¶¶ 46-53 (OILA-108).

[93] *Blue Bank v. Venezuela*, ¶¶ 66-69 (VLA-05).

[94] Rejoinder on Annulment, ¶ 93.

[95] Rejoinder on Annulment, ¶ 93 (internal references omitted).

[96] *Burlington v. Ecuador*, ¶¶ 79, 80 (VLA-06).

Republic of Ecuador' that '[did] not serve any purpose in addressing the proposal for disqualification or explaining circumstances relevant to the allegations that the arbitrator manifestly lacks independence or impartiality.'"[97] In this case, the Applicant has never argued that Mr. Mourre made those sorts of allegations.[98]

- In *Perenco v. Ecuador*,[99] the conclusion of the Secretary-General of the Permanent Court of Arbitration was based on a statement made by Judge Brower that expressed unfavorable views on Ecuador and prejudged a fundamental issue of the case. Again, the Applicant has never argued that Mr. Mourre made similar comments. Additionally, in that case the parties had agreed that the challenge would be resolved applying the IBA Guidelines, which set a different standard than the one applicable to this case.[100]

- In *Caratube v. Kazakhstan*,[101] Mr. Bruno Boesch was disqualified for having acted as arbitrator in prior proceedings that involved similar parties and facts. The Applicant has failed to explain how this decision could support its arguments regarding the effects of Mr. Mourre's conversations and future relationship with Dechert.[102]

- In *Vito Gallo v. Canada*,[103] the standard applicable was different since it was a case governed by the UNCITRAL Arbitration Rules. Additionally, there is no factual correlation between the facts in that case and the facts in the present one.[104]

- In *Alpha Projekt v. Ukraine*,[105] and contrary to the Applicant's misrepresentation of the decisions and the facts of that case, the deciding arbitrators made clear that non-disclosure cannot make an arbitrator partial or lacking independence, but only the facts or circumstances that were not disclosed. Further, they cited with approval Prof. Schreuer's statement that even professional contacts between an arbitrator and

---

[97] Rejoinder on Annulment, ¶ 95.

[98] Rejoinder on Annulment, ¶ 95.

[99] *Perenco v. Ecuador*, ¶¶ 48-58 (VLA-62).

[100] Rejoinder on Annulment, ¶ 96.

[101] *Caratube Decision on Disqualification*, ¶¶ 89-91 (VLA-63).

[102] Rejoinder on Annulment, ¶ 97.

[103] *Vito Gallo v. Canada*, ¶ 32 (VLA-64).

[104] Rejoinder on Annulment, ¶¶ 98-102.

[105] *Alpha Projekt v. Ukraine*, ¶ 63 (VLA-65).

legal counsel representing one of the parties are not, as a rule, an obstacle to the exercise of independent judgement.[106]

90.    Lastly, OIEG maintains that "[m]ere professional contacts cannot by themselves constitute grounds for disqualification."[107] In this regard, OIEG points out that in *SGS v. Pakistan*, when deciding on the challenge of Mr. Thomas (an arbitrator) due to his contacts with Mr. Paulsson (Counsel for Pakistan) in another arbitration, the deciding arbitrators made clear that an applicant must show "dependency" or "reciprocal partisanship."[108] Similarly, OIEG notes that Prof. Schreuer states that "[p]rofessional contacts between an arbitrator and legal counsel representing one of the parties are not, as a rule, an obstacle to the exercise of independent judgment."[109]

> *(iii) An alleged lack of impartiality or independence of the arbitrator may lead to annulment under Article 52(1)(a) only if it would have altered the outcome of the award*

91.    OIEG contends that, even if the Applicant persuades the Committee that a manifest lack of impartiality or independence can be inferred, this may only lead to annulment if the Committee is also persuaded that it would have altered the outcome of the Award.[110] OIEG points out that "all committees considering this ground of annulment have paid close attention to the capacity of the invoked circumstances to alter the outcome of the award" and ultimately each has decided not to annul the award.[111]

---

[106] Rejoinder on Annulment, ¶ 104. *See also id.*, ¶ 105.

[107] Counter-Memorial on Annulment, ¶ 109; Rejoinder on Annulment, ¶ 22.

[108] *SGS Société Générale de Surveillance, S.A. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13 (Feliciano, Faurès), Decision on Claimant's Proposal to Disqualify Arbitrator, December 19, 2002 ("*SGS v. Pakistan*"), ¶ 26 (OILA-104).

[109] Counter-Memorial on Annulment, ¶ 109, citing Christoph Schreuer et al., The ICSID Convention: A Commentary (2nd ed., Cambridge University Press, 2009) ("The ICSID Convention: A Commentary"), p. 513, ¶ 23 (OILA-79).

[110] Counter-Memorial on Annulment, ¶ 110; Rejoinder on Annulment, ¶¶ 53, 54. According to OIEG, the Applicant has recognized that the party seeking annulment must prove, at the very least, that a lack of impartiality or independence "could have" had a material effect on the award. *See also* Rejoinder on Annulment, ¶ 109; Memorial on Annulment, ¶ 67.

[111] Counter-Memorial on Annulment, ¶¶ 112, 113. OIEG cites as an example the *Vivendi v. Argentina II* decision, in which the committee, despite censuring the conduct of Prof. Kaufmann-Kohler for not disclosing her appointment to the board of directors of a bank that was a shareholder of one of the parties, found that this relationship "had no material effect on the final decision of the [t]ribunal, which was in any event unanimous." *See also* Rejoinder on Annulment, ¶ 112.

92.    In this regard, OIEG maintains that the Applicant must demonstrate that the lack of impartiality or independence must have arisen prior to the rendering of the award,[112] and cites the annulment decision in *EDF v. Argentina*, according to which "if an arbitrator ceased to be independent or impartial only after the award has been finalised, his lack of the requisite qualities could not have affected the award and would not, therefore, constitute a ground for annulment."[113]

93.    Finally, and contrary to what the Applicant asserts, OIEG contends that the fact that an award is unanimous "is a relevant factor for whether an alleged lack of impartiality or independence was capable of affecting the outcome of the case."[114]

### c.    *The Committee's Analysis*

94.    As recorded above, the Parties have debated at length whether an arbitrator's loss of his or her ability to act in an impartial and independent manner, as required under Articles 14(1) and 57 of the ICSID Convention, may properly constitute a ground for annulment under Article 52(1)(a).

95.    As a starting point, the Committee undertakes to discern the intent of the Contracting States when agreeing to the specific wording of Article 52(1)(a) stating that "the tribunal was not properly constituted." To that end, the Committee recalls Articles 31 and 32 of the VCLT.[115] As is known, Article 31(1) provides that *"[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."* In accordance with Article 32, interpretation of a treaty also includes recourse to supplementary means of interpretation, "including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31 […]."

---

[112] Counter-Memorial on Annulment, ¶ 117. *See also* Rejoinder on Annulment, ¶¶ 113, 114.

[113] Rejoinder on Annulment, ¶ 113, citing *EDF v. Argentina*, ¶ 134 (OILA-86).

[114] Counter-Memorial on Annulment, ¶ 114. *See also* Rejoinder on Annulment, ¶ 122.

[115] Although the ICSID Convention predates the VCLT, these provisions of the VCLT are generally regarded as declaratory of customary international law.

96.     Applying the foregoing, the Committee begins with a focus on the text of Article 52(1)(a), which, as noted above, provides that a "party may request annulment of the award" on the ground "that the Tribunal was not properly constituted." In its ordinary meaning, the term "constitute" means "establish," "form," "frame," "give legal form to,"[116] thus pointing to the initial formation of a given body. This interpretation is supported by the use of the verb "was" immediately preceding the term "constituted," pointing to a situation existing at the point in the past when the tribunal was established.

97.     The Committee further interprets the term "properly constituted" in the context of the ICSID Convention and Arbitration Rules. Namely, Chapter IV, Section 2, of the Convention, entitled "Constitution of the Tribunal" and comprising Articles 37-40, lists the conditions to be met for a "properly constituted" tribunal, which must be satisfied at the time of the tribunal's initial formation. Such conditions include, for example, the number of arbitrators and the method of their appointment, applicable timeframes, nationality requirements, and, under Article 40(2), the condition that arbitrators "shall possess the qualities stated in paragraph (1) of Article 14," including the ability to "exercise independent judgment."

98.     The foregoing interpretation also is supported by reference to the Arbitration Rules. Specifically, Chapter I (Rules 1 through 12), entitled "Establishment of the Tribunal," in its very first provision refers to ICSID Convention Chapter IV, Section 2 ("Constitution of the Tribunal"),[117] indicating a connection between the terms "establishment" and "constitution."

99.     Accordingly, if the conditions under Articles 37-40 of the ICSID Convention for the proper constitution of the tribunal are not satisfied at the time of such constitution, then as a general matter either party may request the annulment of the award under Article 52(1)(a) on the ground that "the tribunal was not properly constituted."[118] However, in the case of

---

[116] *See* The Concise Oxford Dictionary of Current English, 7th ed., p. 217.

[117] ICSID Arbitration Rule 1(1) ("Upon notification of the registration of the request for arbitration, the parties shall, with all possible dispatch, proceed to constitute a Tribunal, with due regard to Section 2 of Chapter IV of the Convention.").

[118] Aron Broches suggested that, given the complex provisions governing the constitution of the tribunal and the fact that improper constitution of the tribunal may lead to annulment of the award, the tribunal should obtain the parties'

the lack or loss of qualities listed in Article 14(1), the disqualification provisions of Articles 57 and 58 apply (together with Arbitration Rule 9), which regulate the disqualification of an arbitrator in case of a manifest lack of the qualities required by Article 14(1).[119] Contrary to the Applicant's contention,[120] Article 52(1)(a) is not the proper means to address the disqualification of an arbitrator.

100.   As OIEG has maintained,[121] the intent of the drafters of the ICSID Convention was to distinguish annulment under Article 52(1)(a) from disqualification under Article 57. The latter provision provides:

> A party may propose to a Commission or Tribunal the disqualification of any of its members on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14. A party to arbitration proceedings may, in addition, propose the disqualification of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV.

101.   The last sentence of Article 57 appears to confirm OIEG's interpretation in that it provides that a party "may" in addition (*i.e.*, to disqualification for manifest lack of the qualities required by Article 14(1)) propose disqualification as a remedy also in a case in which the arbitrator "was ineligible for appointment to the Tribunal under Section 2 of Chapter IV."[122] Notably, Section 2 includes Article 40(2), which requires that "[a]rbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in

---

agreement that the tribunal was properly constituted at the first session with the parties. *See* A. Broches, Convention on the Settlement of Investment Disputes between States and Nationals of other States of 1965, Explanatory Notes and Survey of its Application in AJ van den Berg (ed.), *Yearbook Commercial Arbitration*, Vol. XVIII (1993), 627, 662-663. ICSID practice indicates that it is not uncommon for tribunals to ask the parties during the first session to confirm that the tribunal was duly constituted, in order to avoid untimely, subsequent challenges. Bishop-Marchili, cit. footnote. 21, ¶ 5.17. *See also* 2016 ICSID Paper, ¶ 78 (OILA-117).

[119] The ICSID Convention: A Commentary, p. 936, ¶ 124 (OILA-79).

[120] Memorial on Annulment, ¶¶ 36, 37, 55.

[121] Counter-Memorial on Annulment, ¶ 87. For support, OIEG cites R. Doak Bishop & Silvia M. Marchili, *Annulment Under the ICSID Convention* (Oxford University Press, 2012), pp. 50-51 (OILA-77). Upon a close examination of that source, it is true that its authors posit such a possible intent on the part of the drafters, but they ultimately are equivocal as to the interplay between Article 52(1)(a) and disqualification. *Id.*, p. 53. Regardless, herein, the Committee finds ample support for such a distinction in the text and context of Articles 52(1)(a) and 57 of the Convention, as confirmed by the *travaux préparatoires*.

[122] Notably, in presenting a quotation of Article 57, including its last sentence, the Applicant describes that the provision "regulates the possible grounds for disqualification." *See* Reply on Annulment, ¶ 71.

paragraph (1) of Article 14." Thus, even in the case of an arbitrator's lack of qualities required for the proper constitution of the Tribunal, the remedy expressly identified in the ICSID Convention is not annulment under Article 52(1)(a) but disqualification under Article 57. If this is so at the time of constitution of the tribunal, there is no evident basis to draw the opposite conclusion where a condition of dependence or partiality arises due to a change of circumstances at a later point in the proceeding. Thus, the distinction in the ICSID system between annulment and disqualification means that Article 57 regulating disqualification is to the exclusion of Article 52(1)(a) regulating annulment.

102.    As supplementary means of interpretation under Article 32 of the VCLT, the drafting history of the ICSID Convention confirms the Committee's conclusions.[123] During the drafting, a proposal similar to the interpretation now advanced by the Applicant was rejected when the States did not agree to add a provision "which would allow annulment of the award where disqualification could have been possible had it been made before the award was rendered."[124] In the context of that discussion, Mr. Broches observed, "if the grounds for disqualification only became known after the award was rendered, this would be a new fact which would enable a revision of the award."[125]

103.    Similarly, the 2016 ICSID Paper observes that:

> the drafting history of the ICSID Convention indicates that the ground of improper constitution of the Tribunal was intended to cover situations such as a departure from the parties' agreement on the method of *constituting* the Tribunal or an arbitrator's failure to meet the nationality or other requirements for *becoming* a member of the Tribunal.[126]

104.    In addition to the above VCLT analysis, the Committee considers in chronological order the three cases that the Parties have presented in addressing this issue. The first is *Azurix v. Argentina*, in which the committee considered whether a challenge addressed in the

---

[123] At the Hearing on Annulment, both Parties relied on selected excerpts of the drafting history of the ICSID Convention to support their respective cases. *See generally* Tr. Day 2, pp. 528-548.

[124] *History*, p. 872 (VLA-47).

[125] *Id*.

[126] 2016 ICSID Paper, ¶ 77 (emphasis added).

underlying proceeding pursuant to ICSID Convention Articles 57 and 58, could be reviewed on annulment under Article 52(1)(a).[127] In answering the question in the negative, the *Azurix* committee reasoned that:

> Article 52 does not state that "any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14" will constitute a ground of annulment. Rather, the ground of annulment in Article 52(1)(a) is that the tribunal was "not properly constituted". The procedure for constituting the tribunal, including the procedure for challenging arbitrators on grounds of a manifest lack of the qualities required by Article 14(1), is established by other provisions of the ICSID Convention. If [such] procedures have been properly complied with, the Committee considers that the tribunal will be properly constituted for the purposes of Article 52(1)(a).[128]

105.    The *Azurix* committee thus found that the review of a decision on disqualification would amount to an improper "*de novo* opportunity to challenge members of the tribunal after the tribunal has already given its award."[129] As recorded by OIEG, the *Azurix* committee – consistent with Mr. Broches' observations set forth above – further stated,

> [i]n the event that the party only became aware of the grounds for disqualification of the arbitrator after the award was rendered, this newly discovered fact may provide a basis for revision of the award under Article 51 of the ICSID Convention but, in the Committee's view, such a newly discovered fact would not provide a ground of annulment under Article 52(1)(a). If no proposal for disqualification is made by a party under Article 57, there will be no decision under Article 58, and in such a case there can […] be no basis for contending that the tribunal was not properly constituted by reason of any failure to comply with Article 57 or Article 58.[130]

106.    The second case is *Vivendi v. Argentina II*, in which the committee considered Argentina's argument that the tribunal was not properly constituted under Article 52(1)(a), because of an arbitrator's purported conflict of interest during the proceedings, which was discovered

---

[127] *Azurix v. Argentina*, Section G (OILA-89).

[128] *Azurix v. Argentina*, ¶ 279 (OILA-89).

[129] *Azurix v. Argentina*, ¶¶ 280, 282 (OILA-89).

[130] *Azurix v. Argentina*, ¶ 281 (OILA-89).

only after the issuance of the Award in question.[131] According to the *Vivendi II* committee, this was a question that could be reviewed on annulment.[132]

107.   Similarly, in *EDF v. Argentina* (the third case addressed by the Parties), at issue was Argentina's challenge to an arbitrator based on a purported conflict that was discovered between the time the proceedings had closed and the time of the Award.[133] According to the *EDF* committee, a challenge based on Article 14(1) was "a ground on which an award might be annulled under Article 52(1)(a)."[134] The *EDF* committee observed the holdings of *Azurix* and *Vivendi II* as follows:

> The Committee has taken careful note of the views of the *Azurix* Committee […] that […] the issue should be raised in proceedings for revision under Article 51 and not for annulment but it respectfully disagrees and prefers the approach of the *Vivendi II* Committee […].[135]

108.   For the above-stated reasons concerning the ordinary meaning of Article 52(1)(a), and its context within the ICSID Convention and Rules, as confirmed by the Convention negotiating history, this Committee is respectfully unable to share the holding and conclusion of the committees in *Vivendi II* and *EDF*, and instead prefers those of the *Azurix* committee. This interpretation maintains the distinction between the rules and standards concerning tribunal formation, arbitrator challenges and annulment, thus facilitating the operation of the Convention and Rules, as the drafters intended.[136]

109.   Accordingly, the Committee finds that the Applicant's claims of partiality and dependence are inadmissible as grounds for annulment under Article 52(1)(a) of the ICSID Convention.

---

[131] *Vivendi v. Argentina II*, ¶¶ 201, 202, 232 (VLA-01).

[132] *Vivendi v. Argentina II*, ¶ 232 (VLA-01). The *Vivendi II* committee, like the *EDF* committee, considered the arbitrator challenge under both Articles 52(1)(a) and 52(1)(d). The Committee addresses the grounds for annulment under Article 52(1)(d) below in Section III.D.

[133] *EDF v. Argentina*, ¶¶ 1, 165-168 (OILA-86).

[134] *EDF v. Argentina*, ¶ 127 (OILA-86).

[135] *EDF v. Argentina*, ¶ 130 (OILA-86).

[136] *See also Kardassopoulos v. Georgia*, ¶ 13 (OILA-98).

**(2)      Application of the Legal Standard to the Present Case**

*a.  Factual Background*

110.    The Applicant invokes this ground for annulment based on the following factual background.

111.    On March 4, 2015, in *Fábrica de Vidrios Los Andes*, *C.A. and Owens-Illinois de Venezuela*, *C.A. v. the Bolivarian Republic of Venezuela* (ICSID Case No. ARB/12/21) ("*Favianca v. Venezuela*"), Mr. Mourre, then a member of the tribunal in that case, informed the parties that in May 2015 he would enter into a consultancy agreement with Dechert with the title of Special Counsel. The letter to the parties in *Favianca v. Venezuela* stated as follows:

> As from May 2015, I will leave Castaldi Mourre & Partners to establish my own individual arbitrator practice. I will also as from then have a consultancy agreement with the law firm of Dechert LLP with the title of Special Counsel. At Dechert, I will only work on specific matters on which Dechert will ask me to participate, and I will have no access whatsoever to databases for matters other than those on which I will work directly. I will have a fixed compensation from Dechert and will not share in its profits or costs. My arbitrator's work will therefore be completely separate from Dechert. As a consequence, I do not consider me a Dechert lawyer for conflict purposes and I do not see Dechert's activities, except for the Dechert cases I work on, to be such as to cast any doubt on my independence and impartiality.
>
> I am however informing the parties, for the sake of transparency, that Dechert has within the past year been adverse to the Bolivarian Republic of Venezuela and/or Petroleos de Venezuela in six litigation matters that are entirely unrelated to the present arbitration. I have no additional information on these cases and, for the avoidance of doubt, I of course confirm that I will not participate in any manner in any work of Dechert with respect to the Bolivarian Republic of Venezuela, Petroleos de Venezuela or any other entity related to the Republic of Venezuela.[137]

112.    Mr. Mourre did not send such a letter to the Parties in the Underlying Arbitration.

---

[137] Communication from Mr. Mourre to the parties in *Favianca v. Venezuela*, March 4, 2015 (Exhibit V-10).

113.    On that same date, March 4, 2015, the Tribunal notified the Parties that the proceeding was declared closed in accordance with Arbitration Rule 38(1).[138]

114.    On March 9, 2015, Venezuela replied to Mr. Mourre's communication in *Favianca v. Venezuela* alleging that the information received raised doubts about his ability to act as an independent and impartial arbitrator in the cases in which Venezuela was a party and seeking additional information.[139] In particular, Venezuela requested:

> • The date of commencement of the negotiations or talks between Mr. Mourre and Dechert LLP that led to the decision to join the law firm under the terms disclosed on 4 March 2015.
>
> • The date on which those negotiations or talks concluded through the agreement disclosed on 4 March 2015.
>
> • The identity of the persons who conducted those negotiations or talks between Mr. Mourre and Dechert LLP and the place or places where they were held.
>
> • A list of the cases in which Dechert LLP acts as attorney or counsel in—domestic or international—arbitration or court proceedings against Latin American States or their instrumentalities, including details on the stage of the proceedings, industry, subject matter, claimant and—in the case of arbitration proceedings—institution conducting the proceedings and names of the members of the tribunal.
>
> • A list of the duties to be performed by Mr. Mourre as from May 2015 in his capacity as 'Special Counsel' for Dechert LLP.
>
> • A list of the team of in-house attorneys and external advisors with which Mr. Mourre will work as legal consultant within Dechert LLP, including the organizational chart on the basis of which he will receive his work requests and/or instructions.
>
> • In the event that it has already been discussed in the negotiations with Dechert LLP or thereafter, a list of the cases in which Mr.

---

[138] Award, ¶ 77.

[139] Letter from Venezuela to the tribunal in *Favianca v. Venezuela*, March 9, 2015 (Exhibit V-11).

Mourre will participate, including the industries and subject matters involved.[140]

115.   On March 10, 2015, the Award was dispatched to the Parties in the present case. The dates of signature of the Award are as follows: Mr. Mourre signed on February 20, 2015; Mr. Orrego Vicuña on February 26, 2015; and the President, Prof. Fernández-Armesto, on March 4, 2015.

116.   In response to Venezuela's additional information request in *Favianca v. Venezuela*, on March 11, 2015, Mr. Mourre sent a letter to the parties in the following terms:

> Dear Ms. Planells-Valero,
>
> I acknowledge receipt of a communication dated March 9, 2015 from counsel for the Bolivarian Republic of Venezuela in this case. In this communication, the Bolivarian Republic of Venezuela requests additional information regarding my communication to the parties dated March 4, 2015, stating however that my future professional relationship with Dechert LLP "is such as to generate conflicts of interest that are not compatible with the requirements that an arbitrator must meet under the ICSID Convention" (*arbitrator's translation*). In this regard, I can only confirm that my professional relationship with this law firm – which will only start on May 1rst [sic] – is not such as to generate any conflict since, (i) my arbitrator's work (including in this case) will be totally separated from Dechert, (ii) I will not be a partner in Dechert and I will have no access whatsoever to their databases, (iii) my relationship with Dechert will be limited to specific matters on which Dechert will ask me to participate, and (iv) I will not have any involvement (and information on) in the cases on which Dechert may act against the Bolivarian Republic of Venezuela or related entities. Therefore, I am unable to provide any information relating to cases in which Dechert may be acting against the Republic or related governmental entities, since I don't have that information and I don't have access to it. I can only add that the conversations that led to the establishment of this professional relationship were informally conducted with Dr. Eduardo Silva Romero, with whom I have a longstanding friendship, and were concluded shortly before I made my declaration. Based on this, I can only confirm my total independence and impartiality. I however understand and respect

---

[140] Letter from Venezuela to the tribunal in *Favianca v. Venezuela*, March 9, 2015 (Exhibit V-11). The translation into English is found in the Memorial on Annulment, ¶ 50.

the position of the Bolivarian Republic of Venezuela. In view of the importance attached to all arbitrators having the full confidence of the parties, if the Republic still believes that my statement is not compatible with my duties of independence and impartiality, I will have no choice but to resign as arbitrator in this case.

Sincerely yours,

Alexis Mourre[141]

117.   On March 13, 2015, Venezuela filed a proposal for the disqualification of arbitrators Alexis Mourre and Yves Fortier in *Favianca v. Venezuela*.[142]

118.   On March 16, 2015, Mr. Mourre resigned as an arbitrator in *Favianca v. Venezuela*[143] and on March 18, 2015 he also resigned his position in *Longreef Investments A.V.V. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/11/5) ("***Longreef v. Venezuela***").[144]

119.   In *Longreef v. Venezuela*, the resignation of Mr. Mourre was accepted by the other two members of the tribunal,[145] and in *Favianca v. Venezuela*, the Chairman of the Administrative Council of ICSID held that, in light of Mr. Mourre's resignation, it was "no longer necessary to address the proposal for his disqualification, which is accordingly dismissed."[146]

---

[141] Email from the ICSID Secretariat to the parties in *Favianca v. Venezuela*, March 11, 2015 (Exhibit V-12).

[142] Letter from Venezuela and Proposal for Disqualification in *Favianca v. Venezuela*, March 13, 2015 (Exhibit V-13).

[143] Email from the ICSID Secretariat to the parties in *Favianca v. Venezuela*, March 16, 2015 (Exhibit V-14).

[144] Letter from the ICSID Secretariat to the parties in *Longreef Investments A.V.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/5 (Edward, Gómez Pinzón, Mourre), March 18, 2015 ("*Longreef v. Venezuela*") (Exhibit V-15). From the text of this letter it seems that in *Longreef v. Venezuela* Mr. Mourre resigned without having previously made the disclosure made in *Favianca v. Venezuela*.

[145] *See* "Case Details" of *Longreef Investments A.V.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/5, ICSID Website, available at https://icsid.worldbank.org/en/Pages/cases/casedetail.aspx?CaseNo=ARB/11/5 (Exhibit OI-50).

[146] *Fábrica de Vidrios Los Andes, C.A. and Owens-Illinois de Venezuela, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/21 (Kim), Decision on the Proposal to Disqualify a Majority of the Tribunal, June 16, 2015, ¶ 38 (OILA-28).

120.   Both Parties appear to acknowledge that the consultancy arrangement between Mr. Mourre and Dechert never materialized.[147]

### b.  Applicant's Position

121.   The Applicant argues that the contractual or professional relationship established between Mr. Mourre and Dechert – in addition to his personal friendship with one of its main partners – "severely and irretrievably affected his impartiality and independent judgment."[148] This is so because the decisions and opinions expressed by Mr. Mourre in cases in which Venezuela is a party "would have been of great importance for the other cases" in which Dechert acts against Venezuela or its government-owned company Petróleos de Venezuela, S.A. ("**PDVSA**").[149] As an example, the Applicant refers to *Convial v. Peru*[150] in which Dechert acted for the claimants and offered an interpretation of the content of the fair and equitable treatment standard under international law "which is radically different from the position adopted by" Venezuela in this proceeding.[151]

122.   The Applicant further claims that Mr. Mourre should have disclosed this relationship in the present proceeding and his failure to do so precluded Venezuela from exercising its right to request explanations and to eventually propose his disqualification.[152] In this regard, the Applicant adds that the situation is analogous to that of *Vivendi v. Argentina II* and *EDF v. Argentina*, since the party seeking the annulment did not have access to the relevant information before the proceeding was closed and thus it is "the annulment committee that must resolve the issue for the first time."[153]

---

[147] *See*, *e.g.*, Tr. Day 1, Mr. Nistal (Counsel for OIEG), 112:3-4 ("It is also undisputed that Mr. Mourre never got to work with Dechert."); Tr. Day 2, Mr. Volterra (Counsel for OIEG), 447:11-14; Counter-Memorial on Annulment, ¶ 123; Reply on Annulment, ¶ 58.

[148] Memorial on Annulment, ¶ 65. *See also id.*, ¶ 62.

[149] Memorial on Annulment, ¶¶ 62, 65.

[150] Memorial on Annulment, ¶ 65, citing *Convial Callao S.A. and CCI - Compañía de Concesiones de Infraestructura S.A. v. Republic of Peru*, ICSID Case No. ARB/10/2 (Derains, Stern, Zuleta), Award, May 21, 2013, ¶¶ 556-570 (OILA-140).

[151] Memorial on Annulment, ¶ 65.

[152] Memorial on Annulment, ¶ 55.

[153] Memorial on Annulment, ¶ 55.

123.    However, the Applicant points out that the situation in this case differs from *Vivendi v. Argentina II*, because in such case this ground for annulment was rejected on the basis of the explanations given by the challenged arbitrator, Prof. Kaufmann-Kohler, who objected to the challenge.[154] Instead, in *Favianca v. Venezuela* and *Longreef v. Venezuela*, Mr. Mourre – unlike what happened with Prof. Kaufmann-Kohler – "did not challenge the proposal for disqualification but expressly stated that the Republic's position as to the incompatibility between his situation and the duties of independence and impartiality left him with *no choice* but to resign."[155]

124.    The Applicant concludes that, in the instant case, given the similar circumstances as in *Favianca v. Venezuela* and *Longreef v. Venezuela*,

> there is no alternative but to assume that, if Mr. Mourre had also disclosed in this proceeding that he had been hired by the law firm Dechert LLP (as he should have done), then he would have resigned from his position as arbitrator by virtue of his conflicts of interest and, therefore, the Award that is now sought to be annulled would not have been rendered.[156]

125.    The Applicant states that at the time the Award was signed and the proceeding declared closed, Mr. Mourre "knew that he was affected by a conflict of interest [of] which he believed" the parties had to be informed in *Favianca v. Venezuela*.[157] Further, for the Applicant, (i) on the one hand, the fact that the Award was rendered when the conflict of interest was already present "precludes any possibility of validating [Mr. Mourre's] acts,"[158] and (ii) on the other hand, the fact that the Award was unanimous does not preclude annulment on the basis of this ground.[159] The Applicant argues that it "cannot be

---

[154] Memorial on Annulment, ¶¶ 56-58. Similarly, the Applicant points out that in *EDF v. Argentina* "Mr. Remón never accepted Argentina's argument nor decided to resign voluntarily as a member of that tribunal." *See* Reply on Annulment, ¶ 118.

[155] Memorial on Annulment, ¶ 57 (emphasis in original). *See also* Reply on Annulment, ¶ 118.

[156] Memorial on Annulment, ¶ 59. *See also* Reply on Annulment, ¶ 103.

[157] Memorial on Annulment, ¶ 60.

[158] Memorial on Annulment, ¶ 67.

[159] Memorial on Annulment, ¶ 68.

truly known, nor assumed to be true [...] that Mr. Mourre had no effect on the shaping of the Tribunal's opinion in any of the points decided upon."[160]

126.   The Applicant adds that the improper constitution of the Tribunal is "aggravated and confirmed" by the following circumstances. Even though the Award was dispatched on March 10, 2015, the Award "was issued" on March 4, 2015, the same date of the closure of the proceeding.[161] What is more, the other two arbitrators, Mr. Mourre and Mr. Orrego Vicuña, signed before the closure of the proceeding, on February 20, 2015 and February 26, 2015, respectively, and "[t]his irregularity in itself constitutes a departure from a fundamental rule of procedure which warrants the annulment of the award."[162]

127.   The Applicant contends that the conflict of interest "does not arise upon initiation of Mr. Mourre's actual work as Special Counsel for Dechert LLP, but with the incompatible professional negotiations that ended up giving rise to that contract" and that necessarily predated the closure of the proceedings and the issuance of the Award.[163]

128.   For the Applicant, the facts that have been proven are "sufficient to establish the lack of an appearance of impartiality of Mr. Mourre" and, in any event, the lack of any additional evidence that could be deemed necessary cannot be attributed to Venezuela, but to Mr. Mourre's "refusal" to provide it.[164] Furthermore, the Applicant asserts that Mr. Mourre's refusal to provide the information requested "does not reduce but rather ratifies the need to proceed with the annulment."[165]

### c.  Respondent on Annulment's Position

129.   As mentioned above, OIEG argues that the Applicant's arguments on this ground for annulment fail as a matter of law and as a matter of fact. The Applicant's request fails as a matter of law because the annulment ground under Article 52(1)(a) is not the proper

---

[160] Reply on Annulment, ¶¶ 104, 105.

[161] Memorial on Annulment, ¶ 61

[162] Memorial on Annulment, ¶ 61. The Committee addresses this separate ground – serious departure from a fundamental rule of procedure – below in Section III.D.

[163] Reply on Annulment, ¶¶ 56-58. *See also id.*, ¶ 94.

[164] Reply on Annulment, ¶¶ 62, 64.

[165] Reply on Annulment, ¶ 62. *See also id.*, ¶¶ 63-66.

procedural avenue to challenge the lack of impartiality or independence of Mr. Mourre. OIEG states that, on this basis alone, the Committee should reject this ground for annulment.

130.    OIEG further argues that the Applicant's Application on the basis of this ground fails as a matter of fact because, even under the Applicant's own "misinterpretation" of the applicable legal standard, the Applicant has failed to discharge its burden of proving (i) the existence of facts indicating that Mr. Mourre manifestly lacked impartiality or independence in the Underlying Arbitration; and (ii) that Mr. Mourre's alleged loss of those qualities could have had a material effect on the Award.

> *(i)   Article 52(1)(a) is not the proper procedural avenue to challenge the lack of impartiality or independence of Mr. Mourre*

131.    This argument from the Respondent on Annulment has already been summarized above. Notably, OIEG adds that the Applicant had "at least two alternative procedural avenues available to it to raise its concerns regarding the impartiality or independence of Arbitrator Mourre, requesting: (a) that the Tribunal reopen the proceeding; or (b) revision of the Award."[166] Additionally, for OIEG:

> Both procedural avenues presented significant advantages over the course of action the Applicant decided to follow. Not only would pursuit of each avenue have been consistent with the ICSID Convention, but also it would have allowed the issue to be decided by the appropriate adjudicators. If the Applicant had requested either the reopening of the proceeding or the revision of the Award and then submitted a disqualification proposal, that proposal would have been decided by Arbitrators Fernández-Armesto and Orrego Vicuña, as mandated by the provisions of the ICSID Convention that govern the disqualification of arbitrators. Unlike this Committee, those arbitrators would have had access to the entire record of [the] *OIEG* Arbitration and, by definition, would have been in a better position to assess the potential effect of Arbitrator Mourre's contacts with Dechert on his ability to exercise independent or impartial judgment in that arbitration.[167]

---

[166] Rejoinder on Annulment, ¶ 45. *See also id.*, ¶¶ 40-44.
[167] Rejoinder on Annulment, ¶ 45.

132.   Further, OIEG points out that, in accordance with Arbitration Rule 9(4), if the Applicant
had sought either to reopen the proceeding or to request the revision of the Award, and then
submitted a disqualification proposal, Mr. Mourre would have been able to furnish
explanations.[168] By choosing to raise its concerns only in the annulment proceeding,
however, "the Applicant necessarily deprived him of that right and now seeks to have the
Committee engage in a level of speculation regarding Arbitrator Mourre's actions that is
not only artificial, but also simply contrary to the legal standard applicable to the
disqualification of arbitrators under the ICSID Convention."[169]

133.   Finally, OIEG asserts that, if the Applicant had opted for requesting the reopening of the
proceeding "immediately after Arbitrator Mourre's 4 March 2015 disclosure, with a view
to moving for his disqualification, any disqualification proposal would have complied with
the temporal requirement of ICSID Arbitration Rule 9(1)"[170] (*i.e.,* to submit the
disqualification proposal "promptly" after the discovery of the relevant facts). Instead, the
Applicant chose to raise its concerns for the first time in this annulment proceeding, that
is, more than four months after Mr. Mourre's disclosure. Such period of time, as confirmed
by "ICSID jurisprudence," cannot possibly meet the "promptly" requirement.[171]

*(ii) Even under its own misinterpretation of Article 52(1)(a), the Applicant has
failed to discharge its burden of proof*

134.   OIEG argues that, even under the Applicant's interpretation of Article 52(1)(a), the
Applicant has the burden to prove: (a) the existence of facts that would indicate that
Mr. Mourre manifestly lacked independence or impartiality at end of the Underlying
Arbitration; and (b) that Mr. Mourre's loss of those qualities at that stage of the proceeding
could have had a material effect on the Award.[172] OIEG contends that the Applicant has
"manifestly failed to discharge its burden of proof for both requirements."[173]

---

[168] Rejoinder on Annulment, ¶ 46.
[169] Rejoinder on Annulment, ¶ 47.
[170] Rejoinder on Annulment, ¶ 48.
[171] Rejoinder on Annulment, ¶ 48. *See also id.*, ¶ 49.
[172] Rejoinder on Annulment, ¶ 55.
[173] Rejoinder on Annulment, ¶ 55.

> ➢ The Applicant has failed to prove the existence of facts indicating Mr. Mourre's manifest lack of impartiality or independence

135. OIEG first argues that there is no evidence on the record suggesting a dependency relationship between Mr. Mourre and Dechert.[174]

136. Second, OIEG states that the Applicant has failed to prove that Dechert had an interest in the outcome of the Underlying Arbitration.[175] OIEG explains that, while it appears that Dechert has represented claimants against the Applicant in a number of proceedings, "the Applicant has not provided any evidence to suggest that those proceedings were related in even the most remote way to the [Underlying] Arbitration."[176]

137. Third, even assuming that Dechert had an interest in the outcome of the Underlying Arbitration, "the Applicant has failed to prove that this could have an effect on Arbitrator Mourre's impartiality or independence."[177] In this regard, OIEG points out that the Applicant has not provided any evidence that Mr. Mourre "was privy to any information regarding the arguments made by Dechert on behalf of its clients" in such proceedings.[178] On the contrary, Mr. Mourre's letter of March 11, 2015 made clear that he did not have access to such information.[179] Further, the Applicant has failed to prove that Mr. Mourre would have benefited "in a material way from Dechert's success" in those other cases.[180] As Mr. Mourre explained, he would be neither a "Partner" nor a "Dechert lawyer" and he would "have a fixed compensation from Dechert and [would] not share in its profits or costs."[181]

138. OIEG further objects to the Applicant's suggestion that Mr. Mourre's alleged "refusal" to provide additional information should lead the Committee to conclude that a conflict of interest existed, or that he lacked independence or impartiality. In this regard, first, OIEG

---

[174] Rejoinder on Annulment, ¶ 70.
[175] Rejoinder on Annulment, ¶¶ 71-74.
[176] Rejoinder on Annulment, ¶ 72.
[177] Rejoinder on Annulment, ¶ 75. *See also* Counter-Memorial on Annulment, ¶¶ 141-148.
[178] Rejoinder on Annulment, ¶ 75.
[179] Rejoinder on Annulment, ¶ 76. *See also* Counter-Memorial on Annulment, ¶¶ 150-152.
[180] Rejoinder on Annulment, ¶ 77.
[181] Rejoinder on Annulment, ¶ 77.

states that it is the Applicant, not the arbitrator, who bears the burden of proving the existence of facts indicating the manifest lack of impartiality or independence.[182] Second, OIEG adds that Mr. Mourre did not "refuse" to provide the information requested by the Applicant. As it "is clear from his 11 March 2015 communication, he responded to those of the Applicant's demands to which he was able to respond and considered reasonable."[183] Third, "Arbitrator Mourre explicitly and repeatedly 'confirm[ed] [his] total independence and impartiality'. He cannot be expected to provide evidence proving the opposite of what he firmly believed."[184]

139.   OIEG also rejects the Applicant's argument that Mr. Mourre lacked impartiality and independence because he failed to disclose his professional relationship with Dechert in the Underlying Arbitration, while disclosing it in *Favianca v. Venezuela*.[185] For OIEG this argument fails as a matter of law because a non-disclosure does not in itself result in disqualification – it is only the facts and circumstances that were not disclosed that can do so.[186] Additionally, according to OIEG the argument must fail as a matter of fact, since there are differences between the two proceedings that "could justify Arbitrator Mourre's decision to make his disclosure in *Favianca and OIdV v. Venezuela* but not in the *OIEG* Arbitration."[187] In this regard, OIEG points out that Mr. Mourre's professional relationship with Dechert was to start from May 2015, at which point the *Favianca v. Venezuela* case would still be active, while the Underlying Arbitration would have concluded.[188]

140.   OIEG further objects to the Applicant's claim that Mr. Mourre's letter of March 11, 2015 in *Favianca v. Venezuela* is an implicit admission that his future relationship with Dechert constituted a conflict of interest in such case, as well as in the Underlying Arbitration.[189]

---

[182] Rejoinder on Annulment, ¶ 79.

[183] Rejoinder on Annulment, ¶ 80.

[184] Rejoinder on Annulment, ¶ 81.

[185] Rejoinder on Annulment, ¶ 82.

[186] Rejoinder on Annulment, ¶ 83. *See also* Counter-Memorial on Annulment, ¶¶ 137, 138.

[187] Rejoinder on Annulment, ¶ 84.

[188] Rejoinder on Annulment, ¶¶ 84, 85.

[189] Rejoinder on Annulment, ¶ 88.

141.    First, OIEG states that Mr. Mourre did not admit to any conflict of interest in *Favianca v. Venezuela*. On the contrary, Mr. Mourre made clear that "his resignation was not based on the existence of a conflict of interest, stating unequivocally that it was based on the Applicant's 'belie[fs]' regarding his 'duties of independence and impartiality' and on the importance he attached to 'having the full confidence of the parties.'"[190]

142.    Second, even assuming that this communication constituted an admission of a conflict of interest in *Favianca v. Venezuela*, "that would not mean that the same conflict existed in the *OIEG* Arbitration or that Arbitrator Mourre would have resigned in that case, too."[191] As mentioned before, while Mr. Mourre's relationship with Dechert "would have overlapped in time with the proceedings in *Favianca and OIdV v. Venezuela* and in *Longreef v. Venezuela*, it could not have overlapped with the *OIEG* Arbitration."[192]

143.    Additionally, OIEG rejects the Applicant's argument that "the dates of the closure and signature [of the Award] were manipulated and distorted to preclude the exercise of [a] fundamental right of the Republic."[193] In this regard, OIEG contends that:

> In addition to being serious and lamentable, this accusation by the Applicant is completely devoid of factual support or merit. The Applicant has not offered even the semblance of evidence that there was manipulation, alteration or distortion of the dates of the signing of the Award, much less with the malicious intent of depriving the Applicant of its rights under the Convention.[194]

---

[190] Rejoinder on Annulment, ¶ 90. *See also* Counter-Memorial on Annulment, ¶¶ 133, 134.

[191] Rejoinder on Annulment, ¶ 91.

[192] Rejoinder on Annulment, ¶ 91. *See also* Counter-Memorial on Annulment, ¶ 136.

[193] Memorial on Annulment, ¶ 126.

[194] Counter-Memorial on Annulment, ¶ 127. *See also id.*, ¶¶ 128, 129.

> ➤ The Applicant has also failed to prove that Mr. Mourre's alleged loss of impartiality or independence at the end of the proceeding could have had a material effect on the Award

144. OIEG argues that there are a number of facts that show that any loss of impartiality or independence by Mr. Mourre resulting from his conversations with a member of Dechert could not have had a material effect on the Award.[195]

145. First, OIEG points out that (i) Mr. Mourre expressly confirmed that his conversations with Dechert were conducted shortly before he made his March 4, 2015 declaration;[196] (ii) by that date all three members of the Tribunal had signed the Award, in fact, Mr. Mourre had signed it almost two weeks before; and (iii) six days later, on March 10, 2015, the Award was dispatched to the Parties.[197] According to OIEG, "[t]hese facts, by themselves, militate strongly in favour of a conclusion that the Award had been finalised by the time Arbitrator Mourre reached any consultancy agreement with Dechert."[198]

146. OIEG rejects the Applicant's counter-argument that the conflict of interest began earlier, when Mr. Mourre began his negotiations with Dechert.[199] OIEG explains that, as confirmed by *EDF v. Argentina*, the burden of proving that the conversations with Dechert could have had a material impact on the Award lies on the Applicant.[200] OIEG contends that if, as the Applicant has expressly recognized, "it is impossible to determine whether the deliberations of the Tribunal were ongoing at the time the conversations took place, then, by definition the Applicant has failed to show that those conversations could have had a material effect on the Award."[201] OIEG notes that, in any event, the Secretary of the Tribunal sent a letter to the Parties on December 8, 2014 stating that at that time the

---

[195] Rejoinder on Annulment, ¶ 113.

[196] Rejoinder on Annulment, ¶ 114.

[197] Rejoinder on Annulment, ¶ 114.

[198] Rejoinder on Annulment, ¶ 114. In this regard, OIEG also states that "[a]rbitrators and experienced counsel know that, in practice, substantive deliberations and finalisation of an award take place well before it is issued to the parties and often even before the proceedings are declared closed." Counter-Memorial on Annulment, ¶ 124.

[199] Rejoinder on Annulment, ¶¶ 117, 118.

[200] Rejoinder on Annulment, ¶ 119.

[201] Rejoinder on Annulment, ¶ 119.

Tribunal was reviewing "a complete draft of the Award,"[202] which again would be a strong suggestion that Mr. Mourre's conversations with Dechert took place after deliberations had finished.[203]

147.    Second, OIEG argues that, contrary to the Applicant's arguments, the fact that the Award was unanimous "firmly indicates that Arbitrator Mourre's alleged loss of impartiality or independence could not have had a material effect on the Award."[204]

148.    Third, OIEG contends that the fact that "at any relevant time, Arbitrator Mourre did not have any knowledge of the details of the cases in which Dechert is (or was) involved (or of any other circumstance that could generate a conflict of interest) constitutes yet another factor that strongly indicates that his [relationship with Dechert] could not have had a material effect on the Award."[205] OIEG relies on *Vivendi v. Argentina II*, where the committee decided not to annul the award, among other reasons, because Prof. Kaufmann-Kohler maintained that she had found out about the connection between UBS (the bank for which she was appointed to the board of directors, and which held shares of one of the claimants) and the claimants only after the issuance of the award.[206]

### d.    The Committee's Analysis

149.    As set forth above in Section III.B(1)c, the Committee disagrees with the Applicant's position that in the circumstances of the present case the only available remedy was the annulment of the Award. Instead, in the Committee's view, and as argued by OIEG,[207] in the case of discovery of relevant new facts after the Tribunal has already closed the proceedings under Arbitration Rule 38(1) but before the issuance of the Award, the Applicant could have requested that the Tribunal reopen the proceedings under Arbitration

---

[202] Rejoinder on Annulment, ¶ 120, citing the Communication from the Secretary of the Underlying Arbitration to the Parties, December 8, 2014 (Exhibit OI-70).

[203] Rejoinder on Annulment, ¶ 121.

[204] Rejoinder on Annulment, ¶ 122. *See* Counter-Memorial on Annulment, ¶ 160.

[205] Rejoinder on Annulment, ¶ 123.

[206] Rejoinder on Annulment, ¶ 123.

[207] *See supra* Sections III.B(1)b(i) and III.B(2)c(i).

Rule 38(2).[208] If the Tribunal had already issued the Award, the Applicant could have requested the revision of the Award under Article 51.[209] It appears based on the chronology that both avenues were available to the Applicant.[210]

150.    As regards Mr. Mourre's March 4, 2015 communication in *Favianca*, the Applicant could have requested the Tribunal prior to the issuance of its Award on March 10, 2015 to reopen the proceeding under Arbitration Rule 38(2) to entertain Mr. Mourre's disqualification in view of concerns expressed by the Applicant in its letter to the *Favianca* tribunal dated March 9, 2015.[211]

151.    Alternatively, the Applicant could have requested a revision of the Award on the basis of either (i) Mr. Mourre's communication of March 11, 2015 in *Favianca* as regards his "undisclosed prior negotiations" with Dechert which, according to the Applicant, "embody the elements that show Mr. Mourre's loss of impartiality"[212] or (ii) Mr. Mourre's resignation in *Favianca* and *Longreef* on March 16 and March 18, 2015 respectively, both of which represent the "discovery" of the "fact" of Mr. Mourre's purported lack of independence and impartiality.[213] Since both events post-date the issuance of the Award in the Underlying Arbitration, the condition under Article 51 for requesting revision would have been met.

152.    If the Applicant had raised the issue in the Underlying Arbitration under one of these other mechanisms, Mr. Mourre would have been requested to give his explanations in the context of the *OIEG* Arbitration which, under the scenario that in fact unfolded, were not provided.

---

[208] ICSID Arbitration Rule 38(2) provides: "Exceptionally, the Tribunal may, before the award has been rendered, reopen the proceeding on the ground that new evidence is forthcoming of such a nature as to constitute a decisive factor, or that there is a vital need for clarification on certain specific points."

[209] ICSID Convention Article 51 provides in pertinent part as follows: "(1) Either party may request revision of the award […] on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence." Under Article 51(2), the applicant must pursue revision within 90 days after the discovery of such new fact, but in any event within three years from the date of the Award. *See also Azurix v. Argentina*, ¶ 281 (OILA-89); *History*, p. 872.

[210] *See supra* Section III.B(2)a.

[211] *See supra* ¶ 114.

[212] Reply on Annulment, ¶ 57.

[213] The condition for the application of Article 51 is the "discovery of some fact of such a nature as decisively to affect the award." *See supra* footnote 209.

Such explanations likely would have been different than those he provided in *Favianca* in view of the timeline of that case, as compared to the *OEIG* Arbitration, and the timing of his never-consummated agreement with Dechert.[214] The advantage of either a reopening or revision would have been to allow the possibility for the members of the original tribunal to consider the Applicant's request.[215] Such an outcome would have been consistent with the letter and the spirit of the ICSID Convention and Arbitration Rules, as set forth and interpreted herein by the Committee.

153.    For these reasons and those detailed above in Section III.B(1)c, this Committee has found that the Applicant's charge of Mr. Mourre's lack of impartiality is inadmissible as a ground for annulment under Article 52(1)(a). Indeed, this Committee has concluded that the ICSID Convention provides other mechanisms for a party to seek redress in circumstances like those present in the Underlying Arbitration.

154.    Even if it were otherwise, the Committee has concluded in Section III.D(2)c below (addressing the grounds for annulment under Article 52(1)(d)) that the Applicant has failed to make a factual showing of a lack of impartiality. Further, even if the Applicant had established Mr. Mourre's partiality or appearance thereof, the Applicant has failed to establish, especially given the timeline of the allegations, that the alleged partiality had, or even could have had, an impact on the outcome of the unanimous Award. Rather, as elaborated in Section III.D(2)c below, the evidence strongly supports a conclusion that the Tribunal had already prepared "a complete draft of the Award"[216] even prior to *the start of* any negotiations between Mr. Mourre and Dechert. Not only does the alleged relationship fail to satisfy the disqualification standard, but also there has been no showing that the impugned relationship overlapped in time with the Tribunal's substantive deliberations.

---

[214] *See supra* ¶ 139 (as pointed out by OIEG, Mr. Mourre's professional relationship with Dechert was to start from May 2015, at which point the *Favianca v. Venezuela* case would still be active, while the Underlying Arbitration would have concluded); *supra* ¶ 142 (as argued by OIEG, Mr. Mourre's relationship with Dechert "would have overlapped in time with the proceedings in *Favianca and OIdV v. Venezuela* and in *Longreef v. Venezuela*, it could not have overlapped with the *OIEG* Arbitration").

[215] Rejoinder on Annulment, ¶¶ 45, 46.

[216] *See* Rejoinder on Annulment, ¶ 120, citing the Communication from the Secretary of the Underlying Arbitration to the Parties, December 8, 2014 (Exhibit OI-70).

155.    In this regard, as noted above, both Parties have invoked and addressed at length the
decision of the committee in *EDF v. Argentina*.[217] As also noted above, contrary to this
Committee's finding, the *EDF* committee held that a lack of the qualities "required under
Article 14(1) […] is [] a ground on which an award might be annulled under Article
52(1)(a)."[218] However, the *EDF* committee also concluded that:

> in a case in which an application for annulment is made on the basis
> that there were reasonable grounds to doubt the independence or
> impartiality of one of the arbitrators and no proposal for
> disqualification had been made before the proceedings were
> declared closed, the role of an *ad hoc* committee is to decide the
> following questions:-
>
> (a) was the right to raise this matter waived because the party
> concerned had not raised it sufficiently promptly ?
>
> (b) if not, has the party seeking annulment established facts the
> existence of which would cause a reasonable person, with
> knowledge of all the facts, to consider that there were reasonable
> grounds for doubting that an arbitrator possessed the requisite
> qualities of independence and impartiality ? and
>
> (c) if so, could the lack of impartiality or independence on the part
> of that arbitrator – assuming for this purpose that the doubts were
> well-founded – have had a material effect on the award ?[219]

156.    The Applicant has failed to establish either prong (b) or (c), as detailed below in
Section III.D(2)c. Thus, applying even this test, this Committee's decision to reject the
application for annulment under Article 52(1)(a) would remain undisturbed.

---

[217] *See, e.g.*, Reply on Annulment, ¶¶ 41-43, 76; Memorial on Annulment, ¶¶ 37-44; Rejoinder on Annulment, ¶ 53 and footnote 157.

[218] *EDF v. Argentina*, ¶ 127 (VLA-03).

[219] *Id.*, ¶ 136 (VLA-03).

## C.   THE TRIBUNAL HAS MANIFESTLY EXCEEDED ITS POWERS

### (1)   Legal Standard

#### a.   *Applicant's Position*

157.   In advancing its view that the Tribunal manifestly exceeded its powers, the Applicant argues that the Committee should adopt the two-step approach of the most recent and representative annulment decisions, first "determining whether there was an excess of powers and, if so, whether that excess was manifest."[220] The Applicant acknowledges that "[i]t is a dual requirement."[221]

158.   As for the ways in which a tribunal may exceed its powers, the Applicant contends that the excess may arise when a tribunal: (i) inappropriately exercises jurisdiction (or fails to exercise jurisdiction); or (ii) fails to apply the proper law.[222]

159.   With regard to (i) the "jurisdictional" excess of powers, the Applicant points out that multiple annulment committees have explained that awards can be annulled if tribunals (a) assume powers to which they are not entitled; or (b) do not use the powers that have been vested upon the tribunal by the parties.[223]

160.   Furthermore, the Applicant argues that in *MHS v. Malaysia*[224] the "committee noted that the analysis to be made by it with a view to determining whether there was actually a

---

[220] Memorial on Annulment, ¶¶ 69, 70, citing *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16 (Söderlund, Edward, Jacovides), Decision on the Argentine Republic's Application for Annulment of the Award, June 29, 2010 ("*Sempra v. Argentina*"), ¶ 212 (VLA-11); *Sociedad Anónima Eduardo Vieira v. Republic of Chile*, ICSID Case No. ARB/04/7 (Söderlund, Bernardini, Silva Romero), Decision on Annulment, December 10, 2010, ¶ 257 (VLA-12).

[221] Memorial on Annulment, ¶ 69, citing *CDC v. Seychelles*, ¶ 39 (VLA-10).

[222] Memorial on Annulment, ¶ 72. According to the Applicant, this position has been adopted by several committees, including, for example, in *Pey Casado v. Chile* and *Impregilo v. Argentina*. *See Pey Casado v. Chile*, ¶ 66 (VLA-16); *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17 (Oreamuno, Cheng, Zuleta), Decision of the *ad hoc* Committee on the Application for Annulment, January 24, 2014 ("*Impregilo v. Argentina*"), ¶ 125 (VLA-17).

[223] Memorial on Annulment, ¶¶ 73, 74. The Applicant relies on the annulment decisions in *Occidental v. Ecuador* and *Tza Yap Shum v. Peru*, among others. *See Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11 (Fernández-Armesto, Feliciano, Oreamuno), Decision on Annulment of the Award, November 2, 2015 ("*Occidental v. Ecuador*"), ¶¶ 50, 51 (VLA-18); *Mr. Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6 (Hascher, Hobér, McRae), Decision on Annulment, February 12, 2015, ¶ 76 (VLA-19).

[224] *Malaysian Historical Salvors Sdn, Bhd v. Malaysia*, ICSID Case No. ARB/05/10 (Schwebel, Shahabuddeen, Tomka), Decision on the Application for Annulment, April 16, 2009, ¶ 74 (VLA-20).

manifest excess of powers in asserting jurisdiction over a given issue must consist in a *de novo* review."[225]

161.   Regarding item (ii) above,[226] the Applicant explains that a "substantive" excess of powers happens when a tribunal "fail[s] to apply the proper law, since it would also be disregarding the powers granted to it by the parties."[227]

162.   As for the second requirement in the two-step approach, citing the annulment committees in *Sempra v. Argentina*[228] and *Soufraki v. UAE*,[229] the Applicant states that "manifest" means "clear," "plain," "obvious" or "evident" or easily understood or recognized by the mind.[230]

163.   However, the Applicant further argues that "the need for such excess to be clear does not mean that the committee must not analyze the arguments raised by the parties."[231] In this regard, the Applicant relies on the statement of the *Pey Casado v. Chile* committee that "extensive argumentation and analysis do not exclude the possibility of concluding that there is a manifest excess of power, as long as it is sufficiently clear and serious."[232] In similar words, the *Caratube v. Kazakhstan*[233] and *Occidental v. Ecuador*[234] committees also reiterated that the manifest requirement does not prevent that in some cases extensive argumentation and analysis may be required to prove that such a manifest excess of power has in fact occurred.

---

[225] Memorial on Annulment, ¶ 75.

[226] *See supra* ¶ 158.

[227] Memorial on Annulment, ¶¶ 77, 78, citing *Soufraki v. UAE*, ¶ 45 (VLA-02); *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8 (Guillaume, Crawford, Elaraby), Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, September 25, 2007 ("*CMS v. Argentina*"), ¶ 49 (VLA-24); *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7 (Guillaume, Crawford, Noriega), Decision on Annulment, March 21, 2007 ("*MTD v. Chile*"), ¶ 47 (VLA-25).

[228] *Sempra v. Argentina*, ¶ 211 (VLA-11).

[229] *Soufraki v. UAE*, ¶ 39 (VLA-02).

[230] Memorial on Annulment, ¶¶ 79, 80.

[231] Memorial on Annulment, ¶ 81.

[232] *Pey Casado v. Chile*, ¶ 70 (VLA-16).

[233] *Caratube v. Kazakhstan*, ¶ 84 (VLA-21).

[234] *Occidental v. Ecuador*, ¶¶ 57-59 (VLA-18).

164. Additionally, the Applicant cites Philippe Pinsolle,[235] who explains that:

> Manifest means obvious, but this adjective relates only to the excess of powers itself. Establishing the existence of an excess of powers, as distinct from assessing its degree, may not be obvious. If the word "manifest" relates to degree in which the tribunal exceeded its powers, it does not necessarily imply that the error (in our case, the excess of powers) must be detected easily.
>
> In other words, "manifest excess of powers" is not synonymous with "*prima facie* excess of powers".
>
> *Prima facie* review would mean that the excess of powers should be apparent on the face of the award, thereby limiting considerably the extent of review. If the review was a *prima facie* test only, competent drafting of the award would in all likelihood render it immune from subsequent challenge. This cannot be so, especially when jurisdictional issues are concerned. This never was, in any event, the practice of *ad hoc* committees.[236]

165. The Applicant further contends that the *EDF v. Argentina* committee confirmed that a tribunal's damages calculation may result in annulment if "in assessing damages, [it] manifestly exceeds its power by failing to apply (as opposed to arguably misapplying) the applicable law."[237]

166. In opposing OIEG's statement of the standard as biased and incorrect, the Applicant contends that OIEG "confuses the difference between an annulment proceeding and an appeal with the lack of an effective annulment proceeding."[238] As regards OIEG's invocation of *Kompetenz-Kompetenz* to assert that "the Committee cannot replace the tribunal's decision on jurisdiction with its own decision,"[239] the Applicant responds that it "does not and could not disregard the validity of [this] principle."[240] However, this does

---

[235] Memorial on Annulment, ¶ 71.

[236] Philippe Pinsolle, "Manifest Excess of Power and Jurisdictional Review of ICSID Awards," 2 Transnational Dispute Management, April 2005, p. 8 (VLA-14).

[237] Memorial on Annulment, ¶ 83, citing *EDF v. Argentina*, ¶ 368 (VLA-03).

[238] Reply on Annulment, ¶ 124.

[239] Reply on Annulment, ¶ 125.

[240] Reply on Annulment, ¶ 126.

not mean that the tribunal's decision on its own jurisdiction cannot be reviewed by an annulment committee.[241]

167.   The Applicant rejects OIEG's interpretation of the *MHS v. Malaysia* decision "in support of its unduly restrictive version of the grounds for annulment for manifest excess of powers."[242] In fact, according to the Applicant, the *MHS v. Malaysia* committee "firmly rejects OIEG's biased and restrictive approach, as it does not limit its review to the application or nominal invocation of certain legal rules, but it also analyzes the manner in which these rules were applied, and it is pursuant to this substantial analysis that it makes its decision" to annul the award on the grounds of manifest excess of powers.[243]

168.   For the Applicant, in addressing whether the applicable law was indeed applied or whether it was invoked in a way that lacked a real normative effect, it is not necessary that the Committee replace the Tribunal's judgment.[244] In fact, OIEG states that when a tribunal's decision on its jurisdiction is "reasonable or tenable," a committee must not substitute the tribunal's decision with its own and, "by saying this, OIEG recognizes that if the decision is unreasonable and untenable, a committee must replace such tribunal's decision on jurisdiction with its own."[245] According to the Applicant, "[t]he only way to determine whether the decision was 'reasonable or tenable' is to assess its content in relation to the applicable legal rules, the positions of the parties and the evidence in the file."[246]

169.   In this regard, the Applicant also notes that the *Occidental v. Ecuador*[247] committee, while affirming the difference between annulment proceedings and appeals, nevertheless performed "a detailed analysis of the content of the decision in view of the applicable laws and proven facts of the case, which led it to partially annul the award."[248]

---

[241] Reply on Annulment, ¶ 126.

[242] Reply on Annulment, ¶ 128.

[243] Reply on Annulment, ¶ 130. *See also* Reply on Annulment, ¶¶ 131, 132. According to the Applicant, this was clearly explained also by the annulment committee in *Patrick Mitchell v. Congo*, ¶¶ 45-48 (VLA-51).

[244] Reply on Annulment, ¶ 134.

[245] Reply on Annulment, ¶ 136.

[246] Reply on Annulment, ¶ 137.

[247] *Occidental v. Ecuador*, ¶¶ 56, 262-266 (VLA-18).

[248] Reply on Annulment, ¶ 140.

### b. *Respondent on Annulment's Position*

170. The Respondent on Annulment agrees with the Applicant that, to establish this ground for annulment, the Applicant must prove that (a) the Tribunal exceeded its powers and (b) the excess was manifest.[249]

171. With regard to the ways in which a tribunal may exceed its powers, OIEG also agrees that this may be done in two ways: (a) by inappropriately exercising jurisdiction (or failing to exercise its jurisdiction), and/or (b) by failing to apply the proper law.[250]

172. However, OIEG disagrees with the Applicant's position as to the scope of review that a committee may undertake to determine whether a tribunal manifestly exceeded its powers.[251]

173. As for a jurisdictional excess of powers and the standard of review of a tribunal's decision on its competence, OIEG first recalls that Article 41 of the ICSID Convention embraces the general legal principle of *Kompetenz-Kompetenz* and argues that a committee may only annul an award if the tribunal's decision on jurisdiction is manifestly wrong or untenable.[252]

174. In this regard, OIEG cites the annulment decision in *Soufraki v. UAE*, according to which "the requirement that an excess of power must be 'manifest' applies equally if the question is one of jurisdiction."[253] OIEG notes that the explanation in *Soufraki v. UAE* has been confirmed and adopted by several other committees including *Azurix v. Argentina*, *Enron v. Argentina* and *Total v. Argentina*.[254]

---

[249] Counter-Memorial on Annulment, ¶ 165; Rejoinder on Annulment, ¶ 132.

[250] Counter-Memorial on Annulment, ¶ 166; Rejoinder on Annulment, ¶ 132.

[251] Rejoinder on Annulment, ¶ 132.

[252] Counter-Memorial on Annulment, ¶¶ 167, 168; Rejoinder on Annulment, ¶ 137.

[253] *Soufraki v. UAE*, ¶¶ 118, 119 (VLA-02).

[254] *Azurix v. Argentina*, ¶¶ 63-68 (OILA-89); *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3 (Griffith, Robinson, Tresselt), Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award (Rule 54 of the ICSID Arbitration Rules), October 7, 2008 ("*Enron v. Argentina*"), ¶ 69 (OILA-88); *MTD v. Chile*, ¶ 47 (VLA-25); *Total v. Argentina*, ¶ 242 (OILA-74).

175.   Contrary to what the Applicant argues, OIEG states that the analysis of the committee must not consist of a *de novo* review and contends that the Applicant has misinterpreted the annulment decision in *MHS v. Malaysia* on which it relies.[255] OIEG further argues that committees "consistently have refused to annul awards in which a tribunal's assumption of jurisdiction was sensible or defensible"[256] and quotes the decision in *Rumeli v. Kazakhstan*, which observed:

> An *ad hoc* committee is not a court of appeal and cannot therefore enter, within the bounds of its limited mission, into an analysis of the probative value of the evidence produced by the parties …. Indeed, this is why the Award can only be annulled for a ***manifest*** excess of powers. Such lack of jurisdiction should have been evident on the face of the award and should not require the Committee to reconsider the evidence put before the Tribunal.
>
> […]
>
> [a]n *ad hoc* committee will not annul an award if the tribunal's approach is reasonable or tenable, even if the committee might have taken a different view on a debatable point of law.[257]

176.   With respect to a substantive excess of powers, OIEG objects to the Applicant's claim that a committee should investigate the "manner" in which the proper law was applied and determine whether it was applied "effectively."[258] On the contrary, OIEG asserts that "it is well established in ICSID jurisprudence that only the complete failure to identify and apply the correct body of law" – and not an error in the application of law – "can constitute annullable error" under Article 52(1)(b).[259]

---

[255] Counter-Memorial on Annulment, ¶ 171. *See also* Rejoinder on Annulment, ¶¶ 139, 140.

[256] Counter-Memorial on Annulment, ¶ 172.

[257] *Rumeli Telekom AS and Telsim Mobil Telekomunikasyon Hizmetleri AS v. Kazakhstan*, ICSID Case No. ARB/05/16 (Schwebel, McLachlan, Silva Romero), Decision of the *ad hoc* Committee on the Application for Annulment, March 25, 2010 ("*Rumeli v. Kazakhstan*"), ¶ 96 (VLA-34) (emphasis in original).

[258] Rejoinder on Annulment, ¶ 147 referring to the Reply on Annulment, ¶¶ 130-135.

[259] Counter-Memorial on Annulment, ¶ 176. *See also* Rejoinder on Annulment, ¶¶ 146-149.  The Respondent on Annulment cites as examples, the annulment decisions in *MCI Power Group v. Ecuador*, *CDC v. Seychelles*, and *Continental Casualty v. Argentina*, among others. *See M.C.I. v. Ecuador*, ¶ 42 (VLA-23); *CDC v. Seychelles*, ¶ 43 (VLA-10), citing *Maritime International Nominees Establishment v. Republic of Guinea*, ICSID Case No. ARB/84/4 (Sucharitkul, Broches, Mbaye), Decision on the Application by Guinea for Partial Annulment of the Arbitral Award dated January 6 1988, December 14, 1989 ("*MINE v. Guinea*"), ¶ 5.04 (OILA-23); *Continental Casualty Company v.*

177.   The Respondent on Annulment further notes that, given that an annulment proceeding is not concerned with the substantive correctness of the award, the annulment committee is not empowered to correct an error of law "no matter how egregious."[260] Rather, citing the annulment decision in *MTD v. Chile*, OIEG contends that the committee's inquiry should be limited to a "determination of whether or not the Tribunal endeavoured to apply" the applicable law.[261]

178.   In relation to the second requirement that the excess be "manifest," the Respondent on Annulment agrees with the Applicant that a tribunal's excess of powers must be "clear," "plain," "obvious" or "evident."[262] However, in response to the Applicant's argument that this requirement does not preclude an assessment of extensive argumentation or analysis in certain cases, OIEG points out that "even if this position were accepted, it would not relax in any way the fundamental requirement that the excess of powers must be 'manifest.'"[263]

179.   Finally, citing the annulment decision in *Soufraki v. UAE*, OIEG contends that to qualify as manifest the excess of powers must be both "textually obvious and substantively serious."[264] Moreover, relying on the decisions in *Sempra v. Argentina* and *Patrick Mitchell v. Congo*, OIEG asserts that in order to find a manifest excess of powers, a committee must

---

*Argentine Republic*, ICSID Case No. ARB/03/9 (Griffith, Ajibola, Söderlund), Decision on the Application for Partial Annulment of Continental Casualty and Decision on the Application for Partial Annulment of the Argentine Republic, September 16, 2011 ("*Continental Casualty v. Argentina*"), ¶ 91 (OILA-115).

[260] Counter-Memorial on Annulment, ¶ 179, citing The ICSID Convention: A Commentary, p. 902, ¶ 13 (OILA-144). Prof. Schreuer also made the point that an annulment committee is not empowered to correct an "error of fact" as well as an "error of law." *See also id.*, ¶ 60.

[261] Counter-Memorial on Annulment, ¶¶ 180, 181; *MTD v. Chile*, ¶ 45 (VLA-25).

[262] Counter-Memorial on Annulment, ¶ 182; Rejoinder on Annulment, ¶ 154.

[263] Counter-Memorial on Annulment, ¶ 183. *See also* Rejoinder on Annulment, ¶¶ 155-157, where OIEG contends that the Applicant's reliance in this regard on the annulment decision in *Occidental v. Ecuador* is misplaced. For OIEG, the *Occidental v. Ecuador* committee "limited itself to reviewing the reasoning of the tribunal on the face of the award and to undertaking a *prima facie* assessment of the tribunal's application of the applicable law." Rejoinder on Annulment, ¶ 156.

[264] Counter-Memorial on Annulment, ¶ 184. *See Soufraki v. UAE*, ¶ 40 (VLA-02). The Respondent on Annulment also refers to *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15 (Oreamuno, Cheng, Knieper), Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, September 22, 2014 ("*El Paso v. Argentina*"), ¶ 140 (OILA-116).

do so with "certainty and immediacy, without it being necessary to engage in elaborate analyses of the award."[265]

### c. *The Committee's Analysis*

180.    There is no contention between the Parties regarding the fact that a manifest excess of powers may derive either from a jurisdictional or substantive source. Nor is there any disagreement regarding the fact that this ground calls for a two-step process, first determining whether there was an excess of powers and then whether it was manifest. This process has been adopted by several annulment committees including *Sempra v. Argentina*, *Fraport v. Philippines*, *Occidental v. Ecuador* and *Total v. Argentina*.[266] The Committee shares this view and will therefore apply it.

181.    The Committee concurs with the Parties and confirms that a manifest excess of powers may arise as regards a jurisdictional determination, where a tribunal either fails to exercise jurisdiction when it should have or exercises jurisdiction when it should not have.

182.    In determining whether a tribunal exceeded its powers in the jurisdictional sphere, two principles, which are deeply engrained in the Convention and have been confirmed in numerous proceedings, are paramount: (i) *Kompetenz-Kompetenz* and (ii) an annulment is not an appeal.

183.    Although the principle of *Kompetez-Kompetez* does not shield the Tribunal's decision on its own competence from scrutiny, the principle favors a presumption of deference to the Tribunal as regards its decision. Taken together with the fact that this process must not be treated as an appeal, it is clear that the Committee cannot conduct a *de novo* analysis of the reasoning underlying the Tribunal's jurisdictional decision. On the contrary, and in line with the ICSID Convention's use of the word "manifest" in setting forth this ground for

---

[265] Counter-Memorial on Annulment, ¶ 185; *Patrick Mitchell v. Congo*, ¶ 20 (OILA-95); *Sempra v. Argentina*, ¶ 213 (OILA-109). *See also* Rejoinder on Annulment, ¶¶ 158, 159, citing *CDC v. Seychelles*, ¶ 41 (VLA-10); *Azurix v. Argentina*, ¶ 68 (OILA-89); *Repsol YPF Ecuador, S.A. v. Empresa Estatal Petróleos del Ecuador (Petroecuador)*, ICSID Case No. ARB/01/10 (Kessler, Bernardini, Biggs), Decision on the Application on Annulment, January 8, 2007 ("*Repsol v. Petroecuador*") (VLA-36).

[266] *Sempra v. Argentina*, ¶ 212 (OILA-109); *Fraport v. Philippines*, ¶¶ 39, 40 (VLA-30); *Occidental v. Ecuador*, ¶ 57 (VLA-18); *Total v. Argentina*, ¶¶ 171, 172 (OILA-74).

annulment, it is only where the Tribunal's jurisdictional decision is untenable or unreasonable, that the Committee may annul the award, if it is to preserve the above-cited principles of the ICSID Convention.

184.    Despite their agreement that a manifest excess of power may be of a substantive nature, the Parties fail to agree on how a Tribunal might exceed its powers regarding the application of the law. Whereas the Applicant maintains that a committee should investigate the "manner" in which the proper law was applied and determine whether it was applied "effectively,"[267] OIEG contends that "it is well established" that "only the complete failure to identify and apply the correct body of law" "can constitute annullable error."[268] Thus, OIEG urges this Committee to find that an error in the application of law, even if serious, is insufficient to give rise to annulment for manifest excess of powers.[269]

185.    Consistent with OIEG's position[270] and that adopted by several other committees in cases such as *Enron v. Argentina*, *MTD v. Chile*, and *CMS v. Argentina*,[271] this Committee finds that an excess of powers of substantive nature may arise only from a complete failure to apply the correct body of law. As is clear from the drafting history of the ICSID Convention, the intention underlying this specific ground for annulment was to exclude the possibility of annulling an award based on an erroneous application of the law:

> Chairman Broches confirmed during the meetings that failure to apply the proper law could amount to an excess of power if the parties had agreed on an applicable law. One proposal suggested adding the "manifestly incorrect application of the law" by the Tribunal as a ground of annulment, but it was defeated by a vote of 17 to 8.[272]

186.    Moreover, if this Committee were to delve into how the Tribunal applied the law in the Underlying Arbitration and base its decision on that assessment, the Committee would

---

[267] Reply on Annulment, ¶¶ 130, 131.

[268] Counter-Memorial on Annulment, ¶ 176. *See also* Rejoinder on Annulment, ¶¶ 146-149.

[269] Rejoinder on Annulment, ¶ 152.

[270] *See supra* ¶ 176.

[271] *Enron v. Argentina*, ¶ 218 (OILA-88); *MTD v. Chile*, ¶¶ 44, 47 (VLA-25); *CMS v. Argentina*, ¶ 49 (OILA-126).

[272] 2016 ICSID Paper, ¶ 21 (OILA-117). *See also id.*, ¶ 15.

improperly transform this procedure into one that is in the nature of an appeal. Instead, the Committee's role in evaluating an application for annulment for manifest excess of powers is limited, as follows:

> in determining whether a tribunal has committed a manifest excess of powers, an annulment committee is not empowered to verify whether a tribunal's jurisdictional analysis or a tribunal's application of the law was correct, but only whether it was tenable as a matter of law. Even if a committee might have a different view on a debatable issue, it is simply not within its powers to correct a tribunal's interpretation of the law or assessment of the facts.[273]

187.    Lastly, as previously suggested, this Committee believes "manifest" to mean "obvious," "evident," or "plain," as the Parties' themselves appear to have agreed.[274] This approach, by its nature, excludes the possibility of a "manifest" excess of powers which cannot be detected relatively easily. Therefore, for an excess of power to be considered manifest, while some degree of inquiry and analysis may be required, it must not require a deep and complex analysis to be perceived. On the contrary, the excess must be evident to the Committee without difficulty.

### (2)    Application of the Legal Standard to the Present Case

#### a.    Applicant's Position

188.    According to the Applicant, the Tribunal manifestly exceeded its powers by (i) asserting jurisdiction without deciding on Venezuela's objections and (ii) failing to apply the proper law in calculating the compensation.

> (i) *The Tribunal manifestly exceeded its powers in asserting jurisdiction without deciding on Venezuela's objections*

189.    The Applicant asserts that the Tribunal manifestly exceeded its powers in asserting jurisdiction in three aspects.

---

[273] *See*, *e.g.*, *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23 (Hanotiau, Oyekunle, Sachs), Decision on Annulment, April 5, 2016 ("*TECO v. Guatemala*"), ¶ 78 (VLA-49).

[274] Memorial on Annulment, ¶¶ 79-81; Counter-Memorial on Annulment, ¶ 182.

190.    The first aspect in which the Tribunal manifestly exceeded its powers refers to the Tribunal's rejection of Venezuela's objection based on the lack of investment. The Tribunal acknowledged that, according to the applicable law, the alleged investment must not only meet the characteristics specified in the BIT but also the objective concept of investment set forth in Article 25(1) of the ICSID Convention, which requires the identification of a contribution by the investor.[275]

191.    In this regard, the Applicant explains that the Tribunal identified two contributions. The first was undistributed reserves, that is, OIEG's decision not to withdraw its share of the Companies' profits and instead keep that share as undistributed reserves. However, the Applicant argues that in the Award "[t]here is no explanation as to how the creation of a reserve […] may constitute a contribution to the Companies, […] since the reserves are created from funds of those Companies and no transfer of funds from [OIEG] to the Companies […] may be identified."[276]

192.    For the Applicant, "the Tribunal's decision on this matter is not supported by any applicable rule or legal authority allowing us to claim that the lack of active cash contribution –at least at the beginning of the alleged investment, in the Tribunal's own terms– can be replaced with a potential – and passive – withdrawal of funds at a later time."[277] On the contrary, "compensating for the lack of real contributions using alleged contributions consisting in the lack of transfer of dividends would otherwise lead to the fact that merely nominal changes in equity securities could be sufficient to assume the status of protected international investor."[278]

193.    The Applicant notes that the Tribunal found that OIEG also contributed by managing the companies, indirectly, since 2002, and directly, since 2005.[279] This contribution was made

---

[275] Reply on Annulment, ¶¶ 151, 152.

[276] Memorial on Annulment, ¶ 87. *See also* Reply on Annulment, ¶¶ 153-158.

[277] Reply on Annulment, ¶ 166.

[278] Reply on Annulment, ¶ 166. The Applicant adds that "[t]his is even worse when we realize that there is no evidence in the file –indeed, no evidence to which the Tribunal has referred in the Award– which allows us to contend that OIEG failed to transfer dividends as a means to reinvest in the economic flows of the Venezuelan companies." Reply on Annulment, ¶ 167.

[279] Memorial on Annulment, ¶ 87.

by participating and voting in shareholders' meetings, and appointing directors and managers of the Companies.[280] However, the Applicant contends that the Tribunal failed "to make any specific reference to the alleged appointments of directors and managers to which it refers or to how those appointments may have actually impacted on the performance of the companies."[281]

194.    For the Applicant, these defects "manifestly" arise from a reading of the Award[282] and are key to the determination of the rights of the Parties to the Underlying Arbitration.[283]

195.    The second aspect in which the Tribunal is alleged to have manifestly exceeded its jurisdiction refers to the Tribunal's finding that OIEG "suffered losses in the Brazilian market without first addressing the objection put forward by the Republic."[284] That objection was based on the fact that the alleged damages related to assets that do not belong to OIEG, since they were owned by another company of the Owens-Illinois group of companies (the "**OI Group**") that was not a party to the Underlying Arbitration.

196.    The Applicant explains that the Tribunal stated that this objection could not be separated from the substance of the dispute and that the claim would be addressed once the existence of an expropriation is found and in the context of the determination of the compensation due. However, the Tribunal later failed to make any observation on the objection.[285]

197.    The third and last aspect with respect to which the Applicant alleges a manifest excess of powers is related to the parallel proceeding in *Favianca v. Venezuela*. Given that the BIT at issue and the object of that proceeding and the Underlying Arbitration "are exactly the same," Venezuela requested that the *Favianca v. Venezuela* proceeding be stayed.[286]

---

[280] Memorial on Annulment, ¶ 87.

[281] Memorial on Annulment, ¶ 87. *See* Reply on Annulment, ¶ 160. In response to OIEG's argument that the Tribunal did in fact carefully consider the evidence on the record to conclude that OIEG had been managing the Companies, the Applicant contends that none of the paragraphs of the Award referred to by OIEG "refer[s] to the management acts that the Tribunal should have established." Reply on Annulment, ¶ 173.

[282] Reply on Annulment, ¶¶ 162, 163.

[283] Reply on Annulment, ¶ 164.

[284] Memorial on Annulment, ¶ 88, referring to ¶ 259 of the Award.

[285] Memorial on Annulment, ¶ 90. *See also* Reply on Annulment, ¶¶ 176, 177.

[286] Memorial on Annulment, ¶ 91.

However, in the Award "the Tribunal refused to come to a decision on the existence of this parallel proceeding and attempted instead to hold that the Republic did not make any claim in this regard."[287] In this sense, the Tribunal failed to decide on the objection raised by Venezuela, "which was clearly within its jurisdiction, which entails the serious risk that [Venezuela] be held liable twice for the same act."[288]

### (ii) The Tribunal exceeded its powers by failing to apply the proper law in calculating the compensation

198.    The Applicant argues that, in calculating the damages, the Tribunal disregarded "the basic principle establishing that the discount rate to be considered must reflect the time value of money."[289] For the Applicant, the rate applied by the Tribunal results in a negative discount rate for the first four years and, as explained by the expert Daniel Flores, a negative discount rate "runs afoul of the fundamental economic principle of the time value of money."[290]

199.    In addition, the Applicant states that, "even though the Tribunal maintains that it is carrying out a valuation based on the 'market value', that is not the standard actually applied. Thus, the Tribunal failed to apply the standard suggested by it and exceeded its powers."[291]

200.    Finally, in response to OIEG's attempt to attack the credibility of the expert Daniel Flores on the basis that he has been retained on various occasions as an expert by Venezuela, the Applicant reaffirms Mr. Flores' independence and points out that (i) Econ One bills the time spent by its staff in this and all other international arbitrations involving Venezuela and PDVSA according to pre-set hourly rates and, therefore, its compensation is not linked

---

[287] Memorial on Annulment, ¶ 93.

[288] Memorial on Annulment, ¶ 94. *See also* Reply on Annulment, ¶ 178. There, the Applicant adds that "[t]he Tribunal, applying the law applicable to the dispute, should have suspended this proceeding when the parallel arbitration began, or it should have consolidated both proceedings in order to prevent the Republic from wasting time and money due to the duplication of claims for compensation attempted by OIEG. By not doing so, the Tribunal manifestly exceeded its powers."

[289] Memorial on Annulment, ¶ 95.

[290] First Econ One Report, ¶ 13. For the Applicant, "this total disregard for the most fundamental financial principles cannot be justified –as OIEG tries to do– by referring to an alleged concession made by the Republic's valuation expert during the proceeding." Reply on Annulment, ¶ 181.

[291] Memorial on Annulment, ¶ 100, referring to ¶ 646 of the Award.

to the outcome of the proceedings; and (ii) matters involving Venezuela and PDVSA represent a very small fraction of Econ One's billings.[292]

### b. *Respondent on Annulment's Position*

#### (i) *The Tribunal did not manifestly exceed its powers in asserting jurisdiction*

> ➢ The Tribunal did not manifestly exceed its powers in holding that OIEG had a covered investment under the BIT and the ICSID Convention

201.   According to OIEG, the Tribunal's decision that OIEG's assets qualified as investments under both the BIT and the ICSID Convention "is eminently reasonable:"

> [T]here can be no doubt that the Tribunal "correctly identified the applicable law, and strove to apply it to the facts that it established". In paragraphs 196 to 206 of the Award, the Tribunal established the relevant "proven facts". In paragraphs 207 to 211, it correctly identified the "applicable law". In paragraphs 212 to 232, it methodically and logically analysed the "the concept of investment" and applied its findings on the law to the facts of the case. There is, therefore, "no room for annulment".[293]

202.   OIEG argues that "it is disingenuous for the Applicant to suggest that the Tribunal considered the requirement that the investor bringing a claim must have made a contribution to the investment to be an essential component of the applicable law."[294] On the contrary, OIEG asserts that the Tribunal made clear that that requirement was a secondary, peripheral issue and only analyzed it after having already concluded that the assets qualified as an investment both under the BIT and the ICSID Convention.[295]

203.   OIEG points out that the Applicant's arguments regarding the lack of contribution refer to the Tribunal's failure to refer to specific evidence on the record.[296] In this regard, OIEG contends that these arguments from the Applicant "make abundantly clear that its true

---

[292] Reply on Annulment, ¶ 185, citing Second Econ One Report, ¶ 6.

[293] Rejoinder on Annulment, ¶ 173 (internal references omitted). *See also id.*, ¶¶ 163-172. *See also* Counter-Memorial on Annulment, ¶ 186.

[294] Rejoinder on Annulment, ¶ 175.

[295] Rejoinder on Annulment, ¶ 175. *See also id.*, ¶¶ 176-179. *See also* Counter-Memorial on Annulment, ¶¶ 191-197.

[296] Rejoinder on Annulment, ¶¶ 182, 183, referring to Reply on Annulment, ¶¶ 153, 160.

complaint relates to the Tribunal's assessment and identification of the evidence on the record."[297] Yet, previous annulment committees have confirmed that "neither disagreement with a tribunal's assessment of the evidence nor an alleged failure to specify the evidence on which a specific finding is based can possibly constitute a manifest excess of powers under Article 52(1)(b) of the ICSID Convention."[298]

204. Furthermore, OIEG argues that the Applicant's arguments also fail as a matter of fact, since the Tribunal reached its conclusion regarding the existence of two contributions (OIEG's decision not to withdraw its share of the Companies' profits and instead to keep that share as undistributed reserves; and OIEG's management of the Companies) on the basis of specific evidence before the Tribunal.[299]

> ➤ The Tribunal did not manifestly exceed its powers by exercising its jurisdiction in relation to the issue of the consequential losses in the Brazilian market

205. OIEG rejects the Applicant's contention that the Tribunal failed to address or decide on the jurisdictional objection regarding Venvidrio's entrance into the Brazilian market.[300] OIEG explains that the Tribunal found that OIEG's claim for additional damages resulting from Venvidrio's exports was intrinsically linked to the existence of a breach and, as a result, decided that it would address the Applicant's objection in the context of the determination of the compensation due.[301] OIEG points out that the Tribunal expressly "reject[ed] the two jurisdictional defences raised by Venezuela, and rule[d] that the Centre has jurisdiction and the Tribunal itself has jurisdiction."[302] In accordance with this decision, in the section of

---

[297] Rejoinder on Annulment, ¶ 184. *See also id.*, ¶¶ 180-183.

[298] Rejoinder on Annulment, ¶ 184. OIEG cites, among others, the decisions in *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9 (Bernardini, Khan, van Haersolte-van Hof), Decision on Annulment, January 15, 2016 ("*Adem Dogan v. Turkmenistan*"), ¶¶ 129, 130 (VLA-46); *Wena Hotels v. Egypt*, ¶ 65 (VLA-29); *Rumeli v. Kazakhstan*, ¶ 96 (VLA-34); *CDC v. Seychelles*, ¶¶ 59-61 (VLA-10); *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13 (Hanotiau, Böckstiegel, Khan), Decision on Annulment, July 10, 2014 ("*Alapli v. Turkey*"), ¶ 76 (VLA-27).

[299] Rejoinder on Annulment, ¶¶ 188-193. *See also* Counter-Memorial on Annulment, ¶¶ 199-207.

[300] Counter-Memorial on Annulment, ¶ 209.

[301] Counter-Memorial on Annulment, ¶ 215.

[302] Rejoinder on Annulment, ¶ 198, citing Award, ¶ 268.

the Award devoted to "Additional Damages," the Tribunal reverted to the objection raised by the Applicant[303] and rejected OIEG's claim:

> In summary, the Tribunal considers that the effect of the exports that Venvidrio has begun is already duly included in the DCF model and that Claimant has not been able to demonstrate the existence of any additional damage for this reason. The burden of proof being on OIEG, the Tribunal rejects the claim.[304]

206. OIEG further argues that, even if the Tribunal had not ruled on the Applicant's jurisdictional objection (*quod non*), "the Tribunal's finding on the merits rendered moot the Applicant's jurisdictional objection"[305] and that, in any event, the Applicant has failed "to ident[ify] any manifest excess of powers in the Tribunal's ruling on the Respondent on Annulment's claim for additional damages resulting from the exports by Venvidrio to Brazil."[306]

> ➢ The Tribunal did not manifestly exceed its powers by not staying the proceedings

207. OIEG argues that the Applicant's arguments in this regard "[are] based on a misrepresentation of the facts with respect to both the *OIEG* Arbitration and the *Faviana and OIdV v. Venezuela* arbitration."[307]

208. According to OIEG, the Tribunal's actions in this regard were entirely proper and cannot lead to the annulment of the Award given that: (i) in the Underlying Arbitration, the Applicant made only one objection with respect to the *Faviana v. Venezuela* arbitration on November 27, 2012, requesting that the Tribunal suspend the proceedings for no less than three months due to its initiation;[308] and (ii) upon the Tribunal's rejection of this suspension request the Applicant stated that it reserved all its rights in this regard, after

---

[303] Counter-Memorial on Annulment, ¶¶ 213, 214, referring to ¶¶ 882, 886, 892, 893 of the Award. *See also* Rejoinder on Annulment, ¶¶ 197-199.

[304] Award, ¶ 893.

[305] Counter-Memorial on Annulment, ¶ 217.

[306] Counter-Memorial on Annulment, ¶ 218.

[307] Counter-Memorial on Annulment, ¶ 222.

[308] Counter-Memorial on Annulment, ¶ 223.

which the Applicant never raised the *Favianca v. Venezuela* arbitration again, whether to object to the Tribunal's jurisdiction or for any other reason.[309]

> *(ii) The Applicant has failed to demonstrate that the Tribunal manifestly exceeded its powers when determining the amount of compensation*

209.    OIEG contends that the Applicant's arguments in this respect have no basis in law or fact.[310]

210.    First, OIEG points out that "[w]hile the Applicant may disagree with the end result of the methodology that the Tribunal adopted with respect to the calculation of damages, that does not mean that the Tribunal failed to identify and apply the correct body of law."[311] In fact, the Tribunal duly identified and applied the proper law (the compensation standard in Article 6(c) of the BIT) when determining the compensation.[312] OIEG further notes that, even though the Applicant invokes "'basic economic principles' and argues that they constitute the 'correct body of law', but it does not even attempt to explain, much less prove, how such 'basic economic principles' constitute a 'body of law.'"[313]

211.    In any event, OIEG contends that the Applicant's arguments also fail as a matter of fact. OIEG states that "[t]o the extent that 'basic principles of economic and financial calculation' are even an applicable body of law (*quod non*), the Applicant's position, aided and abetted by Dr Flores, betrays a fundamental misunderstanding of both those principles and what the Tribunal did in its Award."[314]

212.    In this regard, OIEG argues that the Tribunal's calculation of damages pursuant to Article 6(c) of the BIT was in all respects in full compliance with basic economic principles[315] and

---

[309] Counter-Memorial on Annulment, ¶ 224. *See also* Rejoinder on Annulment, ¶ 201.

[310] Rejoinder on Annulment, ¶ 205.

[311] Rejoinder on Annulment, ¶ 205.

[312] Rejoinder on Annulment, ¶ 207; Counter-Memorial on Annulment, ¶ 236.

[313] Counter-Memorial on Annulment, ¶ 237; Rejoinder on Annulment, ¶ 207.

[314] Rejoinder on Annulment, ¶ 208.

[315] Counter-Memorial on Annulment, ¶ 237. *See also id.*, ¶¶ 230-236.

Case 1:16-cv-01533-ABJ   Document 52-1   Filed 12/10/18   Page 75 of 135

notes that the Tribunal adopted the methodology advocated by the Applicant's own expert to determine the fair market value of OIEG's Investment, that is, the DFC methodology.[316]

213.   OIEG further explains that in applying this DCF methodology, the Tribunal discussed in detail the discount rate that it applied,[317] which, for OIEG, "took account of the time value of money."[318]

214.   In response to the Applicant's argument that the discount rate used to value a company cannot be negative, since that would run afoul of the fundamental economic principle of the time value of money, OIEG states the following:

> As Messrs Kaczmarek and Shopp explain in the Navigant Report: (a) the discount rate method employed by the Tribunal is wholly consistent with basic economic principles; (b) Dr Flores miscalculated the difference between his preferred discount rate method and the discount rate method employed by the Tribunal; and (c) Dr Flores's discount rate is inconsistent with the conclusions of both Parties' experts in the *OIEG* Arbitration.[319]

215.   Finally, OIEG contends that no credence should be given to Econ One's expert reports given the "dependency of both Dr Flores and his firm [on] the Applicant."[320]

### c.   The Committee's Analysis

216.   The Committee will address, under the ground set forth in Article 52(1)(b) of the ICSID Convention: (i) if the Tribunal manifestly exceeded its powers in asserting jurisdiction without deciding on certain of Venezuela's objections; and then, (ii) if the Tribunal manifestly exceeded its powers by failing to apply the proper law in calculating the compensation.

---

[316] Counter-Memorial on Annulment, ¶ 239.

[317] Counter-Memorial on Annulment, ¶ 240.

[318] Counter-Memorial on Annulment, ¶ 240.

[319] Counter-Memorial on Annulment, ¶ 241 (internal references omitted). These arguments are further developed in ¶¶ 242-244 and in the Rejoinder on Annulment, ¶¶ 210-227.

[320] Counter-Memorial on Annulment, ¶ 245. *See also* Rejoinder on Annulment, ¶ 228.

> *(i)  The Applicant has failed to establish that the Tribunal manifestly exceeded its powers in asserting jurisdiction*

217.   Even if this Committee were to find attractive the line of argument as regards whether the Tribunal did or did not address the jurisdictional objections posed by the Applicant in the Underlying Arbitration, a review of the Award in its relevant sections makes plain that no ground for annulment can be sustained on this basis, particularly in view of the fact that the Parties themselves concur that this Annulment is not an appeal.

218.   With respect to the question of the existence of an investment under the BIT and ICSID Convention, Respondent on Annulment asserts that

> there can be no doubt that the Tribunal "correctly identified the applicable law, and strove to apply it to the facts that it established". In paragraphs 196 to 206 of the Award, the Tribunal established the relevant "proven facts". In paragraphs 207 to 211, it correctly identified the "applicable law". In paragraphs 212 to 232, it methodically and logically analysed the "the concept of investment" and applied its findings on the law to the facts of the case.[321]

219.   The Committee agrees. It has undertaken an independent analysis of the above-referenced paragraphs of the Award, as well as, for example, paragraphs 245 and 246 identifying OIEG's specific contributions, and paragraphs 238 and 241 setting forth the rationale for the Tribunal's finding on OIEG's contributions. On this basis, the Committee cannot conclude other than that the Tribunal did, in fact, conduct a reasonable analysis as regards what constitutes an investment under both the BIT and ICSID Convention, regardless as to whether the Committee agrees, or not, with such analysis.

220.   Further, this Committee subscribes to the position, as posited by the Respondent on Annulment citing several prior committee decisions,[322] that neither disagreement with a tribunal's assessment of the evidence, nor a failure to specify the evidence on which a

---

[321] Rejoinder on Annulment, ¶ 173 (internal references omitted). *See also id.*, ¶¶ 163-172; Counter-Memorial on Annulment, ¶ 186

[322] *See supra* ¶ 203 and footnote 298.

specific finding is based, constitutes a manifest excess of powers under Article 52(1)(b) of the ICSID Convention.

221.   In regard to the allegation that the Tribunal found that OIEG suffered losses in the Brazilian market without first addressing the Republic's objection as regards such claims, this Committee considers that the Tribunal did address the Applicant's jurisdictional objection when it expressly rejected such objection in paragraph 268 of the Award. Further, the Tribunal decided, as summarized in paragraph 893 of the Award, that the effect of Venvidrio's exports was already included in the DCF model and that the Claimant had not been able to demonstrate the existence of any additional damage, adding even that the burden of proof was on OIEG, and consequently, the Tribunal rejected the corresponding claim.

222.   Finally, the Committee does not find convincing the argument that the Tribunal's failure to stay the proceedings, notwithstanding the "parallel" *Favianca v. Venezuela* proceeding, constituted a manifest excess of powers. As argued by the Respondent on Annulment, and as is evident from a reading of the pertinent sections of the Award, especially its Section V concerning jurisdictional objections, the Tribunal rejected the requested suspension, and the Applicant reserved all its rights with respect to the "initiation of the parallel proceeding and its impact on the present dispute,"[323] after which the Applicant never again raised the *Favianca v. Venezuela* arbitration, neither as a basis on which to object to the Tribunal's jurisdiction or for any other reason.[324]

223.   These circumstances are set out and addressed in paragraph 175 of the Award, and there is no evidence in the file of the Underlying Arbitration that could lead this Committee to conclude that the Tribunal's evaluation and statement of the circumstances is not true to the facts.

224.   Consequently, for the above reasons, including in particular that this Committee does not serve as an appeal body that is authorized to consider the correctness of the Tribunal's

---

[323] Award, ¶ 175.

[324] *Id.*

reasoning, this Committee rejects the Applicant's above-reviewed arguments that the Tribunal manifestly exceeded its powers in asserting jurisdiction without deciding on certain of the Applicant's objections.

> *(ii) The Applicant has failed to establish that the Tribunal manifestly exceeded its powers by failing to apply the proper law in determining the amount of compensation*

225. As summarized above, the Applicant also argues that the Tribunal manifestly exceeded its powers in calculating the damages, because the Tribunal disregarded basic or fundamental economic principles, especially those that reflect the economic principle of the time value of money. The Applicant adds that such principles were part of the applicable law, which the Tribunal ultimately did not apply.[325]

226. Additionally, according to the Applicant, the Tribunal stated that it was carrying out its valuation based on market value, but ultimately that was not the standard that the Tribunal in fact applied.[326]

227. This Committee finds no support for these allegations, even after having heard and considered the presentations of the experts during the Hearing on Annulment, including the Applicant's appointed expert, Mr. Flores, of Econ One.[327]

228. The Committee, to the contrary, is of the view that the Tribunal undertook a thorough analysis of the economic principles invoked by the Parties during the original proceeding. The Committee has taken particular note of the Respondent on Annulment's point that the Tribunal duly identified and applied the body of law, that is, the compensation standard in Article 6(c) of the BIT.[328] Indeed, upon the Committee's independent analysis of the

---

[325] *See supra* ¶ 198.

[326] *See supra* ¶ 199.

[327] The Committee does not, however, accept the Respondent on Annulment's argument to deny any credence to Econ One's expert reports on the basis of an alleged "dependency of both Dr. Flores and his firm [on] the Applicant." Counter-Memorial on Annulment, ¶ 245. *See also* Rejoinder on Annulment, ¶ 228; Tr. Day 1, Cross Examination of Mr. Flores (Econ One) by Mr. Mandelli (Counsel for OIEG), pp. 228-247. Although the Committee had made clear in the pre-hearing exchanges that it did not deem the experts' oral testimony to be necessary (Letter from the ICSID Secretariat to the Parties of August 29, 2017), the Committee has heard the testimony that was tendered during the Hearing on Annulment on behalf of both Parties and carefully considered that testimony in rendering this Decision on Annulment.

[328] *See supra* ¶ 210.

Award, it is evident that the Tribunal, for example (i) analyzed the compensation standard under Article 6(c) of the BIT;[329] (ii) determined an appropriate methodology for calculating the market value of the expropriated companies, namely the DCF method;[330] (iii) examined in detail and decided points of contention between the Parties' experts in the application of the methodology;[331] (iv) examined the experts' models and calculated and applied an appropriate discount rate;[332] and (v) confirmed its conclusions using alternative methodologies.[333]

229.    In these circumstances, even if, as the Applicant maintains, the Tribunal should have adopted the views advanced by Venezuela and its experts in the Underlying Arbitration as regards the application of certain economic principles (and the Committee expresses no position in this regard), it cannot be maintained that such an error would justify annulment of the Award.  As the *TECO ad hoc* committee stated, "an annulment committee is not empowered to verify whether […] a tribunal's application of the law was correct, but only whether it was tenable as a matter of law.  Even if a committee might have a different view on a debatable issue, it is simply not within its powers to correct a tribunal's interpretation of the law or assessment of the facts."[334]

230.    Thus, whether the Tribunal made a *correct* application of the relevant standard and methodology in calculating the damages in Section VII of the Award is a matter outside the scope of this Committee's mandate, as has been stated in the recitation of the standards applicable, in general, to an annulment proceeding, and in particular under Article 52(1)(b) of the ICSID Convention.

231.    As addressed in paragraph 185 above, according to the 2016 ICSID Paper, the drafting history of the ICSID Convention confirms that a tribunal's failure to apply the proper law could constitute a manifest excess of powers, but that an erroneous application of the law,

---

[329] Award, ¶¶ 647-652.

[330] Award, ¶ 659; *see also generally id.*, ¶¶ 653-670.

[331] Award, ¶¶ 671-761.

[332] Award, ¶¶ 762-820.

[333] Award, ¶¶ 880, 881.

[334] *See, e.g., TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23 (Hanotiau, Oyekunle, Sachs), Decision of the *ad hoc* Committee, April 5, 2016 ("*TECO v. Guatemala*"), ¶ 78 (VLA-49).

even if it is serious, could not amount to an annullable error.[335] As stated above and as has been expressly recognized by many other *ad hoc* committees, an incorrect tribunal decision is no basis for annulment.[336]

232.     Notably, in setting forth its own position on the nature and scope of an annulment, the Applicant accepted that the mechanism is not intended to address "reasonable disagreements in terms of the interpretation of the facts and the law," but rather is intended to serve as a check against "certain <u>defects</u> contained in the Award which are so serious that they fit the specific list included in Article 52(1) of the ICSID Convention as grounds for annulment."[337] This Committee has carefully reviewed the Award, and heard arguments and expert oral testimony from both Parties during the Hearing on Annulment. Applying the standards of Article 52(1)(b) as reviewed above, this Committee cannot conclude that the Award has a serious defect in regard to the damages determination. Reaching the opposite conclusion, on the grounds called for by the Applicant, would constitute a denaturalization of the mechanism of annulment.

## D.     SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### (1)     Legal Standard

#### a.  *Applicant's Position*

233.     The Applicant states that this ground for annulment is subject to a double requirement: (i) the departure must occur in relation to a fundamental rule of procedure, and (ii) that departure must be serious.[338]

234.     With regard to the notion of a "fundamental rule of procedure," the Applicant explains that in the *travaux préparatoires* of the ICSID Convention, "Mr. Broches established a connection between the fundamental rule of procedure and the principles of natural

---

[335] 2016 ICSID Paper, ¶¶ 21, 72-74 (OILA-117).

[336] 2016 ICSID Paper, ¶ 90 (OILA-117).

[337] Reply on Annulment, ¶ 16 (emphasis added).

[338] Memorial on Annulment, ¶ 143.

justice."[339] Additionally, the Applicant notes that in *Fraport v. Philippines*[340] the committee stated that the general principles of law are fundamental rules of procedure, and in *Wena Hotels v. Egypt* the committee construed fundamental rules of procedure to mean the "minimal standards of procedure to be respected as a matter of international law."[341] Furthermore, the Applicant explains that the *Impregilo v. Argentina* committee summarized the views of prior committees and identified the following fundamental rules of procedure: "the equal treatment of the parties, the right to be heard, an independent and impartial tribunal, the treatment of evidence and burden of proof, and deliberations among members of the Tribunal."[342]

235.   As to the second requirement that the departure be "serious," the Applicant contends that the assessment is very fact specific and should be done on a case by case basis.[343]

236.   For the Applicant, the "serious departure" requirement should not be understood to mean that the applicant is required to demonstrate that such departure has led to a different outcome. As explained by the *Kiliç v. Turkmenistan* committee, it is sufficient for the departure to have a potential material effect on the award.[344]

237.   Relying on the annulment decision in *Victor Pey Casado v. Chile*,[345] the Applicant adds that, once a serious departure from a fundamental rule of procedure is established, the award must necessarily be annulled and "any speculation without evidentiary support about

---

[339] Memorial on Annulment, ¶ 144, citing *History*, Vol. II, pp. 271, 423, 480, 517 (VLA-47).

[340] *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No ARB/03/25 (Tomka, Hascher, McLachlan), Decision on the Application for Annulment of Fraport, December 23, 2010 ("*Fraport v. Philippines*"), ¶ 187 (VLA-30).

[341] *Wena Hotels v. Egypt*, ¶ 57 (VLA-29).

[342] Memorial on Annulment, ¶ 146, citing *Impregilo v. Argentina*, ¶ 165 (VLA-17).

[343] In support, the Applicant cites the 2016 ICSID Paper as well as the annulment decisions in *Malicorp v. Egypt* and *Kiliç v. Turkmenistan*. *See* 2016 ICSID Paper, ¶ 101 (OILA-117); Memorial on Annulment, ¶¶ 147, 148, citing *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18 (Rigo Sureda, Alexandrov, Silva Romero), Decision on Annulment, July 3, 2013 ("*Malicorp v. Egypt*"), ¶ 37 (VLA-37); *Kiliç İnşaat İthalat İhracat Sanayi Ve Ticaret Anonim Şirketi v. Turkmenistan*, ICSID Case No. ARB/10/1 (Rigo Sureda, Böckstiegel, Shin), Decision on Annulment, July 14, 2015 ("*Kiliç v. Turkmenistan*"), ¶ 67 (VLA-38).

[344] Memorial on Annulment, ¶ 149; *Kiliç v. Turkmenistan*, ¶ 70 (VLA-38).

[345] *Pey Casado v. Chile*, ¶ 80 (VLA-16).

the possible impact that the violation of the rule could effectively have on the parties and the decision cannot prevent the Award from being annulled."[346]

238.    Finally, the Applicant observes that, according to the *EDF v. Argentina* committee, the lack of independence and impartiality of an arbitrator may, by itself, constitute grounds for annulment under Article 52(1)(d) of the ICSID Convention:[347]

> It is difficult to imagine a rule of procedure more fundamental than the rule that a case must be heard by an independent and impartial tribunal. The Committee accordingly considers that, in principle, an *ad hoc* committee can examine under Article 52(1)(d) […] allegations that the lack of independence and impartiality of an arbitrator meant that there was a serious departure from a fundamental rule of procedure in the arbitration as a whole.[348]

### b.   Respondent on Annulment's Position

239.    OIEG states that to annul an award under Article 52(1)(d), the Applicant must: (a) identify the applicable rule of procedure; (b) demonstrate that this rule is fundamental; (c) show that the Tribunal departed from the rule; and (d) prove that this departure was serious.[349]

240.    OIEG maintains that, as recognized by the Applicant, not all rules of procedure qualify as "fundamental rules of procedure."[350] Rather, they "are those that set the minimal standards of procedure, are essential to a fair hearing and necessary to ensure the integrity and fairness of the arbitral process."[351] Further, relying on the 2016 ICSID Paper, OIEG asserts

---

[346] Reply on Annulment, ¶ 191.

[347] Memorial on Annulment, ¶ 152; Reply on Annulment, ¶¶ 189-194.

[348] *EDF v. Argentina*, ¶ 123 (VLA-03).

[349] Counter-Memorial on Annulment, ¶ 254; Rejoinder on Annulment, ¶ 236. In its Counter-Memorial, the Respondent on Annulment states that "[a]s the Applicant rightly points out in its Memorial on Annulment, annulment under Article 52(1)(d) requires the Tribunal to depart from a rule of procedure, that this rule of procedure be fundamental and that the departure be serious." (Counter-Memorial, ¶ 256). With respect to the burden of proof, OIEG cites *El Paso v. Argentina*, ¶ 268 (OILA-116) (Counter-Memorial, ¶ 258) and refers to the Memorial on Annulment, ¶ 145, citing *Wena Hotels v. Egypt*, ¶¶ 56, 57 (VLA-29) (Counter-Memorial, ¶ 259).

[350] Counter-Memorial on Annulment, ¶ 250; Rejoinder on Annulment, ¶ 237. OIEG relies on *MINE v. Guinea*, ¶ 5.06 (OILA-23); *CDC v. Seychelles*, ¶ 49 (VLA-10); *Azurix v. Argentina*, ¶ 52 (OILA-89); *Fraport v. Philippines*, ¶¶ 186, 187 (VLA-30); *Continental Casualty v. Argentina*, ¶ 97 (OILA-115); *Daimler Financial Services A.G. v. Republic of Argentina*, ICSID Case No. ARB/05/1 (Zuleta, Feliciano, Khan), Decision on Annulment, January 7, 2015 ("*Daimler v. Argentina*"), ¶ 265 (OILA-76); *Alapli v. Turkey*, ¶ 133 (VLA-27).

[351] Counter-Memorial on Annulment, ¶ 260; Rejoinder on Annulment, ¶ 237.

that the principle enshrined in Article 52(1)(d) "excludes the Tribunal's failure to observe ordinary arbitration rules,"[352] no matter how serious.[353]

241.   OIEG agrees with the Applicant that those "minimal standards of procedure" include the right to be heard.[354] However, it points out that this right is "not a catch-all principle that the Applicant can use to circumvent the requirement that the departure concern a 'fundamental' rule."[355] According to OIEG, the right to be heard "is generally understood as the 'full and equal opportunity of the parties to present their case'" and all of the previous annulment decisions that have found a violation of this right are based on "situations where the relevant award was based either on evidence that the parties never had a chance to address or on arguments that the parties had not made."[356]

242.   OIEG further claims that the Applicant must be able to explain how the conduct of which it complains negatively affects the interest protected by the rule in question.[357] Citing *El Paso v. Argentina*, *MINE v. Guinea*, *Continental v. Argentina* and *Impregilo v. Argentina*,[358] among others, OIEG explains that annulment committees have repeatedly confirmed that a departure from a fundamental rule of procedure may only lead to annulment if it is "such as to deprive a party of the benefit or protection which the rule was intended to provide."[359] For OIEG, the Applicant "has not disputed these basic, self-evident principles."[360]

243.   OIEG posits that the main point of disagreement between the Parties is in relation to the meaning and consequences of the requirement that the departure be "serious."[361] OIEG asserts that such departure cannot be regarded as "serious" where it is insubstantial or has

---

[352] Counter-Memorial on Annulment, ¶ 261; 2016 ICSID Paper, ¶ 98 (OILA-117).

[353] Rejoinder on Annulment, ¶ 236. OIEG cites, among others, *MINE v. Guinea*, ¶ 5.06 (OILA-23).

[354] Rejoinder on Annulment, ¶ 238.

[355] Rejoinder on Annulment, ¶ 238.

[356] Rejoinder on Annulment, ¶ 238.

[357] Counter-Memorial on Annulment, ¶ 264; Rejoinder on Annulment, ¶ 239.

[358] *El Paso v. Argentina*, ¶ 269 (OILA-116); *MINE v. Guinea*, ¶ 5.05 (OILA-23); *Continental Casualty v. Argentina*, ¶ 96 (OILA-115).

[359] *MINE v. Guinea*, ¶ 5.05 (OILA-23).

[360] Rejoinder on Annulment, ¶ 239.

[361] Rejoinder on Annulment, ¶ 240.

no material impact on the outcome.[362] Citing the annulment decisions in *El Paso v. Argentina*,[363] *Wena Hotels v. Egypt*[364] and *Daimler v. Argentina*,[365] OIEG asserts that the departure must have "caused the Tribunal to reach a result substantially different from what it would have awarded had such a rule been observed."[366] OIEG adds that numerous additional annulment committees have confirmed this interpretation, including *Total v. Argentina*,[367] *CDC v. Seychelles*,[368] *Continental Casualty Company v. Argentina*,[369] *Malicorp Limited v. Egypt*,[370] *Alapli v. Turkey*[371] and, recently, *Adem Dogan v. Turkmenistan*.[372]

244.  In this regard, OIEG objects to the Applicant's claim that it is sufficient for the departure to have a "potential" material effect on the award. Even if a minority of annulment committees have followed this approach, OIEG contends that the better approach is the one followed by the majority of the annulment committees explained above.[373]

### c.  The Committee's Analysis

245.  Article 52(1)(d) contemplates the possibility of annulling the award based on the existence of a serious departure from a fundamental rule of procedure. This ground necessarily imposes on the Applicant two obligations, first, to identify the rule of procedure the Tribunal purportedly departed from, and second, to satisfy its burden of proof regarding three points: (i) the "fundamental" nature of said rule; (ii) the departure by the Tribunal from said rule; and lastly (iii) whether the departure was serious.

---

[362] Counter-Memorial on Annulment, ¶¶ 262-267; Rejoinder on Annulment, ¶ 240.

[363] *El Paso v. Argentina*, ¶ 269 (OILA-116).

[364] *Wena Hotels v. Egypt*, ¶ 58 (VLA-29).

[365] *Daimler v. Argentina*, ¶ 264 (OILA-76).

[366] *Wena Hotels v. Egypt*, ¶ 58 (VLA-29); *See also Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/08 (Rigo Sureda, Danelius, Silva Romero), Decision on Annulment, May 22, 2013 ("*Libananco v. Turkey*"), ¶ 87 (VLA-31); *Daimler v. Argentina*, ¶ 264 (OILA-76).

[367] *Total v. Argentina*, ¶ 308 (OILA-74).

[368] *CDC v. Seychelles*, ¶ 49 (VLA-10).

[369] *Continental Casualty v. Argentina*, ¶ 96 (OILA-115).

[370] *Malicorp v. Egypt*, ¶¶ 33-35 (VLA-37).

[371] *Alapli v. Turkey*, ¶ 132 (VLA-27).

[372] *Adem Dogan v. Turkmenistan*, ¶ 208 (VLA-46).

[373] Rejoinder on Annulment, ¶¶ 244, 245, citing *Tulip Real Estate v. Turkey*, ¶ 78 (OILA-75).

246.   The drafting history of the ICSID Convention sheds light upon the "fundamental" nature of certain rules. According to the drafters, the phrase "fundamental rules of procedure" was a direct reference to certain principles, including those of natural justice, and necessarily excluding ordinary rules which are not concerned with the integrity and fairness of the arbitral process.[374]   As stated above, the burden of proof regarding the departure and its seriousness must be met by the Applicant.

247.   As for the departure, the Committee considers that it requires a showing, based on specific factual circumstances, that such departure was so substantial that the tribunal effectively deprived the parties of the benefits or protection which the rule was intended to provide.[375]

248.   Finally, as for the seriousness requirement set forth in Article 52(1)(d), this Committee is aware that some committees have previously adopted an approach under which the requirement is met upon a showing of a potential material effect on the award.[376] Although not decisive in this case, this Committee takes note of the position of OIEG and the holdings of prior committees that "seriousness" should be interpreted as requiring a showing that the violation did in fact materially change the outcome of the award.[377] Annulling an award based on a lesser showing would amount to excessive formalism, speculation and second-guessing of decisions taken in the original arbitration in a manner that is improper for an annulment proceeding, thus frustrating the purpose of the arbitration.

249.   Therefore, the Committee finds that in the circumstances of the instant case it does not suffice that the alleged departure could potentially have affected the Award; the departure must be shown effectively to have caused the Tribunal to reach a substantially different result from what it would have reached, if the relevant rule had been observed. Notably, however, as explained below in Section III.D(2)c, the Applicant has failed to meet its

---

[374] 2016 ICSID Paper, ¶¶ 98, 99 (OILA-117).

[375] *MINE v. Guinea*, ¶ 5.05 (OILA-23); *CDC v. Seychelles*, ¶ 49 (VLA-10); *Wena Hotels v. Egypt*, ¶ 58 (VLA-29); *Azurix v. Argentina*, ¶ 234 (OILA-89).

[376] *See, e.g.*, *Kiliç v. Turkmenistan*, ¶ 70 (VLA-38); *Pey Casado v. Chile*, ¶ 80 (VLA-16); *Tulip Real Estate v. Turkey*, ¶ 45 (OILA-75).

[377] 2016 ICSID Paper, ¶ 100 and footnote 191 (and the authorities cited therein) (OILA-117); *Malicorp v. Egypt*, ¶¶ 33-35 (VLA-37); *Alapli v. Turkey*, ¶ 132 (VLA-27); *Continental Casualty v. Argentina*, ¶ 96 (OILA-115).

burden to make the necessary showing under either interpretation of the "seriousness" requirement.

**(2)     Application of the Legal Standard to the Present Case**

### a.   *Applicant's Position*

250.   The Applicant contends that the Award should be annulled on the basis of Article 52(1)(d) in connection with two circumstances: (i) the allegedly partial and biased conduct of Mr. Mourre, including his failure to disclose his relationship with Dechert in a timely manner; and (ii) the Tribunal's treatment of evidence in finding that there was an expropriation in violation of the Treaty.

### (i) *Mr. Mourre's conduct*

251.   The Applicant argues that a fundamental rule of procedure was seriously departed from as a result of both Mr. Mourre's lack of impartiality, and the fact that Venezuela was deprived of its right to be heard on the matter.[378]

252.   First, as explained above, the Applicant maintains that Mr. Mourre's "lack of impartiality is in itself, a paradigmatic case of a serious departure from a fundamental rule of procedure," and an Award rendered with Mr. Mourre's participation "must be annulled."[379]

253.   The Applicant objects to OIEG's argument that Venezuela has failed to explain how Mr. Mourre's lack of impartiality materially impacted the outcome of the Award. The Applicant contends that it is incorrect to impose this burden on Venezuela since "neither the Republic nor OIEG can provide documentary evidence proving such aspects."[380] Furthermore, OIEG errs in assuming that the lack of impartiality of Mr. Mourre occurred only when his negotiations with Dechert concluded "shortly before" the issuance of the

---

[378] Reply on Annulment, ¶ 205.
[379] Reply on Annulment, ¶ 197.
[380] Reply on Annulment, ¶ 208.

Award,[381] since, as noted above, the conflict was purportedly present "during the ongoing full deliberation stage to issue the Award."[382]

254.    Second, the Applicant argues that Venezuela was deprived of its right of defence given that Mr. Mourre's alleged conflict of interest became known on the same day when the arbitration proceeding was declared closed and hence, the "Republic was not allowed to activate the mechanism set forth in Articles 57 and 58 of the ICSID Convention and submit a proposal for disqualification."[383]

255.    For the Applicant, "[t]his problem is even more serious" when considering that Mr. Mourre's signature is dated February 20, 2015 and Mr. Orrego Vicuña's signature is dated February 26, 2015, that is, before the proceeding was declared closed.[384] These circumstances are in conflict with Arbitration Rule 46, which requires arbitrators to sign the Award after the closure of the proceeding.[385] The Applicant adds that those signature dates are inconsistent with the procedural history of the Award, which refers to later-in-time events,[386] and concludes that:

> This alteration to and distortion of the dates shows not only that the Republic was unable to challenge arbitrator Mourre due to the fact that the proceeding was closed and the Award was signed, but also that the dates of closure and signature were manipulated and distorted to preclude the exercise of the fundamental right of the Republic referred to above, which warrants the annulment of the Award.[387]

256.    Additionally, Arbitration Rule 46 is a fundamental rule of procedure since it is "a special case of the general rule that provides that parties have the right to be heard."[388] In this sense, the Applicant explains that "[i]f the arbitrators could sign an award before the

---

[381] Reply on Annulment, ¶ 209.

[382] Reply on Annulment, ¶ 210.

[383] Memorial on Annulment, ¶ 156. *See also* Reply on Annulment, ¶¶ 201-205.

[384] Memorial on Annulment, ¶ 157.

[385] Reply on Annulment, ¶¶ 211-214.

[386] Memorial on Annulment, ¶ 158.

[387] Memorial on Annulment, ¶ 158. *See also* Reply on Annulment, ¶¶ 218-221.

[388] Reply on Annulment, ¶ 215.

closure of the proceeding, the parties would have their right to petition the arbitral tribunal curtailed."[389]

*(ii) Evidence concerning expropriation*

257.    The Applicant also argues that the Tribunal seriously departed from a fundamental rule of procedure when it found that Venezuela had unlawfully expropriated OIEG's investment. This is so "because the Tribunal did not specify the evidence on which it relied in finding that the failure to make the payment without delay, *i.e.*, in a timely fashion, is attributable to the Republic."[390]

258.    The Applicant states that the only evidence on which the Tribunal relies is a statement made by Venezuela's expert during the hearing, which the Tribunal distorted to mean that the Companies' failure to participate in the local expropriation proceedings would not delay the payment of compensation.[391] The Tribunal improperly concluded, according to the Applicant, that Venezuela had failed to offer a plausible explanation to justify the delay in the payment of compensation, effectively reversing "the burden of proof since it is [OIEG] that, in alleging the expropriation, must demonstrate that there was a delay in the payment of compensation and that such delay is attributable to the Republic."[392]

### b.  *Respondent on Annulment's Position*

259.    The Respondent on Annulment contends that the Applicant has failed to show that any of the following constitutes a serious departure from a fundamental rule of procedure: (i) Mr. Mourre's alleged lack of impartiality or independence; (ii) Mr. Mourre's decision not to disclose his conversations with Dechert in the Underlying Arbitration; (iii) the timing of

---

[389] Reply on Annulment, ¶ 216. *See also id.*, ¶¶ 223-227.

[390] Memorial on Annulment, ¶ 161.

[391] Memorial on Annulment, ¶ 164, citing Award, ¶ 424. The Applicant states that "[i]ndeed, while the expert maintained that the failure by the expropriated party to participate in the proceeding would not stand in the way of such proceeding, the Tribunal transformed such statement into one allegedly holding, in the Tribunal's view, that the failure to participate would not draw the proceeding out, since without such a distortion the Tribunal's statement would have no evidentiary basis. That assertion is not included in the statements made by expert Cabrera."

[392] Memorial on Annulment, ¶ 166. *See also* Reply on Annulment, ¶¶ 229, 230.

the signature of the Award by arbitrators Mourre and Orrego Vicuña; and (iv) the Tribunal's treatment of the evidence.

*(i) Mr. Mourre's alleged lack of impartiality or independence*

260.    The Respondent on Annulment refers to its position regarding the Applicant's arguments on Article 52(1)(a) and states that "[*m*]*utatis mutandis*, the reasons provided in that section apply with equal force to the Applicant's arguments regarding 52(1)(d)."[393] OIEG recalls in that regard that the annulment mechanism is not the appropriate procedural avenue to challenge the impartiality or independence of an arbitrator[394] and that the Applicant had avenues at its disposal to raise its concerns regarding Mr. Mourre that it chose not to use.[395] On this basis alone, OIEG contends that the Committee should reject this ground for annulment.[396]

261.    OIEG further contends that the Applicant's arguments fail for two additional reasons.[397] First, as previously set forth, "the Applicant has manifestly failed to prove the existence of facts indicating that Arbitrator Mourre lacked impartiality or independence."[398]

262.    Second, even if the Applicant had met this burden of proof (*quod non*), it has failed to prove that this alleged departure from a fundamental rule of procedure is "serious,"[399] in that the Applicant has failed to show that Mr. Mourre's "alleged loss of impartiality or independence, at the absolute tail end of the proceeding, could have had a material effect on the Award."[400]

---

[393] Rejoinder on Annulment, ¶ 247.

[394] Rejoinder on Annulment, ¶¶ 248, 249.

[395] Rejoinder on Annulment, ¶¶ 250-252.

[396] Rejoinder on Annulment, ¶ 253.

[397] Rejoinder on Annulment, ¶ 253.

[398] Rejoinder on Annulment, ¶ 254, citing Rejoinder on Annulment Section II.B.1. (summarizing OIEG's arguments). *See also supra* ¶¶ 135-143.

[399] Rejoinder on Annulment, ¶ 255.

[400] Rejoinder on Annulment, ¶ 255.

*(ii) Mr. Mourre's decision not to disclose his conversations with Dechert in the Underlying Arbitration*

263.    First, OIEG notes that Arbitration Rule 6(2) sets out the disclosure obligations of arbitrators and argues that the Applicant has failed to prove how this rule required Mr. Mourre to disclose his conversations with Dechert in the Underlying Arbitration.[401] Indeed, as set forth above,[402] OIEG contends that Mr. Mourre was under no obligation to disclose such conversations since they did not question "his reliability for independent judgment."[403] OIEG also contends that there could be no deprivation of the right to be heard in the case of facts that Mr. Mourre was not obligated to disclose.[404]

264.    OIEG points out again that the Applicant had at least two procedural avenues at its disposal through which to raise its alleged concerns in the Underlying Arbitration.[405]

265.    Second, OIEG argues that "even assuming that Arbitrator Mourre's failure to disclose his contacts with Dechert in the *OIEG* Arbitration amounted to a departure from a rule of procedure, the Applicant has failed to prove that such departure could be considered 'serious' under Article 52(1)(d) of the ICSID Convention."[406] In this regard, OIEG maintains that "[e]ven in the impossible scenario that Arbitrator Mourre would have been disqualified in the *OIEG* Arbitration on the basis of the disclosure of those facts, the Applicant has not even tried to explain, let alone demonstrate, how that would have caused the Tribunal 'to reach a result substantially different' from what it decided, unanimously, in the Award."[407]

*(iii)The timing of the signature of the Award by arbitrators Mourre and Orrego Vicuña*

266.    OIEG argues that Arbitration Rule 46 is not a fundamental rule of procedure, since it "neither seeks to protect 'natural justice' nor concerns 'the essential fairness of the

---

[401] Rejoinder on Annulment, ¶ 258.

[402] *See supra* ¶ 139.

[403] Rejoinder on Annulment, ¶ 259.

[404] Rejoinder on Annulment, ¶ 259.

[405] Rejoinder on Annulment, ¶ 260.  *See also supra* ¶ 131.

[406] Rejoinder on Annulment, ¶ 261.

[407] Rejoinder on Annulment, ¶ 263.

proceeding.'"[408] Rather, "it merely seeks to avoid excessive delays in the preparation of ICSID awards after the closure of the proceedings."[409]

267.   Further, OIEG contends that, even assuming that Arbitration Rule 46 were a fundamental rule and that Mr. Mourre and Prof. Orrego Vicuña had departed from that rule by signing the Award before the closure of the proceedings, such departure could not be considered "serious" under Article 52(1)(d).[410] Indeed, as argued by the Respondent on Annulment, "the Applicant has failed to explain how Arbitrators Mourre and Orrego Vicuña signing the Award after (instead of before) the closure of the proceeding would have 'had the potential of causing the tribunal to render an award substantially different from what it actually decided.'"[411]

*(iv) The Tribunal's treatment of the evidence*

268.   According to OIEG, the Applicant's arguments regarding the Tribunal's alleged treatment of the evidence as grounds for annulment under Article 52(1)(d) have no basis in law or fact. First, the Applicant has failed to identify a fundamental rule of procedure from which the Tribunal allegedly departed, since previous "committees have confirmed consistently that the tribunals are not required procedurally to specify or itemise the evidence on which their findings are based."[412]

269.   Second, the Applicant's argument also fails as a matter of fact since "the Tribunal did analyse and specify the evidence on which it relied to find that the Applicant had failed to comply with its obligation to provide compensation to the Respondent on Annulment 'without undue delay.'"[413]

270.   OIEG objects to the Applicant's argument that the Tribunal incorrectly interpreted the testimony given by the Applicant's legal expert in relation to the effects of the Companies'

---

[408] Rejoinder on Annulment, ¶ 265.

[409] Rejoinder on Annulment, ¶ 266. *See also id.*, ¶¶ 267, 268.

[410] Rejoinder on Annulment, ¶ 269.

[411] Rejoinder on Annulment, ¶ 270. *See also id.*, ¶¶ 271-273.

[412] Rejoinder on Annulment, ¶ 275. *See also* Counter-Memorial on Annulment, ¶¶ 294-296.

[413] Rejoinder on Annulment, ¶ 276, citing Counter-Memorial on Annulment, ¶¶ 297-300.

non-participation in the local expropriation proceeding. First, OIEG points out that this argument from the Applicant "merely confirms that the real basis of its claim is that it disagrees with the Tribunal's assessment of the testimony of its legal expert," which can not constitute, by itself, a ground for annulment,[414] as confirmed by several annulment committees and scholars.[415] Second, OIEG also contends that the Applicant's argument is without merit as a matter of fact, since the Tribunal did not rely exclusively on the expert's testimony, but "on a wealth of evidence and on thorough analysis."[416]

### c.   The Committee's Analysis

#### (i)  Purported conflict of Mr. Mourre

271.   At the outset, this Committee observes that whether or not an arbitrator's purported lack of impartiality or independence is reviewable under Article 52(1)(d) has been a matter of some debate among the Parties and in view of prior committee decisions. Thus for example, in *Vivendi II* and *EDF*, the committees accepted that such challenges could be heard under Article 52(1)(d) (in addition to Article 52(1)(a)), although, as noted above, neither committee annulled on that basis.[417] By contrast, in *Azurix*, the committee rejected the admissibility of the challenge under Article 52(1)(d) for the same reasons set forth in its analysis under Article 52(1)(a).[418]

272.   In this case, it appears that the Applicant is making two main arguments with respect to arbitrator conflict under Article 52(1)(d): first, that – procedurally – Mr. Mourre's failure to timely disclose facts that could have led to his disqualification deprived the Applicant of its right to be heard by an impartial tribunal; and second – substantively – that Mr. Mourre actually lacked the requisite impartiality and independence, which also led to a deprivation of that right.[419] This Committee has already held (*see supra* Section III.B(1)c)

---

[414] Rejoinder on Annulment, ¶¶ 281-284; Counter-Memorial on Annulment, ¶ 301.

[415] Among others, the Respondent on Annulment cites The ICSID Convention: A Commentary, p. 993, ¶ 330 (OILA-79); *TECO v. Guatemala*, ¶ 349 (VLA-49); *Impregilo v. Argentina*, ¶ 160 (OILA-90); *Rumeli v. Kazakhstan*, ¶ 104 (VLA-34).

[416] Rejoinder on Annulment, ¶ 285; *see also id*., ¶¶ 286-295.

[417] *See supra* ¶¶ 106, 107; *Vivendi v. Argentina II*, ¶¶ 201, 232 (VLA-01); *EDF v. Argentina*, ¶¶ 120-127 (OILA-86).

[418] *See supra* ¶¶ 104, 105; *Azurix v. Argentina*, ¶¶ 279-282, 293 (OILA-89).

[419] *See supra* ¶¶ 251-256.

that the second argument is inadmissible as a ground for annulment.[420] Like the committee in *Azurix*, this Committee holds that this conclusion applies to both Articles 52(1)(a) and (d).[421]

273.     The Applicant's first argument appears to be strictly a matter of procedure and concerns Mr. Mourre's purported failure to timely disclose his relationship with Dechert (which relationship is said to have given rise to his lack of impartiality and independence). This Committee finds that objection to be admissible under Article 52(1)(d), which by its terms is designed to ensure the availability of procedural protections for the parties. However, for the reasons stated below, the Committee does not consider that the Applicant's claims regarding the timing and manner of such disclosure support a finding that a fundamental rule of procedure was breached in this case.

274.     More specifically, in addition to lack of impartiality "in itself,"[422] as set forth above the Applicant has alleged in connection with Mr. Mourre's purported conflict a serious departure from (i) the right to timely disclosures under Arbitration Rule 6(2)[423] and (ii) the right to be heard, positing that Arbitration Rule 46 is a specific case of the latter right.[424] The Applicant specifies that because there are "overlaps" in these alleged departures "that makes it twice as serious."[425]

275.     Before addressing each of the Applicant's specific allegations in turn, and in particular because of the Applicant's asserted "overlaps," the Committee first scrutinizes the Applicant's allegations of lack of impartiality, which are the focal point of and ultimately underpin each of the above-noted Applicant's arguments in support of annulment under Article 52(1)(d). Indeed, as the Applicant itself has acknowledged,

---

[420] Of course, corruption is a ground for annulment under ICSID Convention Article 52(1)(c). However, corruption is not being alleged in this case. No annulment committee (as of May 2016) has issued a decision based on a charge of corruption. 2016 ICSID Paper, ¶ 97 (OILA-117).

[421] *Azurix v. Argentina*, ¶ 293 (OILA-89).

[422] *See supra* ¶ 252, citing Reply on Annulment, ¶ 197.

[423] Reply on Annulment, ¶¶ 198, 201-204.

[424] Reply on Annulment, ¶ 215.

[425] Reply on Annulment, ¶ 205.

> it would make no sense to contend that the [T]ribunal has departed
> from a fundamental rule of procedure demonstrated by the lack of
> impartiality […] if the [Applicant] did not claim and prove, at the
> same time, that said lack of impartiality occurred.[426]

276.    As a starting point in the chronology of relevant events, the Respondent on Annulment has argued, and the Applicant has not contested, that ICSID sent a letter to the Parties on December 8, 2014, stating that at that time the Tribunal was reviewing "a complete draft of the Award." [427] According to the facts of the case, including Mr. Mourre's declaration regarding the timing of the conclusion of his conversations with Dechert, this ICSID letter is a strong suggestion that Mr. Mourre's conversations with Dechert took place after deliberations had finished.[428] Taken together with the final part of the procedural history contained in Section II of the Award, it is reasonable for this Committee to conclude that deliberations took place substantially, if not entirely, during the year of 2014, which according to the evidence before the Committee was before Mr. Mourre even began negotiations with Dechert.

277.    Moreover, as observed by OIEG,[429] the fact that Mr. Mourre made his March 4, 2015 disclosure in the *Favianca* arbitration, as opposed to the Underlying Arbitration, is reasonable in light of the timing of the facts concerned. Namely, whereas Mr. Mourre's professional relationship with Dechert was to begin from May 2015, the Underlying Arbitration would have been already concluded (as opposed to the *Favianca* Arbitration, which would have been ongoing at that time).[430] Indeed, as noted above, Mr. Mourre had already signed the Award on February 20, 2015.

278.    The Committee recalls in this context the applicable holdings of the annulment decisions in *Vivendi II* and *EDF*. In *Vivendi II*, in rejecting the application for annulment, the committee found relevant the fact that Prof. Kaufmann-Kohler was not aware of the potential for conflict resulting from her role on the board of directors of the bank concerned,

---

[426] Reply on Annulment, ¶ 196.

[427] Rejoinder on Annulment, ¶¶ 120, 121.

[428] Rejoinder on Annulment, ¶¶ 114, 120, 121.

[429] *See supra* ¶ 139; Rejoinder on Annulment, ¶ 84.

[430] *See supra* ¶¶ 111-116, 139 and foonote 214.

at a time when such role could have affected tribunal deliberations. In *EDF*, the committee found that the "drafting of the Award had been completed several weeks before" the purported conflict arose, based in part on the Award's complexity and the fact that it was to be rendered in two languages.[431]

279.   So too in this case, the Committee finds that, even if a conflict could have arisen due to Mr. Mourre's relationship with Dechert, that alleged conflict could not have affected the Award based on the timeline of the facts concerned, and on that basis the seriousness requirement of Article 52(1)(d) is not met. As previously set forth in Section III.B(2)d above, if the Applicant nevertheless had reason to be concerned about such a possible conflict – arising as it did at such a late stage of the proceedings – it could have pursued a reopening of the case or revision under Article 51 of the ICSID Convention.

280.   In any event, and for the same reasons as outlined above, the Committee finds that there is no showing on the record of any lack of independence or impartiality on the part of Mr. Mourre. The threshold commonly used to make such a determination is whether an independent third party could, based on the facts of the case, reasonably conclude that the arbitrator obviously was, or appeared to be, influenced by external forces. This standard has been used recently in the *Blue Bank v. Venezuela* case, which was cited by both the Applicant and OIEG.[432]

281.   Based on the facts of the case, Mr. Mourre did not have any occasion to influence his co-arbitrators during the deliberations leading to the decision since, at the relevant time, the evidence strongly suggests that he had not yet even initiated negotiations with Dechert, and therefore, could not have been influenced by that fact. Indeed, Mr. Mourre's alleged conflict is to be excluded on the basis of the fact that when he informed the Parties in *Favianca* by letter of March 4, 2015 that "[a]s from May 2015" he would have a

---

[431] *Vivendi v. Argentina II*, ¶¶ 234, 235 (VLA-01); *EDF v. Argentina*, ¶ 170 (OILA-86).
[432] *See supra* Sections III.B(1)a and III.B(1)b; *Blue Bank v. Venezuela*, ¶¶ 55-61 (VLA-05).

consultancy agreement with Dechert he had already signed the Award in the present case on February 20, 2015.[433]

282.   Furthermore, even if Mr. Mourre hypothetically had already begun negotiations with Dechert during the Tribunal deliberations period, there has been no showing that his impartiality or independence would have been, or even appeared to have been, compromised, given the explanations that Mr. Mourre provided in the letters delivered in *Favianca v. Venezuela*. The Committee recalls that Mr. Mourre represented – in the *Favianca* arbitration – that the relationship with Dechert would not provide him with access to relevant information concerning cases involving Venezuela or related entities.[434] This Committee has no reason to doubt the reliability of that statement, and the Applicant has raised none.[435] Moreover, on the evidence, the reality is that the allegations of possible conflict are all the weaker in the present case, given that for all practical purposes deliberations appear to have been completed before the time of any negotiations with Dechert. In brief, the Applicant has made no showing of any "dependency" or "reciprocal partisanship"[436] between Mr. Mourre and Dechert, which would have affected the Underlying Arbitration.

283.   In view of the above review of the Applicant's allegations, the Committee addresses each of the Applicant's specific alleged rule violations in light of the applicable legal analytical framework. The Committee's recalls (*see* Section III.D(1)c above) that to succeed on annulment under Article 52(1)(d) the Applicant must satisfy its burden of proof regarding: (a) the "fundamental" nature of the rule; (b) the departure by the Tribunal from said rule; and lastly (c) whether the departure was serious.

---

[433] Communication from Mr. Mourre to the parties in *Favianca v. Venezuela*, March 4, 2015 (Exhibit V-10); *see also* Email from the ICSID Secretariat to the parties in *Favianca v. Venezuela*, March 11, 2015 (Exhibit V-12) (stating in the context of the *Favianca* case that "my professional relationship with this law firm – which will start on May 1rst – is not such as to generate any conflict").

[434] Communication from Mr. Mourre to the parties in *Favianca v. Venezuela*, March 4, 2015 (Exhibit V-10); Email from the ICSID Secretariat to the parties in *Favianca v. Venezuela*, March 11, 2015 (Exhibit V-12).

[435] *See Vivendi v. Argentina II*, ¶ 237 (VLA-01) (stating that the committee had no sufficient reason to doubt the reliability of Prof. Kaufmann-Kohler's statements).

[436] *See supra* ¶ 90, citing *SGS v. Pakistan*, ¶ 26 (OILA-104). The Committee's conclusion is also consistent with Prof. Schreuer's commentary, as presented by the Respondent on Annulment, and referenced in paragraph 90 above.

284.  First, as the Committee made clear was the case in its analysis under Article 52(1)(a),[437] as a factual matter the Applicant has failed to establish the partiality of Mr. Mourre or the appearance thereof, and even if the Applicant had done so, given the timeline of the allegations, there has been no showing that such alleged partiality even could have had an outcome-determinative effect on the Award. Thus, even assuming such a charge were deemed admissible under Article 52(1)(d), the Committee's ultimate decision rejecting the Application on this basis would remain undisturbed.

285.  Second, as for the right to timely disclosures under Arbitration Rule 6(2), the Applicant's arguments must be rejected for similar reasons. Notably, Arbitration Rule 6(2) requires disclosure of information that an arbitrator "reasonably believes […] would reasonably cause his or her reliability for independent judgment to be questioned by a reasonable person."[438] In view of the Committee's findings above, there was no obligation on the part of Mr. Mourre to disclose his relationship with Dechert in the Underlying Arbitration. While his disclosure may have been temporally relevant in *Favianca v. Venezuela*, the anticipated commencement date of the Dechert relationship was well after the anticipated issuance of the Award. Indeed, Mr. Mourre had signed the Award on February 20, 2015. Further, the evidence strongly suggests that the Tribunal had substantially completed its deliberations already in December 2014, even before any negotiations between Mr. Mourre and Dechert. Accordingly, the absence of a disclosure in the Underlying Arbitration does not constitute a departure from Arbitration Rule 6(2).

286.  Additionally, the absence of a disclosure did not result in a breach of the right to be heard. There is no right to be heard about facts that Mr. Mourre was not obligated to disclose. Further, upon learning of Mr. Mourre's relationship with Dechert through the disclosure in *Favianca*, the Applicant could have, notwithstanding the timing of the closing, pursued (i) reopening under Arbitration Rule 38(2) as a means of having its concerns heard in the Underlying Arbitration, or (ii) revision under Article 51 of the ICSID Convention.

---

[437] *See supra* Section III.B(2)d.

[438] *Suez, Sociedad General de Aguas de Barcelona S.A. and others v. Argentine Republic*, ICSID Case No. ARB/03/17 (Nikken, Salacuse), Decision on a Second Proposal for the Disqualification of a Member of the Arbitral Tribunal, May 12, 2008, ¶ 46 (OILA-142). *See also Alpha Projekt v. Ukraine*, ¶ 66 (VLA-65).

287.    As a final point as regards Arbitration Rule 6(2), even assuming Mr. Mourre's decision not to disclose was a departure from that rule, the Committee finds that the Applicant has not established the requirement of seriousness in terms of Article 52(1)(d). The Applicant has not shown that the disclosure of the information would have (or even could have) resulted in a substantially different outcome in the Award. Among other reasons, the Committee's findings above make clear that such information would not have resulted in Mr. Mourre's removal from the Tribunal in the Underlying Arbitration, especially given that it was on a different temporal footing than, for example, *Favianca v. Venezuela*. Even if such a disclosure would have resulted in Mr. Mourre's disqualification, the December 8, 2014 ICSID letter reported that the Tribunal was reviewing "a complete draft of the Award"[439] and thus the Underlying Arbitration was at a very late stage. While the Committee acknowledges that under Arbitration Rule 12 a newly-appointed committee member may require that the oral procedure be recommenced, even in such case it is unlikely that a reconstituted Tribunal, including Prof. Fernández-Armesto and Prof. Orrego Vicuña as members, would have reached a substantially different conclusion.

288.    Third, and finally, as for the Applicant's allegations of a right to be heard, this Committee has found immediately above that Mr. Mourre's decision not to disclose the Dechert relationship in the Underlying Arbitration did not deprive the Applicant of the general right to be heard.

289.    As noted above, the Applicant also cites Arbitration Rule 46 as a specific case of the right to be heard.[440] It provides,

>       The award (including any individual or dissenting opinion) shall be drawn up and signed within 120 days after closure of the proceeding. The Tribunal may, however, extend this period by a further 60 days if it would otherwise be unable to draw up the award.

290.    By way of background, this Committee observes that the proceedings in the Underlying Arbitration were in fact closed on the same date that the President of the Tribunal signed

---

[439] Rejoinder on Annulment, ¶ 120, citing the Communication from the Secretary of the *OIEG* Tribunal to the Parties, December 8, 2014 (Exhibit OI-70).

[440] *See supra* ¶¶ 256, 274, citing Reply on Annulment, ¶ 215.

the Award (March 4, 2015), whereas both co-arbitrators signed the Award some days before the proceedings were closed.[441]

291.   Based on the Award's procedural history, it can be inferred that there were some administrative issues arising towards the end of the case.[442] Once a new Secretary to the Tribunal was appointed, the proceedings were declared closed as the President was ready to sign the Award, which his co-arbitrators had already signed. Consequently, while there may have been an administrative imperfection on the part of the Tribunal in its approach to declaring the closure of the proceedings, the closing was necessary, even if it might have been done at an earlier stage.

292.   More importantly for present purposes, to the extent that the sequence of events can be said to have conflicted with Arbitration Rule 46, this Committee cannot conclude that that Rule (stating that the signature should take place after the closure) is "fundamental"[443] or that any such departure was "serious" within the meaning of Article 52(1)(d).[444]

293.   For the foregoing reasons, the Committee finds that there was no departure from a fundamental rule of procedure and that even if there had been such a departure, it could not have been so substantial as to deprive the Applicant of the protection which the rules in question were intended to provide.[445] Nor has the Applicant established that such alleged violations had a material impact on the outcome of the Award.[446]

294.   Accordingly, this Committee rejects the Applicant's request for annulment on the basis of its partiality-related arguments under Article 52(1)(d).

---

[441] *See supra* ¶ 115. Prof. Orrego Vicuña signed the Award on February 26, 2015, and Mr. Mourre signed on February 20, 2015.

[442] Award, ¶ 77 ("On 4 March 2015, the Parties were informed that Mr Gonzalo Flores would act as the Secretary of the Tribunal, replacing Ms Ann Catherine Kettlewell who was no longer with the ICSID Office of the Secretary, and the arbitration proceedings were declared closed in accordance with Rule 38(1) of the Arbitration Rules.").

[443] This Committee's conclusion finds support in the reasoning of prior committees (*see, e.g.*, *CDC v. Seychelles*, ¶ 62, 65 and footnote 92 (VLA-10) and the leading commentary on the ICSID Rules, The ICSID Convention: A Commentary, p. 844, ¶ 13 (OILA-79).

[444] *See supra* ¶¶ 246, 248 and footnote 377.

[445] *MINE v. Guinea*, ¶ 5.05 (OILA-23); *CDC v. Seychelles*, ¶ 49 (VLA-10); *Wena Hotels v. Egypt*, ¶ 58 (VLA-29); *Azurix v. Argentina*, ¶ 234 (OILA-89).

[446] *See supra* ¶¶ 248, 249 and this Section (III.D(2)c).

*(ii) The Tribunal's treatment of evidence concerning expropriation*

295.   Finally, in regard to Article 52(1)(d), the Applicant argues that the Tribunal seriously departed from a fundamental rule of procedure in finding that there was an expropriation in violation of the Treaty.

296.   The Applicant rests this allegation principally on its view that the Tribunal did not specify the evidence on which it relied in finding that the failure to make payment without delay, *i.e.*, in a timely fashion, is attributable to the Republic. The Applicant adds that the only possible evidence on which the Tribunal relied was the statement made by Venezuela's expert during the hearing, which the Tribunal misinterpreted to mean that the Companies' failure to participate in the local expropriation proceedings would not delay the payment of compensation.[447]

297.   OIEG maintains that the Applicant's arguments are without merit as a matter of fact, because the Tribunal did not rely exclusively on the expert's testimony, but "on a wealth of evidence and on thorough analysis."[448]

298.   Even assuming that the Applicant's arguments in this regard were borne out by the record (a matter about which the Committee draws no conclusion one way or another), it is even more evident than in the case of the Applicant's other causes for annulment that these arguments invite this Committee to evaluate not only the Tribunal's criteria for assessing which evidence was pertinent or not, but also, and moreover, the interpretation of the evidence, and which facts have been proven or not.

299.   As this Committee has already made clear above, entering into such an analysis is clearly outside the boundaries of an annulment proceeding. The ICSID Convention and the Arbitration Rules constrain this Committee from relying on any such disagreements with the Tribunal's assessment of the evidence as a valid cause for partial or total annulment of the Award. These circumstances alone are sufficient to reject the Applicant's position in this instance.

---

[447] *See supra* ¶¶ 257, 258.
[448] Rejoinder on Annulment, ¶¶ 285-295.

300.    Accordingly, the Committee dismisses this second line of argument in favor of annulment under Article 52(1)(d).

E.    **THE AWARD FAILED TO STATE THE REASONS ON WHICH IT IS BASED**

    **(1)    Legal Standard**

        *a.  Applicant's Position*

301.    The Applicant argues that Article 52(1)(e) of the ICSID Convention cannot be interpreted separately from Article 48(3) of the ICSID Convention.[449] When these two provisions are read in conjunction, it is clear that "arbitral tribunals are under a fundamental obligation to provide a reasoned award"[450] and that the tribunal's failure to provide "coherent and adequate reasoning" renders the award of no effect.[451]

302.    The Applicant states that the purpose of these provisions is to guarantee that the parties "may understand the decisions rendered by the tribunals and the reasons leading to those decisions, so as to ensure respect for due process and the right of defence."[452] Citing *Libananco v. Turkey*,[453] in its Memorial on Annulment the Applicant contends that this duty to provide reasons "applies to any argument and claim expressly made before the Tribunal."[454] However, in its Reply on Annulment, the Applicant specifies that it "does not challenge [that] the Tribunal [does not have an] obligation under Articles 48(3) and 52(1)(e) to provide a detailed answer to each and every argument of the parties."[455]

---

[449] Memorial on Annulment, ¶ 103.

[450] Memorial on Annulment, ¶ 104; *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22 (Hanotiau, Knieper, Yusuf), Decision of the *ad hoc* Committee on the Application for Annulment, June 29, 2012 ("*AES v. Hungary*"), ¶ 46 (VLA-28)

[451] Memorial on Annulment, ¶ 104, citing *Alapli v. Turkey*, ¶ 64 (VLA-27).

[452] Memorial on Annulment, ¶ 106. The Applicant cites *Impregilo v. Argentina*, ¶ 180 (VLA-17). *See also* Reply on Annulment, ¶ 237.

[453] *Libananco v. Turkey*, ¶ 192 (VLA-31).

[454] Memorial on Annulment, ¶ 107.

[455] Reply on Annulment, ¶ 255. The Committee has inserted the words "that" and "does not have an" because there seems to be a mistake in the English translation of this sentence. The Spanish version reads: "*La República no disputa que el Tribunal no tenga la obligación bajo los Artículos 48(3) y 52(1)(e) de brindar una respuesta detallada a todos y cada uno de los argumentos de las partes.*"

303.   The Applicant points out that the ICSID Convention "does not impose any condition upon the failure to state reasons which may give rise to a restrictive interpretation," since there is no requirement that the failure be "manifest" or "serious."[456] The Applicant posits that the only option available under the ICSID Convention in case of a failure to state reasons is the annulment of the award.[457]

304.   With regards to the impact that the failure to state reasons should have in order to render the award annullable, the Applicant contends that the criterion established by the committee in *TECO v. Guatemala* should be followed.[458] According to such decision:

> The Committee wishes to point out that it cannot determine whether the evidence that was ignored by the Tribunal would have had an impact on the Award or not. What can be ascertained at the annulment stage is that the Tribunal failed to observe evidence which at least had the potential to be relevant to the final outcome of the case.[459]

305.   The Applicant further notes that, since a total absence of reasons in a tribunal's decision is almost unconceivable, annulment committees "have stated that the provision of *contradictory* reasons and/or *inadequate* or *insufficient* reasons equally amounts to 'failure to state reasons.'"[460] Thus, as explained in the decision on annulment in *Iberdrola v. Guatemala*, "there are three possible issues relating to the statement of reasons for the Award: (i) absence of reasons; (ii) insufficient reasons and (iii) contradictory reasons."[461]

---

[456] Memorial on Annulment, ¶ 108. *See also* Reply on Annulment, ¶ 238.

[457] Memorial on Annulment, ¶ 109.

[458] Reply on Annulment, ¶ 267.

[459] *TECO v. Guatemala*, ¶ 135 (VLA-49).

[460] Memorial on Annulment, ¶ 112 (emphasis in original). The Applicant cites *Sempra v. Argentina*, ¶ 167 (VLA-11).

[461] Memorial on Annulment, ¶ 113; *Iberdrola Energía S.A. v. Republic of Guatemala*, ICSID Case No. ARB/09/5 (Bourie, Bernardini, Shaw), Decision on Annulment, January 13, 2015, ¶ 117 (unofficial translation) (VLA-32).

306.    Regarding contradictory reasons, those are reasons that are "mutually inconsistent and thus cancel each other out."[462] As set forth by several annulment committees under the ICSID Convention, contradictory reasons are tantamount to a failure to state reasons.[463]

307.    As for inadequate or insufficient reasons, the Applicant points out that these reasons are those "which do not logically lead to the conclusion reached."[464] As explained by the *MINE v. Guinea* committee, "[t]he requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A to Point B and eventually to its conclusion[.]"[465] According to the Applicant, this means that "the mere statement of some 'reason' by an arbitral tribunal in alleged support of a decision is not enough to comply with the duty to state reasons under international law. These 'reasons' must be coherent and adequate."[466]

308.    The Applicant contends that OIEG is wrong in asserting that "the *ad hoc* committee should not determine whether the reasons stated by the tribunal are 'adequate.'"[467] For the Applicant, OIEG is confusing the "'adequacy' requirement applicable to the reasons provided by a tribunal with the review of the 'merits' of these reasons."[468] In this regard, the Applicant clarifies that "Venezuela is not holding that the Committee should review the adequacy or merits of the reasons presented by the Tribunal in terms of factual or legal correctness."[469]

309.    Relying on the annulment decision in *TECO v. Guatemala*,[470] the Applicant further argues that "the failure to state reasons may also arise where the tribunal ignores the evidence

---

[462] Memorial on Annulment, ¶ 114. *See also* Reply on Annulment, ¶ 240.

[463] The Applicant cites *Caratube v. Kazakhstan*, ¶ 102 (VLA-21); *MINE v. Guinea*, ¶ 5.09 (VLA-33); *Fraport v. Philippines*, ¶ 272 (VLA-30); *Pey Casado v. Chile*, ¶ 86 (VLA-16).

[464] Memorial on Annulment, ¶¶ 115, 117.

[465] *MINE v. Guinea*, ¶ 5.09 (VLA-33).

[466] Memorial on Annulment, ¶ 116. In this regard, the Applicant states that OIEG's argument that the requirement to state reasons sets "a minimum standard" is incorrect. On the contrary, for the Applicant it is a requirement "for reasons to be sufficient in order to understand the tribunal's reasoning, which requires reasons to be consistent and adequate." Reply on Annulment, ¶ 252, citing *TECO v. Guatemala*, ¶ 249 (VLA-49).

[467] Reply on Annulment, ¶ 256.

[468] Reply on Annulment, ¶ 256. *See also* Reply on Annulment, ¶¶ 257-265.

[469] Reply on Annulment, ¶ 263.

[470] *TECO v. Guatemala*, ¶ 138 (VLA-49).

before it."[471] According to the Applicant, in that case the committee gave high importance "to the fact that the tribunal's reasoning with respect to damages was unclear and hard to follow [and that this] defect was not compensated for by the mere reference made to elements that were not actually considered at the time of adopting the decision."[472]

310. Finally, the Applicant also contends that annulment committees should not "create the reasons justifying the conclusion reached by a tribunal."[473]

### b. Respondent on Annulment's Position

311. First, OIEG asserts that, as pointed out by previous annulment committees, the scope of review under Article 52(1)(e) is very narrow and the threshold for annulment very high.[474] For OIEG, the standard to be applied is whether the Tribunal has failed to satisfy the "minimum requirement" to state reasons sufficient "to explain to the parties the motives that have induced the tribunal to adopt its decision."[475] As long as "an 'informed reader' would understand the reasons, discern no material contradiction in them, and the reasons are 'sufficiently clear and sufficiently displayed', annulment under Article 52(1)(e) must be refused."[476] In other words, "[f]or annulment under Article 52(1)(e) of the ICSID Convention to be justified: (a) the failure to state reasons must leave the decision on a particular point essentially lacking in any expressed rationale; and (b) that point must itself be necessary to the tribunal's decision."[477]

---

[471] Memorial on Annulment, ¶ 118.

[472] Reply on Annulment, ¶ 247.

[473] Memorial on Annulment, ¶ 119. *See also* Memorial on Annulment, ¶ 120; Reply on Annulment, ¶ 248. In support, the Applicant cites *Rumeli v. Kazakhstan*, ¶ 83 (VLA-34).

[474] Counter-Memorial on Annulment, ¶¶ 318, 319. OIEG refers to *Vivendi v. Argentina I*, ¶ 64 (OILA-83); *CDC v. Seychelles*, ¶ 75 (VLA-10).

[475] Counter-Memorial on Annulment, ¶ 321. In support, OIEG cites Christoph Schreuer, "ICSID Annulment Revisited," in Legal Issues of Economic Integration 30(2) (Kluwer Law International, 2003), p. 113 (OILA-125). OIEG refers also to *MINE v. Guinea*, ¶ 5.09 (OILA-23) ("the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law").

[476] Counter-Memorial on Annulment, ¶ 322. OIEG relies on *MINE v. Guinea*, ¶¶ 5.08, 5.09 (OILA-23); *Wena Hotels v. Egypt*, ¶¶ 75-83 (VLA-29); *Vivendi v. Argentina I*, ¶¶ 64, 65 (OILA-83); *CMS v. Argentina*, ¶¶ 125-127 (OILA-126) (in the words of the *CMS ad hoc* Committee, the Tribunal "should certainly have been more explicit in specifying" the reasoning by which it came to its conclusion; yet, "a careful reader can follow the implicit reasoning of the Tribunal"); The ICSID Convention: A Commentary, p. 997, ¶ 342 (OILA-79).

[477] Counter-Memorial on Annulment, ¶ 324.

312.    Second, OIEG argues that a tribunal is not required to address each argument or sub-issue raised by the parties but only such questions as it considers determinative to resolve the dispute.[478] Citing the annulment decision in *Alapli v. Turkey*,[479] OIEG points out that tribunals have a broad discretion in the exercise of their decision-making power. "They are not required to address each and every argument or sub-issue. Rather, tribunals are required to: (a) deal with each of the parties' heads of claim more broadly; and (b) decide questions raised by the parties that are determinative to resolve the dispute between them."[480]

313.    OIEG further contends that an award should be construed so as to eliminate contradictory reasoning insofar as is possible.[481] Citing *Amco v. Indonesia* and *Rumeli v. Kazakhstan*, OIEG argues that "[n]ot every gap or ambiguity in reasoning [] constitutes a failure to state reasons"[482] under Article 52(1)(e) and "[c]ontradictory reasons do not constitute a failure to state reasons 'unless they completely cancel each other out and therefore amount to a total absence of reasons.'"[483] For OIEG, "jurisprudence confirms that committees should always attempt to construe the language of an award in a way that results in consistency," as opposed to its inner contradictions.[484]

314.    Finally, OIEG maintains that failure to state reasons can only lead to annulment when it concerns a decision that had an impact on the outcome of the dispute.[485] As the committee in *Alapli v. Turkey* made clear, the tribunal's lack of reasoning must refer to "a point that was essential to the outcome of the case."[486]

### c.   *The Committee's Analysis*

315.    Article 52(1)(e) of the ICSID Convention provides that an award may be annulled if it has "failed to state the reasons on which it is based." ICSID *ad hoc* committees have considered

---

[478] Counter-Memorial on Annulment, ¶¶ 326, 327.

[479] *Alapli v. Turkey*, ¶ 125 (VLA-27).

[480] Counter-Memorial on Annulment, ¶ 328; Rejoinder on Annulment, ¶ 305.

[481] Counter-Memorial on Annulment, ¶¶ 329, 330; Rejoinder on Annulment, ¶ 307.

[482] Counter-Memorial on Annulment, ¶ 329; *Amco v. Indonesia*, ¶ 7.56 (VLA-35).

[483] Counter-Memorial on Annulment, ¶ 329; *Rumeli v. Kazakhstan*, ¶ 82 (VLA-34).

[484] Rejoinder on Annulment, ¶ 312, citing *TECO v. Guatemala*, ¶ 102 (VLA-49); *CDC v. Seychelles*, ¶ 81 (VLA-10).

[485] Rejoinder on Annulment, ¶ 310. *See* Counter-Memorial on Annulment, ¶ 331.

[486] *Alapli v. Turkey*, ¶ 202 (VLA-27).

that annulment under this ground requires a failure by the tribunal to comply with its duty of rendering an award that allows an informed reader to comprehend and follow its reasoning.[487]

316.   The 2016 ICSID Paper, quoting decisions of other *ad hoc* committees, similarly confirms that "the requirement to state reasons is intended to ensure that parties can understand the reasoning of the Tribunal, meaning the reader can understand the facts and law applied by the Tribunal in coming to its conclusion. The correctness of the reasoning or whether it is convincing is not relevant."[488] As this Committee has already expressed in Section III.A(3), addressing the "Nature and Scope of the Annulment Mechanism," annulment under the ICSID Convention is not in any form an appeal of an award.

317.   The Applicant agrees that this Committee should not review the adequacy of the merits of the reasons presented by the Tribunal in terms of factual or legal correctness.[489] The Respondent on Annulment maintains the same principle, adding that, despite the Applicant's statements to the contrary, most of the Applicant's arguments are directed at showing the Tribunal's findings on the facts and the law are incorrect.[490]

318.   As stated by the *ad hoc* Committee in *MINE v. Guinea*, "the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A to Point B, and eventually to its conclusion, even if it made an error of fact or of law."[491]

319.   This Committee considers relevant and appropriate that in analyzing if this ground on annulment has been established, or not, the Committee should generally seek to construe the language of the Award in a way that results in consistency, as opposed to finding its possible inner contradictions.[492]

---

[487] *MINE v. Guinea*, ¶ 5.09 (VLA-33).
[488] 2016 ICSID Paper, ¶ 105 (OILA-117).
[489] *See supra* ¶ 308.
[490] Rejoinder on Annulment, ¶ 297 and footnote 473.
[491] *MINE v. Guinea*, ¶¶ 5.08, 5.09 (VLA-33).
[492] *TECO v. Guatemala*, ¶ 102 (VLA-49); *CDC v. Seychelles*, ¶ 81 (VLA-10).

320.     Prior annulment committees have recalled that the standard under Article 52(1)(e) is a minimum standard, which is intended to ensure that a reasonable reader may understand the award.[493] Thus, this Committee concurs in the view that, as in the case of the other annulment grounds, the scope of review under Article 52(1)(e) is strict and the threshold for annulment is high.[494]

321.     Article 52(1)(e), therefore, does not allow a committee to evaluate or assess the correctness or adequacy of the reasoning in the award, even less, inquire into or raise questions regarding the quality of the reasons.  Rather, as specified by the *ad hoc* committee in *Alapli*, "the Applicant bears the burden of proving that the Tribunal's reasoning on a point which is essential to the outcome of the case was either unintelligible or contradictory or frivolous or absent."[495]

### (2)     Application of the Legal Standard to the Present Case

#### a.   *Applicant's Position*

322.     The Applicant states that the Tribunal failed to state reasons (i) in deciding that there was an expropriation in violation of the BIT and (ii) in calculating the amount of damages.

> (i)  *The Tribunal failed to state reasons in deciding that there was an expropriation in violation of the BIT*

323.     The Applicant explains that the Tribunal concluded that Venezuela violated Article 6 of the BIT "by purportedly failing to appropriately identify the property subject to expropriation," which led the Tribunal to conclude that Venezuela violated the due process of law.[496] However, the Applicant notes that the property expropriated is identified in the Award itself, "which confirms that such property was always identified and known to

---

[493] *Wena Hotels v. Egypt*, ¶¶ 75-83 (VLA-29).

[494] *Alapli v. Turkey*, ¶ 202 (VLA-27); *Vivendi v. Argentina I*, ¶¶ 64, 65 (OILA-83).

[495] *Alapli v. Turkey*, ¶ 202 (VLA-27).

[496] Memorial on Annulment, ¶ 122.

OIEG."[497]   On this basis, the Applicant argues that the Tribunal's Award includes a contradiction that is equivalent to a failure to state reasons.[498]

324.    Further, the Applicant contends that the "Tribunal includes no discussion, explanation, or indication as regards the international law decisions or doctrines that allegedly support the idea that the clear identification of the property subject to expropriation 'constitutes a basic guarantee of due process required by international [l]aw.'"[499] This failure makes it impossible for Venezuela to understand the decision adopted by the Tribunal in this respect,[500] particularly since:

> it is not possible to identify any international law rule stating that "due process" may be affected by an alleged defect in an administrative act within the framework of an expropriation, without evidence having been submitted that there were no judicial remedies for the purportedly affected party to complain about such defect or that such party actually attempted—at least—to make use of such remedies or demonstrated that any attempt to do so would have been futile.[501]

325.    In this regard, the Applicant points out that there is "an incurable contradiction in the Tribunal's arguments" in this respect given that:

> it is a proven fact that the Claimant did not resort to any of the judicial remedies that were available with the aim of challenging any potential defect that it deemed to exist in any of the administrative acts of the Republic relating to the expropriation and because the general definition of the guarantee of due process provided by the Tribunal in the Award refers to the "minimum regulatory standard commonly accepted" in relation to the availability of appropriate judicial proceedings to protect any right that a person might deem to be affected by a State act.[502]

---

[497] Memorial on Annulment, ¶ 123. The Applicant refers to ¶¶ 397, 398, 401, 402 of the Award.

[498] Memorial on Annulment, ¶¶ 125, 126. *See also* Reply on Annulment, ¶¶ 276, 277.

[499] Memorial on Annulment, ¶ 127.

[500] Memorial on Annulment, ¶ 127.

[501] Memorial on Annulment, ¶ 127.

[502] Memorial on Annulment, ¶ 129. *See also id.*, ¶¶ 130, 131.

326.   Moreover, the Applicant claims that, when analyzing the measures from the perspective of the fair and equitable treatment standard, the Tribunal reaches the opposite conclusion: "that the Republic did not violate international law because [OIEG] did not resort, attempt to resort, or demonstrate the futility of resorting, to the judicial remedies that […] were available to it."[503] For the Applicant, this "flagrant logical inconsistency, which is equivalent to the total absence of reason, is confirmed upon verifying that the Tribunal uses the same concept of 'due process' as it is understood in international law to analyze the matter of expropriation and the issue of fair and equitable treatment, as expressly stated by the Tribunal."[504]

*(ii) The Tribunal failed to state reasons in calculating the amount of damages*

327.   The Applicant claims that the Tribunal applied a discount rate that "is in conflict with the premises established in the Award." As explained by expert Daniel Flores:

> The Award stated that the DCF valuation it calculated was "confirmed" by two "sanity checks": (i) pricing multiples and (ii) the Companies' share of the OI Group (the parent of the Companies). In fact, the Award's "sanity checks" are contradicted by its own reasoning elsewhere in the Award. Had the "sanity checks" been properly performed, they would have shown that the Award's DCF valuation of the Companies was overstated.[505]

328.   In this regard, the Applicant contends that the Tribunal's multiples calculation did not apply a country risk adjustment that it recognized was necessary in the DCF valuation.[506] Similarly, with regard to the second "sanity check" (the Companies' share of the OI Group), the Applicant states that it is impossible to assign the Companies an intrinsic value as a percentage of the entire group without taking into account "the 'risk premium' which weighs the circumstances to which each of the assets of this 'group as a whole' are exposed."[507]

---

[503] Memorial on Annulment, ¶ 132. The Applicant refers to ¶¶ 534, 536 of the Award. *See also* Reply on Annulment, ¶¶ 280, 281.

[504] Reply on Annulment, ¶ 283, referring to ¶ 388 of the Award.

[505] First Econ One Report, ¶ 29 (internal references omitted).

[506] Memorial on Annulment, ¶ 137. *See also* Reply on Annulment, ¶¶ 294-296.

[507] Memorial on Annulment, ¶ 139.

329.    Additionally, the Applicant claims that the Tribunal contradicted itself in fixing the value of Bolivars in US dollars terms.[508] As explained by expert Daniel Flores:

> […] the Award found that OIEG was not entitled to unfettered access to the official exchange rate and therefore could not claim damages for not being able to exchange bolivars at that rate.
>
> However, the Award took a different position with respect to the U.S. dollar value of bolivar denominated "excess cash balances" that the Companies held on the valuation date. For those cash balances, […] the Award assumed that OIEG would have been able to convert its excess cash from bolivars into U.S. dollars using the official exchange rate, which is inconsistent with the Award's earlier determination that OIEG was not entitled and had not been able to do so in the past. The Award did not state any reason for this inconsistent treatment of the value of bolivars.[509]

330.    Lastly, the Applicant argues that the Tribunal failed to state the reasons based on which it assigned a unified value to both Plants and then calculated the 72.983% equity interest, "which led to an artificial increase in the value of the [C]ompanies."[510] According to the Applicant, the Tribunal's "mistake is glaring, since it is an undisputed fact that [OIEG] had different levels of participation in the [C]ompanies. […] In this context, the calculation of damages recognized by the Tribunal not only does not reflect those circumstances—which were established in the proceedings—but is actually inconsistent with them."[511]

### b.   Respondent on Annulment's Position

331.    Contrary to the Applicant's arguments, the Respondent on Annulment contends that: (i) the Tribunal's finding that the Applicant's expropriation of the Respondent on Annulment's investments was not carried out in accordance with due process, and (ii) the Tribunal's valuation of the expropriated investments are both based on sufficient, adequate and coherent reasons.

---

[508] Memorial on Annulment, ¶ 140. *See also* Reply on Annulment, ¶¶ 290-293.
[509] First Econ One Report, ¶¶ 41, 42 (internal references omitted).
[510] Memorial on Annulment, ¶ 141.
[511] Memorial on Annulment, ¶ 141 (internal references omitted).

> *(i) The Tribunal's finding that the expropriation was not carried out in accordance with due process is based on adequate, sufficient and coherent reasons*

332.    Contrary to the Applicant's arguments, OIEG claims that there is no contradiction between the Tribunal's conclusion "that the Expropriation Decree did not clearly identify the assets that were to be expropriated and the fact that, once the effects of the expropriation materialised fully, the Tribunal and some experts were able to assess the value of the assets that had been expropriated."[512]

333.    In this regard, the Respondent on Annulment explains that the Tribunal found that, at the time the Expropriation Decree was issued, OIEG could not know precisely which assets would be expropriated[513] and on this basis concluded that the expropriation was not carried out in accordance with the "due process of law" requirement in Article 6(a) of the BIT.[514] However, by the time the Tribunal started its deliberations and issued its Award, "the effects of the expropriation had materialized fully" and OIEG "knew which assets had been taken from it by the Applicant," and thus the Tribunal was able to determine the amount of compensation owed by that the Applicant.[515]

334.    Further, OIEG also objects to the Applicant's argument that there is a contradiction between: (a) the Tribunal's finding that the Applicant's failure to identify clearly the assets that would be expropriated constitutes a breach of the BIT's "due process of law" requirement; and (b) the Tribunal's finding that the Applicant had not violated due process as part of the protection against unfair and inequitable treatment under the BIT.[516] According to OIEG, this argument "lacks any merit because it is based on a blatant misrepresentation of the Award."[517]

335.    First, OIEG argues that the premise that the Tribunal found that the Applicant had not violated due process as part of the protection against unfair and inequitable treatment under

---

[512] Rejoinder on Annulment, ¶ 327.

[513] Rejoinder on Annulment, ¶ 329, referring to ¶ 400 of the Award.

[514] Rejoinder on Annulment, ¶ 330, referring to ¶ 403 of the Award.

[515] Rejoinder on Annulment, ¶ 330. *See also id.*, ¶¶ 331-336.

[516] Rejoinder on Annulment, ¶ 337.

[517] Rejoinder on Annulment, ¶ 338.

the BIT is false. Instead, "[t]he Tribunal actually concluded that the Applicant violated due process as part of the protection against unfair and inequitable treatment under the BIT in several ways."[518] OIEG cites as examples paragraphs 560 and 557 of the Award.[519]

336.    Second, OIEG claims that "the Tribunal never stated that a finding of [a] violation of due process in the context of the fair and equitable treatment standard requires that the injured party use avenues available to it to challenge the flaws of the relevant administrative acts."[520]

> *(ii) The Tribunal's valuation of the expropriated investments is based on sufficient, adequate and coherent reasons*

337.    OIEG claims that the Applicant's argument that the Tribunal contradicted itself by not applying a country risk adjustment to its EBITDA multiples "sanity check" must fail. OIEG contends that "[w]hen undertaking an EV/EBITDA multiples analysis, it is wrong to apply country risk because one of the steps of that analysis involves identifying comparable companies" and therefore, as explained by the Second Navigant Report, "[b]y definition, that step takes into account a level of country risk in which those comparable companies operate."[521]

338.    OIEG further notes that, indeed, on the basis of the evidence before it, the Tribunal determined that two companies, Argentina-based Rigolleau and Brazil-based CIV, were truly comparable companies for the purposes of the sanity check and that the Applicant's own expert in the Underlying Arbitration accepted as much.[522] Accordingly, for the Respondent on Annulment, "the Tribunal's approach and its reasoning was consistent with economic principles and with the positions of both Parties and their experts in the *OIEG* Arbitration."[523]

---

[518] Rejoinder on Annulment, ¶ 339.

[519] Rejoinder on Annulment, ¶¶ 339, 340.

[520] Rejoinder on Annulment, ¶ 341. *See also id.*, ¶¶ 342-347.

[521] Rejoinder on Annulment, ¶ 358. OIEG cites the Second Navigant Report, ¶ 79.

[522] Rejoinder on Annulment, ¶ 359.

[523] Rejoinder on Annulment, ¶ 360. *See also id.*, ¶¶ 361, 362.

339.    OIEG also objects to the Applicant's argument regarding the alleged contradiction concerning the conversion of the excess cash balance from Bolivars into US dollars and the Bolivar-denominated DCF valuation. In this regard, OIEG contends that the Tribunal did not find that access to the official exchange rate had not been available for OIEG or the Companies, but that the BIT did not guarantee such access. In fact, the Tribunal rejected the Respondent on Annulment's repatriation claim not because OIEG or the Companies were unable to access the official market, but because the Companies chose not to and opted instead for the "parallel market."[524]

340.    On this basis, OIEG claims that the Tribunal did not contradict itself by finding that the official exchange rate was the appropriate rate to use to otherwise convert the value of the Respondent on Annulment's investment into US dollars. "To the contrary, as explained by Messrs Kaczmarek and Shopp in the First and Second Navigant Reports, 'the [Tribunal's] use of the official exchange rate aligns with fundamental economic principles' and 'is consistent with the practice of financial and economic experts.'"[525]

341.    Finally, OIEG contends that the Applicant's argument that the Tribunal failed to state the reasons based on which it assigned a unified value to both Plants and then calculated the 72.983% equity interest, which led to an artificial increase in the value of the Companies, is entirely unsubstantiated by the evidence.[526]

342.    OIEG explains that the Tribunal "valued the Respondent on Annulment's shareholding in both [Companies] on a combined basis" and then allocated a portion of this combined value to the Respondent on Annulment in accordance with its equity interest.[527] OIEG notes that this approach "was necessary due to the consolidated nature of the [C]ompanies' financial result and their shared management"[528] which is confirmed by the fact that "both Parties'

---

[524] Rejoinder on Annulment, ¶ 352.

[525] Rejoinder on Annulment, ¶ 353. OIEG cites First Navigant Report, ¶ 15; Second Navigant Report, ¶ 54. *See also* Rejoinder on Annulment, ¶¶ 354-356.

[526] Rejoinder on Annulment, ¶ 363; Tr. Day 1, Mr. Kaczmarek and Mr. Shopp (Experts presented by OIEG), 295:18-296:16. The Respondent on Annulment notes that the Applicant did not pursue this line of argument in its Reply. Rejoinder on Annulment, ¶ 363.

[527] Counter-Memorial on Annulment, ¶ 372.

[528] Counter-Memorial on Annulment, ¶ 373, citing First Navigant Report, ¶ 77.

experts valued the [C]ompanies as a combined entity throughout the [Underlying] Arbitration."[529]

### c.   The Committee's Analysis

343.   As set forth above, the Applicant advances two main arguments or grounds in support of the alleged failure to state the reasons on which the Award is based (Article 52(1)(e)), as follows: (i) that the Tribunal failed to state its reasons in deciding that there was an expropriation in violation of the BIT; and (ii) that the Tribunal failed to state its reasons in calculating the quantum of the damages awarded.

344.   At the outset, this Committee confirms as part of this final Section of its analysis that it holds the view that the Award, in general, is well motivated.[530] Consequently, the Committee has strained to comprehend the position of the Applicant, particularly in view of the very basic point already stated throughout this Decision that annulment is an extraordinary recourse, and not a mechanism of appeal by virtue of which an *ad hoc* committee can revisit the correctness or incorrectness of the Tribunal's reasons for its Award.

345.   As for the finding of expropriation more specifically, the Award sets out detailed reasoning leading to its findings concerning compliance with each of the various requirements for a lawful expropriation under Article 6 of the BIT.[531] After analyzing the applicable law and the facts, the Tribunal specifically concluded that the expropriation was carried out in the public interest and was not discriminatory, but also determined that there had been a lack of due process as well as an "excessive and unjustified delay in the payment" of compensation.[532]

---

[529] Counter-Memorial on Annulment, ¶ 373.

[530] This Committee has had no difficulty understanding the Tribunal's reasoning in the Award. The present case is by no measure comparable to the *TECO v. Guatemala* case, to which the Applicant refers (*see supra* ¶ 309). There, the committee stated that "the Tribunal's reasoning on the loss of value claim is not clear at all, such that the Committee, despite having had the benefit of the Parties' submissions and of the entire record before it, has struggled to understand the Tribunal's line of reasoning." *TECO v. Guatemala*, ¶ 128 (VLA-49).

[531] Award, ¶¶ 321-426.

[532] Award, ¶ 426. *See also id*., ¶¶ 385-403 (analyzing the due process requirement under BIT art. 6(a)); *id*., ¶¶ 413-425 (analyzing the just compensation "without undue delay" requirement under BIT art. 6(c)).

346.   This Committee considers, as the Respondent on Annulment maintains,[533] that the Tribunal's determination that the Applicant's expropriation of OIEG's investments was not carried out in accordance with due process was sufficiently reasoned, including the Tribunal's finding that a failure to identify clearly the expropriated assets affects due process. The Committee recalls that the due process requirement, which the Tribunal applied, is contained in the BIT's expropriation provision (Article 6(a)),[534] and that it is for the Tribunal to interpret the BIT as part of its findings on the merits.

347.   In the Committee's view, the Tribunal adopted a clear three-step rationale (i) defining due process of law within the meaning of Article 6 of the BIT,[535] (ii) explaining why the failure to identify clearly the expropriated property is incompatible with due process,[536] and (iii) showing that the expropriation measure in dispute failed to comply with the due process requirement of Article 6(a) of the BIT.[537]

348.   The Tribunal reviewed the provisions of the Expropriation Decree so as to demonstrate that "[t]he imprecise language of the Decree prevented the Claimant from knowing precisely which of its assets would be expropriated, and as such, violated its right to due process";[538] the Tribunal then showed how the "uncertainty regarding exactly which property was being expropriated persisted throughout the expropriation process."[539] In view of the "significant weaknesses"[540] the Tribunal had identified, the Tribunal concluded

---

[533] Rejoinder on Annulment, ¶¶ 327-330, ¶¶ 337-343.

[534] Award, ¶ 385.

[535] Award, ¶ 387.  The Tribunal noted that Article 6(a) of the BIT "does not refer specifically to the regulations of the expropriating State, but to due process in general, a generic concept which must be interpreted in accordance with the requirements of international Law […]." *Id*. The Tribunal went on to explain that due process "is this minimum regulatory standard commonly accepted in all States under the rule of law which guarantees the subject that any decision affecting it will be adopted after having gone through a fair and equitable process." *Id*.

[536] Award, ¶ 395.  The Tribunal agreed with the Respondent on Annulment's view that "an essential component of due process, required by international Law, is that the party whose property is expropriated must know, with certainty, which assets the State is forcibly acquiring." *Id*. The Tribunal then elaborated that "if the expropriation order, which may have been issued *inaudita parte*, did not clearly and with certainty define which assets are to be expropriated, this would allow the Executive Branch to determine, at its discretion, what set of assets would be expropriated and this would undermine the investor's right to obtain an independent review of the decision." *Id*.

[537] Award, ¶¶ 396-402.

[538] Award, ¶ 400.

[539] Award, ¶ 401.

[540] Award, ¶ 396.

that it was "a proven fact that in the Expropriation Decree and the subsequent legal action, the Respondent failed to clearly identify the property subject to expropriation, the definition of which constitutes a basic guarantee of due process required by international Law."[541] This in turn amounted to a violation of due process under Article 6(a) of the BIT.

349.   The fact that the Tribunal's reasoning does not contain references to cases or scholarly comments does not mean that that its reasoning is absent or contradictory. On the contrary, as shown above, the Tribunal's reasoning can easily be followed from point A to point B, as required under Article 52(1)(e) of the ICSID Convention. That is not to say, of course, that this Committee agrees or not with the Tribunal's reasoning or that it considers such reasoning correct or incorrect. The Committee has been able to understand how the Tribunal reached its conclusions, regardless of whether the Committee agrees or disagrees with those conclusions.

350.   In addition, this Committee is persuaded by the point made by the Respondent on Annulment that there is no contradiction between the Tribunal's conclusion "that the Expropriation Decree did not clearly identify the assets that were to be expropriated and the fact that, once the effects of the expropriation had materialised fully, the Tribunal and some experts were able to assess the value of the assets that had been expropriated."[542]

351.   Similarly, the Committee cannot agree with the Applicant's contention that there is a contradiction amounting to a failure to state reasons based on the Tribunal's findings that (a) the Applicant violated the BIT's "due process of law" requirement upon failing to identify precisely the assets to be expropriated; and (b) the Applicant had not violated due process as part of the protection against unfair and inequitable treatment under the BIT.

352.   The Award is clear that, in fact, the Tribunal found that the Applicant had violated due process in breach of the BIT's fair and equitable treatment obligation.[543] Indeed, in applying the fair and equitable treatment standard to the facts, the Tribunal began by recalling its conclusion of an unlawful expropriation due to the Applicant's failure to

---

[541] Award, ¶ 403.

[542] Rejoinder on Annulment, ¶ 327.

[543] Award, ¶¶ 557, 560.

follow due process as well as "an excessive and unjustified delay in payment of the due compensation."[544] In such case, the Tribunal concluded, "the Republic must have also breached the guarantee of FET."[545]

353.   Additionally, even assuming that the Applicant could establish the asserted contradiction as regards the Tribunal's findings on due process, as noted the Tribunal also based its finding of unlawful expropriation on "an excessive and unjustified delay" in the payment of compensation. Thus, the Applicant has not sustained its burden of proving that the Tribunal's reasoning on "a point which is essential to the outcome of the case" was absent or contradictory.[546] Accordingly, there is no annullable error for failure to state reasons as regards the Tribunal's determination that the Applicant violated the due process requirement under Article 6 of the BIT.

354.   The second asserted basis for annulment under Article 52(1)(e) (failure to state reasons) relates to the calculation of the amount of damages. The Applicant's principal argument is that there are serious contradictions in the Tribunal's Award.

355.   The debate circles around various topics, including contentions that the Tribunal contradicted itself by (i) not applying a country risk adjustment to its EBITDA multiples "sanity check";[547] (ii) determining that two companies were truly comparable for the purpose of the sanity check;[548] and finally (iii) using the official exchange rate from Bolivars to US dollars to convert the excess cash balance and a Bolivar-denominated DCF valuation.[549]

356.   As regards these and other similar arguments raised by the Applicant as a basis for this ground for annulment, and the counter arguments of the Respondent on Annulment, this Committee confirms what was stated at the outset, at paragraph 344 above: it finds that the Award is abundant in its reasoning as regards matters related to the calculation of damages

---

[544] Award, ¶ 500.
[545] Award, ¶ 501.
[546] *Alapli v. Turkey*, ¶ 202 (VLA-27).
[547] *See supra* ¶¶ 327, 328, 337.
[548] *See supra* ¶¶ 327, 328, 338.
[549] *See supra* ¶¶ 329, 339.

and, as addressed above, the prior determination that there was an expropriation in violation of the BIT.

357.    Specifically as regards the calculation of damages, the Tribunal's findings are set forth in detail, and accompanied by ample reasoning.[550] The Applicant's principal contentions to the contrary are addressed in turn. The first and second contentions are considered together. Namely, the Applicant maintains that the Tribunal failed to state its reasons in undertaking sanity checks by not applying a country risk adjustment to its EBITDA multiples analysis (after having done so in its DCF analysis), and by determining that two companies were comparable.

358.    The Committee rejects these grounds. The expert evidence supports a view that because the EBITDA multiples analysis involves identifying comparable companies, "[b]y definition, that step takes into account a level of country risk in which those comparable companies operate."[551] Furthermore, in determining the appropriate comparable companies, the Tribunal methodically reviewed the positions of each Party's expert in the Underlying Arbitration.[552] Indeed, the Award records a measure of agreement on the part of Venezuela's appointed expert with this aspect of the Tribunal's determination.[553] In the circumstances, the Applicant has not sustained its burden to show the asserted contradiction.

359.    The Applicant's third contention concerns the Bolivar-US dollar exchange rate used by the Tribunal in the conversion of (i) the excess cash balance and in (ii) a Bolivar-denominated DCF valuation.  The Applicant complains that the Award assumes that the conversion could have been undertaken at the official ("privileged") exchange rate, whereas according to the Applicant the Tribunal found in a prior section of the Award that such rate was not available to OIEG.[554] However, the Tribunal's prior finding, which pertains to OIEG's claim under the BIT transfers provision, was in fact that OIEG, "had the option of resorting

---

[550] Award, ¶¶ 647-881.

[551] Rejoinder on Annulment, ¶ 358. OIEG cites the Second Navigant Report, ¶ 79.

[552] Award, ¶¶ 857-861.

[553] Award, ¶ 860.

[554] *See supra* ¶ 329.

to the official market or the parallel market" for currency conversion.[555] "By opting for the parallel market," the Tribunal explained, "it is inappropriate for Claimant to complain" about decisions to reject the transfer requests.[556] Thus, the Tribunal rejected the transfers claim based on a finding that OIEG had opted to forego the official market, not that OIEG was not entitled to the official rate or had not been able to obtain that rate in the past. Again, the Applicant has not established the alleged contradiction.[557]

360.    Finally, the Committee briefly addresses the Applicant's further contention that "the Tribunal failed to state the reasons based on which it assigned a unified value to both Plants and then calculated the 72.983% equity interest, which led to an artificial increase in the value of the [C]ompanies."[558] The Committee notes that the Applicant has elected not to expand on this argument.[559] Nor has it provided a response to the Respondent on Annulment's arguments on this point,[560] neither in the Applicant's Reply on Annulment nor at the Hearing on Annulment.  The Committee further notes the statement in the First Navigant Report that, in the Underlying Arbitration, "[…] both Parties' experts only ever valued the companies as a combined entity."[561]  In the circumstances, the Committee finds no basis for annulling the Award on this ground.

361.    In summary, after a careful review of the Award, the Committee does not discern any of the contradictions alleged by the Applicant, even less, contradictions of such nature that they could be considered mutually inconsistent and thus cancelling each other out.[562]

---

[555] Award, ¶ 632.

[556] Award, ¶¶ 633-635.

[557] Furthermore, this Committee has been presented with evidence that (i) the Tribunal's relying on the official exchange rate aligned with fundamental economic principles (Second Navigant Report, ¶ 54) and (ii) both Parties' experts appear to have endorsed relying on the official exchange rate in the Underlying Arbitration. Second Navigant Report, ¶ 55, citing First KPMG Report in the Underlying Arbitration, ¶ 9 (NAV-A-3).

[558] Memorial on Annulment, ¶ 141.  *See supra* ¶ 330.

[559] *See* Memorial on Annulment, ¶ 141.

[560] *See* Rejoinder on Annulment, ¶ 363.

[561] First Navigant Report, ¶ 77; Tr. Day 1, Brent Kaczmarek and Matthew Shopp, 296:2-7.  *See also* Counter-Memorial on Annulment, ¶ 373.

[562] *Caratube v. Kazakhstan*, ¶ 102 (VLA-21); *El Paso v. Argentina*, ¶ 221 (OILA-116).

Rather, the Committee is able "to follow how the tribunal proceeded from Point A to Point B and eventually to its conclusions."[563]

362.    Accordingly, this Committee is not satisfied that there is a showing by the Applicant of the existence or materialization of a ground for annulment under Article 52(1)(e) of the ICSID Convention.

## F.    COSTS

363.    On December 11, 2017, each Party presented its submissions on costs in accordance with Section 22.1 of Procedural Order No. 1 and the Committee's direction at the close of the Hearing on Annulment.[564] Additionally, following a March 9, 2018 decision, as noted at paragraph 40 above, rejecting the Applicant's proposal to disqualify Dr. Castellanos and condemning the Applicant to bear all the associated costs,[565] the Respondent on Annulment provided on March 29, 2018 its statement of costs incurred in relation to the Proposal for Disqualification, followed by the Applicant's observations.  On September 7, 2018, further to the Committee's invitation, each Party submitted its statement of costs associated with the Second Stay Request.

364.    As set forth below, each Party invokes the principle of costs follow the event and seeks reimbursement of all of its costs, with interest.

### (1)    Applicant's Cost Submissions

365.    In its Costs Submission of December 11, 2017, referring to Article 61(2) of the ICSID Convention and Administrative and Financial Regulation 14(3)(e), the Applicant seeks an order condemning the Respondent on Annulment to pay all the costs of the proceedings and all legal representation fees, plus interest until the date of payment.[566] The Applicant

---

[563] *MINE v. Guinea*, ¶¶ 5.08, 5.09 (VLA-33).

[564] Tr. Day 2, pp. 563:9-14; 564:11-12; 564:19-22; 572:16-19.

[565] *See* Decision on the Proposal to Disqualify Dr. Álvaro Castellanos Howell, March 9, 2018, ¶¶ 124, 125.

[566] Applicant's Submission on Costs, December 11, 2017 ("Applicant's Submission on Costs"), ¶¶ 2-6.

maintains that its costs amply satisfy the requisite reasonableness threshold, especially in view of the complexity of the case and multiple grounds of annulment.[567]

366.   The Applicant specifies that the Committee has discretion to determine the allocation of all costs.[568]  Citing the *EDF* annulment committee, the Applicant maintains that there are no presumptions in respect of the allocation of costs between the parties, nor have the decisions of *ad hoc* committees given rise to a *jurisprudence constante*.[569] Rather, the Applicant asserts that the result should depend in "great measure" on the circumstances of the case, which in this case warrant that the Respondent on Annulment should carry the entirety of the costs.[570]

367.   The Applicant invokes the principle of costs follow the event, which "serves to compensate the prevailing party" and "has been followed by various annulment committees in numerous cases."[571]  The Applicant approvingly quotes, for example, the committee's decision in *Adem Dogan v. Turkmenistan* for the proposition that "'costs follow the event', unless a different approach is called for,"[572] and adds that the principle that costs must be charged to the losing party is "strongly recognized."[573]

368.   The Applicant further states that the representation has been managed with complete seriousness and – as the jurisprudence has signalled is important – professionalism,[574] and with "maximum efforts" for achieving an abbreviated schedule and complying with the

---

[567] Applicant's Submission on Costs, ¶ 6.

[568] Applicant's Submission on Costs, ¶ 7.

[569] Applicant's Submission on Costs, ¶ 8.

[570] Applicant's Submission on Costs, ¶ 9 (translation of the *ad hoc* Committee).

[571] Applicant's Submission on Costs, ¶¶ 12-14 (translation of the *ad hoc* Committee). *See generally* Applicant's Submission on Costs, Section I.B.

[572] Applicant's Submission on Costs, ¶¶ 17, 20 (translation of the *ad hoc* Committee).

[573] Applicant's Submission on Costs, ¶ 20 (translation of the *ad hoc* Committee).

[574] Applicant's Submission on Costs, ¶ 29, citing *Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic*, ICSID Case No. ARB/13/8 (Kettani, Edward, Shin), Decision on Poštová banka's Application for Partial Annulment of the Award, September 29, 2016, ¶ 172 (OILA-146); *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20 (Von Wobeser, Cremades, Yusuf), Decision on Annulment, February 26, 2016, ¶ 353 (OILA-84); *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11 (Fernández-Armesto, Feliciano, Oreamuno), Decision on Annulment of the Award, November 2, 2015, ¶ 581 (VLA-18).

113

payment of advance costs.[575] For these same reasons, the Applicant alternatively notes that, in the event that the Committee rejects the Application, the Applicant should not be sanctioned with the payment of costs.[576]

369.    As for the quantum of its costs, the Applicant seeks reimbursement of its legal costs, including representation costs and the costs of the Applicant's expert (Mr. Flores), in the amount of **US$2,750,000**,[577] as well as an additional **US$60,000** for expenses, including those incurred in connection with the September 26-27, 2017 Hearing on Annulment,[578] and **US$21,360** for costs arising out of the Applicant's Second Stay Request.[579]

370.    As regards ICSID advance payments, in its December 11, 2017 Submission on Costs, the Applicant claimed to have made advance payments in the amount of US$600,000.[580] However, as of that date, the Applicant in fact had made advance payments of **US$394,767.29**, not US$600,000.[581] Additionally, the Applicant noted its payment of the **US$25,000** registration fee with its Application.

371.    In its April 9, 2018 observations on the Respondent on Annulment's statement of costs in relation to the Proposal for Disqualification, the Applicant recorded that "the Republic has no observations on the economic content of said declaration,"[582] but added,

> its absolute disagreement with the early condemnation of costs incurred by the arbitrators Bernardini and Pawlak, which contravenes sustained practice in the matter of challenge and […] sets a dangerous precedent […].[583]

---

[575] Applicant's Submission on Costs, ¶ 29 (translation of the *ad hoc* Committee).

[576] Applicant's Submission on Costs, ¶ 30.

[577] Applicant's Submission on Costs, ¶ 32.

[578] Applicant's Submission on Costs, ¶ 33.

[579] Letter from the Applicant to ICSID, September 7, 2018.

[580] Applicant's Submission on Costs, ¶ 31.

[581] *See* Letter from ICSID to the Parties, February 8, 2018.

[582] E-mail from the Applicant to ICSID, April 9, 2018 at 4:30 PM.

[583] *Id*.

### (2)     Respondent on Annulment's Cost Submissions

372.    The Respondent on Annulment's Submission on Costs of December 11, 2017 maintains that the Applicant should bear all costs of this proceeding and all of the Respondent on Annulment's legal fees and expenses, together with interest.[584]

373.    The Respondent on Annulment posits that there is a presumption that the applicant should bear all costs of the proceeding (*i.e.*, ICSID and Committee costs), citing ICSID Administrative and Financial Regulation 14(3)(e), and the annulment decision in *Azurix v. Argentina*.[585] The Respondent on Annulment contends, "while an equal distribution of costs was common in early annulment decisions, recent jurisprudence supports OIEG's position."[586]

374.    The Respondent on Annulment adds that no special circumstances justify departing from this presumption in this case, and that an award of legal fees and expenses in its favor is necessary to make it whole, if the Application is unsuccessful.[587] For support, the Respondent on Annulment cites the annulment decisions in *Adem Dogan v. Turkmenistan* and *Alapli v. Turkey*, in which the unsuccessful applicants were ordered to bear all costs of the proceeding and all of the responding parties' legal expenses.[588]

375.    The Respondent on Annulment further argues that a costs award in its favor, including legal representation costs, is warranted because the Applicant's Application was "manifestly meritless," citing the annulment decisions in *CDC v. Seychelles* and *AES v. Hungary*.[589] The Respondent on Annulment adds that the Applicant's litigation tactics improperly delayed the proceeding and increased costs.[590]

---

[584] *See* Respondent on Annulment's Submission on Costs, December 11, 2017 ("Respondent on Annulment's Submission on Costs"), Section 1, ¶¶ 13, 42(2)-(3).

[585] Respondent on Annulment's Submission on Costs, ¶ 4 (internal references omitted).

[586] Respondent on Annulment's Submission on Costs, ¶ 8, citing 2016 ICSID Paper, ¶ 65 (OILA-117).

[587] Respondent on Annulment's Submission on Costs, ¶¶ 7, 10-13.

[588] Respondent on Annulment's Submission on Costs, ¶¶ 8, 9, citing *Adem Dogan v. Turkmenistan*, ¶¶ 279, 281 (VLA-46); *Alapli v. Turkey*, ¶¶ 263, 264 (VLA-27).

[589] *See generally* Respondent on Annulment's Submission on Costs, Section III, ¶¶ 15, 16, 27 (internal references omitted).

[590] *See generally* Respondent on Annulment's Submission on Costs, Section IV.

376. The Respondent on Annulment also refers to the Applicant's failures to comply in a timely manner with the advance payment requests of the Centre pursuant to Administrative and Financial Regulation 14(3)(e), which resulted in "a close-to-six-month suspension of the proceeding" and "the consequent postponement of the hearing" by nine months.[591] The Respondent on Annulment adds that the Applicant's (i) repeated use of evidence not in the record (in breach of the Committee's procedural orders); (ii) insistence on oral expert testimony at the Hearing on Annulment (although deemed not necessary by the Committee); and (iii) unsuccessful request for a stay of enforcement of the Award, unnecessarily increased costs in this case.[592]

377. Finally, the Respondent on Annulment seeks interest on any costs award in its favor, under the same terms as ordered by the Tribunal in its Award.[593] Among the factors offered in support of an award of interest, the Respondent on Annulment cites the Applicant's failure to pay ICSID advances and failure to comply with recent adverse awards, and states that awarding interest will mitigate the risk of noncompliance with a costs award, without causing undue prejudice to the Applicant.[594]

378. In its December 11, 2017 Submission on Costs, the Respondent on Annulment presented that its total legal fees and expenses arising from the proceeding amount to **US$3,241,998.98**.[595]

379. On March 29, 2018, the Respondent on Annulment further reported that the costs incurred in connection with the Applicant's failed proposal to disqualify Dr. Castellanos amounted to **US$206,524**.[596]  On September 7, 2018, the Respondent on Annulment informed the

---

[591] Respondent on Annulment's Submission on Costs, ¶¶ 32, 33, citing *Repsol v. Petroecuador*, ¶ 88 (VLA-36).

[592] Respondent on Annulment's Submission on Costs, ¶¶ 34-37.

[593] *See generally* Respondent on Annulment's Submission on Costs, Section V. *See also id.*, ¶ 41.  The Tribunal awarded interest on the compensation, costs, and expenses due to the Respondent on Annulment "calculated at a LIBOR interest rate for one-year deposits in US dollars, plus a margin of 4%, with annual compounding of accrued interest."  Award, ¶ 984(6)-(7).

[594] Respondent on Annulment's Submission on Costs, ¶¶ 39-41.

[595] *See generally* Respondent on Annulment's Submission on Costs, Section VII.

[596] Respondent on Annulment's Statement of Costs Incurred in Connection with the Applicant's Proposal to Disqualify President Castellanos, March 29, 2018 ("Respondent on Annulment's Second Costs Submission"), ¶ 1 (stating that the amount, which consists "entirely of legal fees, has been invoiced to and fully paid by the Respondent on Annulment.").

Committee that its costs in connection with the Second Stay Request amounted to **US$34,426.02**.[597]

380.   Finally, the Committee recalls that the Respondent on Annulment paid to ICSID, on March 2, 2018, the third advance of **US$200,000** on the Applicant's behalf, and the Respondent on Annulment has sought reimbursement thereof, with interest.[598] On July 25, 2018, ICSID confirmed the Respondent on Annulment's payment, again on the Applicant's behalf, of the fourth requested advance in the amount of **US$179,970**.[599]

---

[597] Respondent on Annulment's Statement of Costs incurred in connection with the Applicant's Second Application for Stay of Enforcement of the Award, p. 2.

[598] E-mail from Respondent on Annulment to ICSID, March 2, 2018 (attaching Outgoing Money Transfer Debit); Letter from the Respondent on Annulment to ICSID, March 1, 2018, p. 2.

[599] Letter from ICSID to the Parties, July 25, 2018.

381.    Based on the presentation of each Party's position above, and in light of the ICSID advance payments, each Party's claim for costs may be summarized as follows:

| Description | Applicant | OIEG |
|---|---|---|
| *Legal Representation* | | |
| Parties' Costs Submissions of December 11, 2017 | $     2,750,000.00 | $     3,238,486.80 |
| Statement of Costs incurred in connection with the Proposal to Disqualify | $                    - | $        206,524.00 |
| Statement of Costs incurred in connection with the Second Stay Request | $          21,360.00 | $          33,930.00 |
| **Amount in US$** | **$     2,771,360.00** | **$     3,478,940.80** |

| *Expenses* | | |
|---|---|---|
| Parties' Costs Submissions of December 11, 2017 | $          60,000.00 | $            3,512.18 |
| Statement of Costs incurred in connection with the Proposal to Disqualify | $                    - | $                    - |
| Statement of Costs incurred in connection with the Second Stay Request | $                    - | $               496.02 |
| **Amount in US$** | **$          60,000.00** | **$            4,008.20** |

| *ICSID Calls for Funds* | | |
|---|---|---|
| Call for Funds 001 (received on April 7, 2016) | $        194,767.29 | $                    - |
| Call for Funds 002 (received on April 4, 2017) | $        200,000.00 | $                    - |
| Call for Funds 003 (received on March 8, 2018) | $                    - | $        200,000.00 |
| Call for Funds 004 (received on July 25, 2018) | $                    - | $        179,970.00 |
| **Amount in US$** | **$        394,767.29** | **$        379,970.00** |

| | | |
|---|---|---|
| Annulment Lodging fee | $          25,000.00 | $                    - |

### (3)     The Committee's Analysis

382.    ICSID Convention Article 61(2) (read in connection with ICSID Arbitration Rules 47(1)(j) and 53), provides that this Committee shall

> assess the expenses incurred by the parties in connection with the
> proceedings, and shall decide how and by whom those expenses, the
> fees and expenses of the members of the [Committee] and the
> charges for the use of the facilities of the Centre shall be paid.

383. These provisions grant this Committee broad discretion concerning apportioning and
awarding costs.[600]

### a. Costs of Proceeding

384. With respect to the costs for the use of the Centre, and the fees and expenses of the
Committee members, the Committee finds, consistent with the decisions of a majority of
annulment committees in recent years, that an unsuccessful applicant should generally bear
the full costs of the Centre and of the Committee members, unless special circumstances
warrant otherwise.[601] The Committee's finding is also informed by ICSID Administrative
and Financial Regulation 14(3)(e), which provides that the applicant is "solely responsible"
for paying the advances (without prejudice to the Committee's later discretion to
reapportion those costs).[602] Regulation 14(3)(e), together with the Applicant's delays in
making advance payments[603] and more generally the principle that costs follow the event
(which the Applicant has endorsed),[604] support the allocation of costs of the proceeding to
the unsuccessful Applicant.

385. Accordingly, given that each of the Applicant's asserted grounds for annulment has failed,
the Committee finds that the Applicant should bear the costs of the proceeding in full. No
special circumstances exist in this case that justify a different result.[605] As noted above, the
Respondent on Annulment has paid the third and fourth advances on the Applicant's behalf
in March and July of 2018, and therefore the Applicant must reimburse the Respondent on

---

[600] *See, e.g.*, 2016 ICSID Paper, ¶ 65 (OILA-117); *Libananco v. Turkey*, ¶ 224 (VLA-31); *Suez, Sociedad General de Aguas de Barcelona S.A. and others v. Argentine Republic*, ICSID Case No. ARB/03/19 (Sachs, Carmichael, Oreamuno), Decision on Annulment, May 5, 2017 ("*Suez v. Argentina*"), ¶¶ 420-422 (OILA-141).

[601] *See, e.g.*, 2016 ICSID Paper, pp. 26-29, ¶ 65 (OILA-117) ("in recent years, a majority of Committees have decided that the Applicant should bear all or a majority of the Costs of Proceeding when the application for annulment was unsuccessful.").

[602] *See, e.g.*, *AES v. Hungary*, ¶ 181 (VLA-28); *Azurix v. Argentina*, ¶¶ 372, 373 (OILA-89).

[603] *See Repsol v. Petroecuador*, ¶ 88 (VLA-36).

[604] *See* Applicant's Submission on Costs, ¶¶ 14, 17, 20.

[605] *See, e.g.*, *Azurix v. Argentina*, ¶ 378 (OILA-89); *Suez v. Argentina*, ¶ 434 (OILA-141).

Annulment the expended portion of the advance payments (and interest thereon) made by the Respondent on Annulment, namely **US$381,862.05**.[606]

386.   The costs of the proceeding are summarized as follows:

Committee's fees and expenses

| | |
|---|---|
| Dr. Álvaro Castellanos | US$133,839.70 |
| Professor Piero Bernardini | US$239,296.30 |
| Mr. David Pawlak | US$189,162.24 |
| ICSID's administrative fees | US$148,000 |
| Direct expenses | US$68,296.84 |
| Total | US$778,595.08 |

387.   The above costs have been paid out of advances made by the Applicant (US$394,767.29 and interest thereon), and the Respondent on Annulment (US$379,970 and interest thereon).   As noted above, the expended portion of the advance payments (and interest thereon) made by the Respondent on Annulment amounts to **US$381,862.05**.

### b.   *Legal representation fees and expenses*

388.   With respect to the legal representation fees and expenses of the Parties, the Committee recalls its broad discretion to decide based on the circumstances of the case, which, as noted above, is a position advocated by the Applicant. The Committee also observes that other

---

[606] *See* Letter from ICSID to the Parties, February 8, 2018 (in Spanish), pp. 1, 2 (recording the Applicant's assurances of December 13, 2017 and of January 11, 2018 that payment was imminent, although it never was made); Letter from ICSID to the Parties, March 8, 2018; Letter from ICSID to the Parties, July 25, 2018.  *See also Repsol v. Petroecuador*, ¶ 88 (VLA-36) (ordering the unsuccessful applicant to reimburse the respondent on annulment for the costs of the Centre that it had incurred, including the fees and expenses of the committee members); *cf. Suez v. Argentina*, ¶ 434 (OILA-141) (where the unsuccessful applicant had already paid all ICSID advances, "no reimbursement order [was] required.").  The interest earned on the advance payments made by the Respondent on Annulment amounts to US$ 1,892.05. A statement of account will be sent to the Parties separately.

*ad hoc* committees have ordered the applicant to reimburse the successful respondent on annulment for all or a substantial portion of such fees and expenses.[607]

389.    In deciding on the proper apportionment of legal fees and expenses, the Committee has taken into account, first and foremost, that the Applicant has failed to sustain any of the alleged grounds for annulment.[608] The Committee, like others before it, tends to agree that generally a party that has been compelled to defend a favorable award against a wholly unsuccessful Application should not suffer the further burden of having to pay for it.[609]

390.    In addition, the Applicant has failed in these annulment proceedings to make the requested advance payments in a timely manner. The Applicant's delays resulted in numerous unnecessary communications and substantial disruption to the proceedings, including a nine-month postponement of the Hearing on Annulment, the date of which had been confirmed already in Procedural Order No. 1. As the Respondent on Annulment has observed, the *Repsol* committee, noting "exceptional delay" relating to advance payments, ordered that the applicant "bear all the costs incurred by the Centre […] [and] half of the professional fees and related expenses incurred by [the respondent on annulment]."[610]

391.    In the overall circumstances, the Committee exercises its discretion as to the allocation of costs under ICSID Convention Article 61(2) by deciding that the Applicant shall reimburse all of the Respondent on Annulment's reasonable legal fees and expenses incurred in connection with the main proceeding.

392.    As for the legal representation costs associated with the Proposal for Disqualification, it has been decided that those costs shall be borne by the Applicant. As noted, the Respondent

---

[607] *See generally* 2016 ICSID Paper, ¶ 65, pp. 27-29 (OILA-117); *see also Adem Dogan v. Turkmenistan*, ¶ 281 (VLA-46) (awarding respondent on annulment all of its professional fees and expenses incurred); *Alapli v. Turkey*, ¶¶ 263, 264 (VLA-27) (same); *Repsol v. Petroecuador*, ¶ 88 (VLA-36) (awarding respondent on annulment half of its professional fees and expenses incurred). *See also CEAC Holdings Limited v. Montenegro*, ICSID Case No. ARB/14/08 (Greenwood, Kim, Oyekunle), Decision on Annulment, May 1, 2018, ¶¶ 144, 155, 156.

[608] *See AES v. Hungary*, ¶¶ 181, 182 (VLA-28) (observing that "Hungary prevailed in totality" in awarding legal expenses to Hungary); *Alapli v. Turkey*, ¶¶ 263, 264 (VLA-27) (observing that "the Respondent [on Annulment] has prevailed in totality" in awarding its legal expenses).

[609] *See AES v. Hungary*, ¶ 181 (VLA-28); *Adem Dogan v. Turkmenistan*, ¶ 279 (VLA-46); *Alapli v. Turkey*, ¶ 263 (VLA-27).

[610] Respondent on Annulment's Submission on Costs, ¶ 33, citing *Repsol v. Petroecuador*, ¶ 88 (VLA-36).

on Annulment has claimed **US$206,524** in connection with the challenge to Dr. Castellanos. The Applicant was explicit that it had "no observations on the economic content of" the claimed amount.[611] While the costs claimed are high,[612] the Applicant has not objected as to the amount, and it is understandable that the Respondent on Annulment would defend against the Applicant's Disqualification Proposal vigorously, especially given that it was presented at a late stage in the proceedings. In the circumstances, the Committee confirms the decision to award the Respondent on Annulment its legal fees associated with the Disqualification Proposal.

393.    The Committee recalls, as recited in paragraph 371 above, the Applicant's "absolute disagreement" with the decision of the Two Members, and the statement that such decision "contravenes sustained practice in the matter of challenge and […] sets a dangerous precedent."[613] However, the Two Members' directive is consistent with prior cases,[614] and with the principle of costs follow the event, both in the context of the ultimate disposition of a case,[615] as well as in earlier phases thereof (such as at the time of the decision rejecting the challenge).[616]

---

[611] E-mail from the Applicant to ICSID, April 9, 2018 at 4:30 PM.

[612] The Committee observes that the amount claimed by the Respondent on Annulment is equivalent, for example, to approximately 550 hours of work at the rates afforded to ICSID tribunal and committee members. At even triple those rates, the amount claimed is equivalent to approximately 180 hours of work on opposing the challenge. This work necessarily had to have been undertaken during the period from the date of the Disqualification Proposal on December 13, 2017 to the final submission of the Applicant on January 26, 2018 relating to translation issues associated with the Disqualification Proposal.

[613] E-mail from the Applicant to ICSID, April 9, 2018 at 4:30 PM.

[614] ICSID's table of cases involving disqualification decisions is available here: https://icsid.worldbank.org/en/Pages/Process/Decisions-on-Disqualification.aspx.

[615] See, e.g., *Koch Minerals S.á.r.l. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/19 (Veeder, Douglas, Lalonde), Award, October 30, 2017 ("*Koch Minerals v. Venezuela*"), ¶¶ 11.24-11.26 (OI-86). *See also Quiborax S.A. and others v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2 (Kaufmann-Kohler, Lalonde, Stern), Award, September 16, 2015, ¶ 624; *Joseph C. Lemire v. Ukraine*, ICSID Case No. ARB/06/18 (Fernández-Armesto, Paulsson, Voss), Award, March 28, 2011 ("*Lemire v. Ukraine*"), ¶ 382 ; *Fábrica de Vidrios Los Andes, C.A. and Owens-Illinois de Venezuela, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/21 (Shin, Douglas, Fortier), Award, November 13, 2017, ¶ 318; *Victor Pey Casado and others v. Republic of Chile*, ICSID Case No. ARB/98/2 (Berman, Mourre, Veeder), Decision on Rectification of the Award, October 6, 2017, ¶¶ 57, 58.

[616] See, e.g., *Fábrica de Vidrios Los Andes, C.A. and Owens-Illinois de Venezuela, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/21 (Shin, Douglas), Reasoned Decision on the Proposal to Disqualify L. Yves Fortier, March 28, 2016, ¶ 58 (OILA-134) (finding the proposal for disqualification "wholly without merit, the Two Members […] decided that the Respondent shall be responsible for the costs associated with the Proposal and that an order to that effect will be made in the award […]"); *Fábrica de Vidrios Los Andes, C.A. and Owens-Illinois de*

394. The Committee further recalls that the Applicant filed a Second Stay Request at a very late stage in this proceeding, which gave rise to additional costs (**US$21,360** for the Applicant and **US$34,426.02** for the Respondent on Annulment).  As noted in the Committee's Decision on the Second Stay Request, not only did the Applicant fail in its bid to challenge the rationale of the Committee's First Stay Decision, but the available evidence confirmed this rationale.[617]  In addition, the Committee cannot help but note the incongruity of the Second Stay Request at such a late stage and in the circumstances of the Applicant's failure to make two of the requested advance payments.  While, in light of the foregoing, these further costs could have been avoided, they do not appear to be excessive in view of the Parties' submissions on the Second Stay Request.

395. More generally as to the reasonableness of legal fees and expenses claimed by each Party, the Committee records that neither Party has provided any substantiation and only very limited specification of its legal representation costs and expenses, in accordance with the approach that the Parties effectively agreed upon, and the Committee accepted, at the close of the Hearing on Annulment. While the Committee considers that the costs claimed by both Parties are rather high for an annulment proceeding involving one two-day hearing, and that the better practice is at least some degree of substantiation and specification of legal fees and costs, both Parties have advocated for a costs-follow-the-event approach and neither Party has contested the quantum of the legal fees and expenses of the other Party. In fact, although not decisive as to reasonableness,[618] the Parties respective claims for legal

---

*Venezuela, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/21 (Shin, Douglas), Decision on the Proposal to Disqualify L. Yves Fortier, September 12, 2016, ¶ 62 (same) (Annex 15 to OIEG's Reply to Applicant's Disqualification Proposal); *Fábrica de Vidrios Los Andes, C.A. and Owens-Illinois de Venezuela, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/21 (Shin, Douglas), Decision on the Proposal to Disqualify L. Yves Fortier, May 5, 2017, ¶ 76 (OILA-139) (same).  *See also Nations Energy, Inc. and others v. Republic of Panama*, ICSID Case No. ARB/06/19 (Alexandrov, Gómez-Pinzón, Irarrázabal), Procedural Order No. 1 (Allocation of the Costs of the Annulment Proceeding), May 17, 2012, ¶¶ 24, 33 (unsuccessful Applicants ordered to bear costs incurred in connection with disqualification proposal); *Mathias Kruck and others v. Spain*, ICSID Case No. ARB/15/23 (Lowe, Douglas), Decision on the Proposal to Disqualify Mr. Gary B. Born, March 16, 2018, Sections G, H (inviting further cost submissions of parties, to inform the Tribunal's "decision on costs arising specifically from this proposal").
[617] First Stay Decision, ¶¶ 79, 80.
[618] *See Adem Dogan v. Turkmenistan*, ¶ 280 (VLA-46). *Cf. AES v. Hungary*, ¶ 179 (VLA-28) (finding both parties' costs reasonable under ICSID Arbitration Rule 28(2), where applicant's costs totaled approximately two-thirds of respondent on annulment's costs).

fees and expenses for the main proceeding are not vastly different (US$2,810,000.00[619] for the Applicant and US$3,241,998.98[620] for the Respondent on Annulment).

396.     Under the circumstances, in the exercise of the Committee's discretion, it determines that it is appropriate to apportion all of the Respondent on Annulment's legal fees and expenses, as set out in the table at paragraph 381 above, to the Applicant.

### c.  Interest

397.     As set forth above, this Committee retains broad discretion to fashion an appropriate cost award,[621] and both Parties have called for an award of interest.  As observed by the Respondent on Annulment, previous *ad hoc* committees have issued interest on costs awards against unsuccessful applicants.[622]  Consistent with the principle that costs generally follow the event, this Committee finds that an award of interest (at the rate provided in the Tribunal's Award) is appropriate in this case to promote the Applicant's timely compliance with this Decision.[623]

---

[619] This figure reflects the Applicant's claim for legal representation fees of US$2,750,000 (which includes expert fees), and US$60,000 in expenses.

[620] This figure reflects the Respondent on Annulment's claim for legal representation fees of US$3,241,998.98 until December 11, 2017 (which includes Navigant's expert fees and US$3,512.18 for expenses of OIEG's representatives). *See supra* ¶ 378.

[621] *See supra* ¶ 383.  Pursuant to the ICSID Convention and ICSID Arbitration Rules, this Committee has the same discretion in this regard as a tribunal.  *See* ICSID Convention Article 52(4); ICSID Arbitration Rule 53.

[622] *See* Respondent on Annulment's Submission on Costs, ¶ 41, citing *Adem Dogan v. Turkmenistan*, ¶ 282(3) (VLA-46) and *Antoine Abou Lahoud and others v. Democratic Republic of Congo*, ICSID Case No. ARB/10/4 (Kettani, Hobér, Knieper), Annulment Decision, March 29, 2016 ("*Lahoud v. Congo*"), ¶ 243 (OILA-85); *Koch Minerals v. Venezuela*, Award, ¶ 11.26 (awarding interest on legal costs and arbitration costs) (OI-86); *Blue Bank International & Trust (Barbados) Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/20 (Söderlund, Bermann, Malintoppi), Award, April 26, 2017, ¶ 215 (awarding interest on arbitration costs, and legal costs and expenses) (VLA-74).  *See also Lemire v. Ukraine*, Award, Section V (awarding interest on costs); *Rachel S. Grynberg and others v. Grenada*, ICSID Case No. ARB/10/6 (Rowley, Nottingham, Tercier), Award, December 10, 2010, Sections 8, 9 (awarding interest on "legal and other costs").

[623] *See Adem Dogan v. Turkmenistan*, ¶ 282(3) (VLA-46) (ordering interest on cost award "at the rate provided in […] the Award"); *Lahoud v. Congo*, ¶ 243 (OILA-85) (awarding interest at the same rate as in underlying Award (*see Antoine Abou Lahoud and others v. Democratic Republic of Congo*, ICSID Case No. ARB/10/4 (Park, Hafez, Ngwe), Award, February 7, 2014, ¶ 664(iv)).  Pursuant to the Committee's discretion and the Respondent on Annulment's request, this interest shall also apply to the reimbursement of the portion of the Respondent on Annulment's advances on costs paid out to cover the costs of the proceedings.  *See* Letter from Respondent on Annulment to ICSID, March 1, 2018, p. 2; Respondent on Annulment's Cost Submission, ¶ 39; Letter from Respondent on Annulment to ICSID, July 16, 2018, p. 2.

#### d. *Summary of Determinations*

398.  For the reasons outlined above, the Committee finds that the Applicant shall be responsible in full for the cost of proceeding in the amount of **US$778,595.08**, and thus must reimburse the Respondent on Annulment the third and fourth advances paid to cover the costs of the proceedings, including interest thereon, namely **US$381,862.05**. Additionally, the Applicant shall bear the Respondent on Annulment's legal representation costs and expenses in the amount of **US$3,482,949** (including US$3,241,998.98 for the main proceedings up until December 11, 2017, US$206,524 of such costs associated with the Disqualification Proposal, and the US$34,426.02 for costs arising out the Applicant's Second Stay Request). Interest shall apply to the total amount of the award of costs (US$381,862.05 plus US$3,482,949) as of the date of this Decision until paid at the rate provided in the Tribunal's Award (*i.e.,* calculated at a LIBOR interest rate for one-year deposits in US dollars, plus a margin of 4%, with annual compounding of accrued interest).

**IV.     DECISION**

399.    For the reasons set forth above, the Committee unanimously decides that:

(1)    the Application for Annulment of the Award dated March 10, 2015 is rejected in its entirety;

(2)    the Applicant shall be responsible to pay in full the costs of this proceeding, including the costs of legal representation, and interest thereon, as summarized in paragraph 398 above.

Dr. Piero Bernardini
Member of the *ad hoc* Committee

Date:     NOV 0 9 2018

Mr. David Pawlak
Member of the *ad hoc* Committee

Date:     NOV 1 3 2018

Dr. Álvaro Castellanos
President of the *ad hoc* Committee

Date:     NOV 1 9 2018

127