**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OI EUROPEAN GROUP B.V.,<br><br>                              *Plaintiff*,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>                              *Defendant*. | Case No. 1:16-cv-01533-ABJ |

**DEFENDANT BOLIVARIAN REPUBLIC OF VENEZUELA'S OMNIBUS
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTIONS
UNDER SECTIONS 1610(c) AND 1963 AND IN SUPPORT OF ITS
COUNTER-MOTION FOR A 120-DAY STAY OF ENFORCEMENT PROCEEDINGS**

Defendant Bolivarian Republic of Venezuela (the "Republic") respectfully submits this omnibus memorandum of law (i) in opposition to Plaintiff's motions for a declaration that a "reasonable period of time" has elapsed to begin enforcement proceedings under 28 U.S.C. § 1610(c) and for leave to register the judgment in federal courts outside this district pursuant to 28 U.S.C. § 1963, and (ii) in support of the Republic's counter-motion to stay enforcement proceedings for 120 days.

It is inherently unreasonable to begin enforcement proceedings against Venezuela's assets at this time in light of the political and humanitarian realities in Venezuela.  While endeavoring to resolve these challenges, interim President Juan Guaidó's government – the only legitimate Venezuelan government in the United States – is also working to bring an orderly resolution to Venezuela's legacy debt, including OIEG's judgment.  This Court should give the Guaidó government the opportunity to achieve these goals during this momentous time in Venezuela's history without the additional impediment of having to defend enforcement actions in courts around the country.

Furthermore, OIEG will not be prejudiced by any delay. As more fully explained below, present regulations promulgated by the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC") prevent OIEG from attaching, seizing, or executing on the assets it seeks in the absence of a specific license for OFAC.

## RELEVANT BACKGROUND

### A. Procedural History

On July 27, 2016, OIEG brought this action to recognize and enforce an award rendered against the Republic pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention"). (ECF No. 1.) In light of the Republic's application to annul the award in ICSID, this Court stayed the case. The case remained stayed until December 18, 2018.

Following the United States' recognition of the Guaidó government on January 23, 2019, the undersigned counsel appeared on behalf of the Republic at the instructions of the Guaidó administration. The parties litigated OIEG's motion for summary judgment and other issues, after which this Court entered judgment in favor of OIEG on May 21, 2019. (ECF No. 86.)

On July 25, 2019, OIEG filed two separate motions seeking: (i) a declaration that a "reasonable period of time" had elapsed to begin enforcement proceedings under 28 U.S.C. § 1610(c), and (ii) leave to register the judgment in federal courts outside this district pursuant to 28 U.S.C. § 1963. (ECF No. 89.) Given the procedural posture of the case, *i.e.*, no appeal from the judgment has been taken and the time to appeal has expired, OIEG's request for leave to register the judgment outside this district is moot. Accordingly, the Republic now files this omnibus memorandum of law in opposition to OIEG's section 1610(c) motion and in support of its counter-motion to stay enforcement proceedings for 120 days.

### B. Political Uncertainty in Venezuela

Since January 10, 2019, National Assembly President Juan Guaidó has acted as interim President of Venezuela pursuant to Article 233 of the Venezuelan Constitution. On January 23, after President Guaidó ratified the application of Article 233, President Donald Trump issued a statement recognizing Mr. Guaidó as interim President of Venezuela and rejecting the legitimacy of Nicolas Maduro's regime. Since that time over 50 countries have recognized the Guaidó government as the official government of Venezuela, as have the Organization of American States and the Inter-American Development Bank. (Vecchio Decl. ¶ 3.)[1]

To facilitate the transition to the Guaidó government, the Venezuelan National Assembly enacted the "Statute Governing the Transition to Democracy to Restore the Validity of the Constitution of the Bolivarian Republic of Venezuela" (the "<u>Transition Statute</u>") (*Id.* at ¶ 4, Ex. 1.) On February 5, 2019, pursuant to the authority granted in Article 15.b of the Transition Statute, President Guaidó appointed José Ignacio Hernández as Special Attorney General of Venezuela. (*Id.* at ¶ 4.) On March 19, 2019, the National Assembly passed a resolution ratifying Mr. Hernández as the only person having the power to represent the Republic and to appoint legal counsel in cases outside of Venezuela. (*Id.* at ¶ 5, Ex. 2.)

Although the Guaidó government is the sole authority recognized by the United States and the broader international community, President Guaidó's administration does not have full access to the personnel and documents of the government and its instrumentalities in Venezuela at this time. To the contrary, the Maduro regime has maintained substantial control of the operation of the Venezuelan government. Mr. Maduro has thus far refused to recognize the constitutional authority of the National Assembly and President Guaidó, and has instead

---

[1] Citations to "Vecchio Decl." refer to the Declaration of Ambassador Carlos Alfredo Vecchio, dated August 5, 2019, and filed concurrently herewith.

unlawfully usurped the operations of the government.  Among other things, the Maduro regime controls the Venezuelan Central Bank, Finance Ministry, and Supreme Court, and the operations and assets of key government owned entities within Venezuela.  As a result, the Guaidó government does not have full access to the Republic's operations, facilities, or personnel.  Nor does it have access to the bank accounts or assets of the government in Venezuela.  (Vecchio Decl. ¶ 6-7.)

President Guaidó has nevertheless taken significant steps that are within his control in order to protect the interests of the Venezuelan people and to address legacy claims against the Venezuelan government.  Given that oil production and sales constitute the Republic's largest source of revenue, and the source of virtually all of its foreign currency, President Guaidó is taking steps within his power to protect and preserve those assets.  Also, these actions aim to reduce the collapse of the Venezuelan oil industry.  (Vecchio Decl. ¶ 8.)

The fact that President Guaidó has been making efforts to preserve assets outside of Venezuela does not mean that his government has total control within Venezuela, which is still controlled by the unrecognized Maduro regime.  Indeed, the Maduro-controlled Supreme Court has purported to strip President Guaidó of the immunity from prosecution that members of the National Assembly possess under Venezuelan law, exposing him to arrest and/or prosecution for acts taken in Venezuela.  (Vecchio Decl. ¶ 9.)

**C. Unprecedented Humanitarian Crisis in Venezuela**

Venezuela is collapsing amidst an unparalleled and complex humanitarian crisis. According to the Venezuela Governor at the Inter-American Development Bank, the gross domestic product of Venezuela "has fallen by well over 50 percent." (Vecchio Decl. ¶ 10.)

He has further explained:

> That is double the size of the U.S. Great Depression. It's double the size of the Greek crisis. It's double the size of the economic collapse that occurred during the Spanish Civil War. It is something of really unique proportions. The consequence of that collapse is expressed in the fact that the minimum wage today is $6 a month. That means that the minimum wage does not buy two eggs a day. It buys something like 700 calories a day. It means that because you don't have the calories and the proteins and the medicines for 30 million people, people are losing weight. This has been measured at something like eight kilos a year on average — there is in that the stunting of children's growth.

(Vecchio Decl. ¶ 10.)

According to the United Nations High Commissioner for Human Rights (UNHCHR), more than four million people have fled Venezuela "[a]s a direct result of this far-reaching human rights crisis." (*Id.* at ¶ 11.) For those remaining, the U.S. State Department reports that nearly nine out of ten Venezuelans live in poverty and 90% of families report not being able to buy enough food. Eight out of ten households lack a reliable source of food. Many lack access to clean water. Eighty percent can no longer afford basic healthcare. Nearly 70% of Venezuela's hospitals report intermittent power outages and a lack of potable water. Venezuela now experiences routine outbreaks of vaccine-preventable diseases that had previously been eradicated. More than one million children no longer attend school. The crisis has been further exacerbated by rolling blackouts. (*Id.*)

This collapse has also triggered a massive migration crisis. The General-Secretary of the Organization of American States has stated that, "with more than 3.4 million, Venezuelans are the second largest refugee population in the world, second only to Syria, which has been at war for 7 years." (Vecchio Decl. ¶ 12.) It is further predicted that "by the end of 2019 the exodus will reach 5.4 million people." (*Id.*)

The humanitarian emergency is closely intertwined with Venezuela's current lack of foreign currency. Almost all of Venezuela's debt was incurred at a time when robust production from Venezuela's vast oil and gas reserves provided the nation with hard currency to import food, medicine and other products and to repay debt incurred in the ordinary course. But during the Chavez and Maduro regimes, expropriations, corruption, and kleptocracy destroyed infrastructure and domestic production capacity. Today, the Venezuelan people cannot meet their own needs through local production. Imports represent the only immediate source of food, medical equipment, and medicine. The collapse of the oil industry, along with the looting of public resources by the Maduro regime, has left Venezuela without any means to pay for these essential, life-preserving imports. Total imports have collapsed by almost 70 percent amidst hyperinflation. And shortage of food, medicine, and other essential products and services grow worse every day. (Vecchio Decl. ¶ 13.)

## ARGUMENT

### I. IT IS INHERENTLY UNREASONABLE TO BEGIN ENFORCEMENT PROCEEDINGS AGAINST VENEZUELA AT THIS TIME

The Foreign Sovereigns Immunities Act ("FSIA") directs that "no attachment or execution . . . shall be permitted until the court has . . . determined that a reasonable period of time has elapsed following the entry of judgment." 28 U.S.C. § 1610(c). In determining whether any period of time is "reasonable," courts consider the realities of each foreign state's situation on a case-by-case basis, and that decision "should be informed by an examination of the procedures necessary for the foreign state to pay the judgment (such as the passage of legislation), evidence that the foreign state is actively taking steps to pay the judgment, and

evidence that the foreign state is attempting to evade payment of the judgment."[2]  *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (noting the absence of any "evidence that the defendant has taken any steps toward the payment of its debt" in making its reasonableness determination).

It is inherently unreasonable to expect the Guaidó government – the only Venezuelan government recognized by the United States to act on behalf of the Republic – to make payments from Venezuela's public fisc at this time.  Generally courts have accepted that several months and even years are "reasonable" periods of time under section 1610(c), including in cases where the foreign sovereign never even appeared.  *See*, *e.g.*, *Bennett v. Islamic Republic of Iran*, No. 03-cv-1486 (RCL), 2011 U.S. Dist. LEXIS 90784, at *4 (D.D.C. Jan. 25, 2011) (more than two years); *Agudas Chasidei Chabad v. Russian Fed'n*, 798 F. Supp. 2d 260, 269–70 (D.D.C. 2011) (one year); *Harrison v. Republic of Sudan*, No. MC 13-80116 JSW, 2013 U.S. Dist. LEXIS 102295, at *11–13 (N.D. Cal. June 24, 2013) (fourteen months).  And while some courts have found about two or three months to be "reasonable" in some cases, none has done so under extraordinary circumstances such as the one presented here.  Not only is there a humanitarian crisis of daunting proportions afflicting the livelihood of the Venezuelan people in tangible ways, but there are also practical impediments that prevent the Guaidó government from accessing the Republic's resources to pay judgments during this time of political uncertainty.  As OIEG itself recognizes, Venezuela is "functionally unable" to pay down its debt right now, because the

---

[2] The House Report for the FSIA, section 1610(c), states: "In determining whether the period has been reasonable, the courts should take into account procedures, including legislation, that may be necessary for payment of a judgment by a foreign state, *which may take several months*; representations by the foreign state of steps being taken to satisfy the judgment; or any steps being taken to satisfy the judgment; or evidence that the foreign state is about to remove assets from the jurisdiction to frustrate satisfaction of the judgment." H.R. REP. NO. 94-1487, at 30 (1976) (cited by *Ned Chartering*, 130 F. Supp. 2d at 67) (emphasis added).

Guaidó government "lacks practical control over the Treasury or the other levers of power at home."[3]  OIEG Br. 3, 8.

Even so, there is no evidence that the Guaidó government is attempting to avoid payment. To the contrary, his administration is working diligently to address Venezuela's economic crisis, including its legacy public debt, all while working to resolve the country's humanitarian crisis. As OIEG acknowledges, section 1610(c)'s "rationale is to give foreign sovereigns engaged in a good-faith effort to satisfy their obligations some period of time to pay their debts without experiencing piecemeal attachments."  OIEG Br. 6-7.  And although OIEG is aware of the multiple actions currently pending against Venezuela and its agencies or instrumentalities in U.S. courts, it fails to mention the public representations that the Guaidó government has made in those proceedings as to its plans for resolving all these claims in an orderly consolidated manner.

In fact, a policy priority for the Guaidó administration is to seek a fair settlement of all legacy claims against the Republic, including claims arising from the prior government's nationalizations and expropriations, as promptly as possible in all circumstances.  To that end, the Republic plans to engage in an orderly, consensual debt restructuring to which all similarly situated commercial claims will be treated equally.  (Vecchio Decl. ¶ 15.)  In that regard, President Guaidó recently retained veteran debt restructuring lawyer Mr. Lee Buchheit on a *pro bono* basis to help restructure claims against the Republic dating from the Chavez/Maduro period.  (*Id.* at ¶ 16.)  The claims restructuring plan on which Mr. Buchheit has been helping will address all of the external debt of, and claims against, the Republic.  His plan is being prepared in conjunction with the Guaidó government's discussions with the United States government,

---

[3] Even before the current political situation arose, a court in this district denied a section 1610(c) motion filed by a judgment creditor of Venezuela, determining that a reasonable period of time had not yet elapsed.  *See* Minute Order, *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, No. 16-cv-2020-RJL (D.D.C. Nov. 21, 2018).  No new applications have been considered in that case.

which has expressed interest in assisting the Guaidó administration in addressing these issues. (*Id.* at ¶ 17.) *See Guidelines for the Renegotiation of the Chavez/Maduro Era Legacy Public External Debt*, published by the Office of the Special Attorney General of the Bolivarian Republic of Venezuela, dated Jul. 1, 2019, attached hereto as Exhibit A.

The Guaidó administration and the National Assembly need time to complete the plan before addressing individual claims. Based on the unprecedented and complex financial and humanitarian crisis in Venezuela, the Guaidó government should be given time to address its claims, including OIEG's claim in this action, in a global manner that best serves the interests of the Venezuelan people. Allowing claims to proceed through piecemeal litigation at this juncture puts at risk assets that will be required for long-term, humanitarian relief. Equally important, the adjudication of claims itself will require the Republic to expend resources to protect those assets – resources that, again, could be used for humanitarian purposes. (Vecchio Decl. ¶ 18-19.)

Furthermore, the untimely enforcement of judgments will precipitate additional suits, in which some claimants attempt to obtain competitive advantages over similarly situated claimants. A deluge of litigation would magnify the scope and gravity of these matters, require the Republic's attention, threaten to extend and deepen the humanitarian crisis, and delay the Republic's economic recovery. (Vecchio Decl. ¶ 20.)

**II.     THIS COURT SHOULD GRANT A 120-DAY STAY AS A MATTER OF COMITY**

Regardless of whether a reasonable period of time has elapsed under section 1610(c), this Court should exercise its discretion and "inherent power to stay proceedings in control of its docket, . . . after balancing the competing interests." *Dellinger v. Mitchell*, 442 F.2d 782, 786 (D.C. Cir. 1971) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)); *see Feld Entm't, Inc. v. ASPCA*, 523 F. Supp. 2d 1, 3 (D.D.C. 2007) (granting a stay where the hardship of

defending the lawsuit was greater than any prejudice that could potentially result from a short delay).

The Supreme Court has explained that stays are especially appropriate in times of "extraordinary public moment" when a litigant may be required to wait for a reasonable period of time "if the public welfare or convenience will thereby be promoted." *Landis*, 299 U.S. at 256. In particular, courts have stayed litigation against foreign states during periods of political uncertainty or when other foreign relations concerns call for caution. *See Thai-Lao Lignite (Thail.) Co. v. Gov't of the LAO People's Democratic Republic*, Nos. 13-495 (L), 13-545 (Con) 13-1844, 2013 U.S. App. LEXIS 26396, at *5 (2d Cir. May 28, 2013) (finding cause to stay discovery order where "issues of sufficient foreign relations sensitivity" were at stake); *Gov't of France v. Isbrandtsen-Moller Co.*, 48 F. Supp. 631, 633-34 (S.D.N.Y. 1943) (staying all proceedings until 60 days after French government was again recognized by the United States).

Here, a limited stay is necessary to give President Guaidó's government a fair chance to conduct an orderly transition to democracy, address the daunting humanitarian crises in Venezuela, and implement a comprehensive public debt restructuring plan. As set forth above, the Guaidó government is working diligently to achieve these goals. Venezuela is suffering from crippling inflation, overwhelming poverty (upwards of ninety percent of Venezuelans are living in poverty), and widespread malnutrition and disease. In this very fluid circumstance, adequate time is necessary to ensure that the Republic is able to protect the interests of the Venezuelan people during this crucial moment in their history.

Since the United States recognized the Guaidó government, the D.C. Circuit and other courts have granted limited or indefinite stays in cases involving Venezuela and its agencies or instrumentalities on the basis of the current political uncertainty. *See, e.g.*, *Rusoro Mining Ltd. v.*

*Bolivarian Republic of Venezuela*, No. 18-7044, Doc. No. 1773506 (D.C. Cir. Feb. 14, 2019) (granting motion by defendant for 120-day stay of proceedings); *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, S.A., No. 11-CV-01735, ECF No. 133 (D.D.C. Feb. 15, 2019).  This Court should do the same.

Furthermore, OIEG will not suffer any prejudice as a result of any such stay.  OIEG's motion explicitly requests leave to commence execution of its judgment against assets of non-party Petróleos de Venezuela, S.A. ("PdVSA"), which is Venezuela's state-owned oil company.  Putting aside the fact that PDVSA is not a debtor on the judgment or arbitral award, PdVSA's assets are blocked by U.S. sanctions and therefore cannot be attached or executed upon without a license from OFAC.  Earlier this year, OFAC designated PdVSA as a Specially Designated National ("SDN") and, as a result, "all property and interests in property of PdVSA subject to U.S. jurisdiction are blocked."  U.S. Dep't of Treasury, Press Release: *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019), *available at* https://home.treasury.gov/news/press-releases/sm594.[4]  Under OFAC guidance, "[b]locking immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property."  U.S. Dep't of Treasury, OFAC FAQs: General Questions, 9, *available at* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx (last visited August 8, 2019).  Other U.S. sanctions against the Maduro regime similarly confirm that any securities owned, directly or indirectly, by the Venezuelan Government, including PDVSA's shares of PDV Holdings, Inc., cannot be attached or executed upon absent an OFAC license.  *See* Exec. Order No. 13835, 83 Fed. Reg. 24,001 (May 24, 2018); U.S. Dep't of

---

[4] Designating PDVSA as an SDN and blocking its property was intended to "support Interim President Juan Guaidó, the National Assembly, and the Venezuelan people's efforts to restore their democracy" and to "preserve these [PDVSA] assets for the people of Venezuela."  *Id.* (quoting Treasury Secretary Steven T. Mnuchin).

Treasury, OFAC, Other Sanctions Programs, Venezuela Sanctions, FAQ No. 596, *available at* https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_other.aspx.

These sanctions were strengthened on August 5, 2019, when President Trump issued an executive order blocking all U.S. property of the Maduro regime. *See Executive Order on Blocking Property of the Government of Venezuela* (Aug. 5, 2019), *available at* https://www.whitehouse.gov/presidential-actions/executive-order-blocking-property-government-venezuela/; *see also General License No. 31 Certain Transactions Involving the Venezuelan National Assembly, the Interim President of Venezuela, and Certain Other Persons Authorized*, *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl31.pdf (authorizing the Guaidó administration to engage in all transactions prohibited by the August 5, 2019 Executive Order).

Furthermore, a stay at the present time is consistent with the stated policy of the Executive Branch to preserve the assets of Venezuela for the benefit of the Venezuelan people. On August 6, 2019, OFAC issued the following statement in connection with the enforcement of the Venezuelan sanctions:

> As the illegitimate former Maduro regime continues to usurp power and plunder assets that rightfully belong to the Venezuelan people, the United States has implemented Venezuela related sanctions to preserve such assets for the Venezuelan people. These sanctions are designed to limit the Maduro regime's sources of revenue and hold accountable those who stand in the way of restoring democracy in Venezuela, while also ensuring that the flow of humanitarian goods and services to the Venezuelan people is not prohibited by U.S. sanctions. The United States stands with the Venezuelan people and interim President Juan Guaidó in opposition to the Maduro regime.

U.S. Dep't of Treasury, *Guidance Related to the Provision of Humanitarian Assistance and Support to the Venezuelan People* (Aug. 6, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl31.pdf.

Here, OIEG has not represented that it has obtained the required OFAC license to obtain any attachment or execution of Venezuela's or PdVSA's assets. Even assuming OFAC were incline to grant such a license to OIEG, the application process will likely take far longer than the 120-day stay requested by the Republic. Thus, the requested stay will not prejudice OIEG.

**CONCLUSION**

In sum, this Court should deny OIEG's motions and grant the Republic's request to stay proceedings for 120 days.

Respectfully submitted,

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By: */s/ Joseph D. Pizzurro*
Joseph D. Pizzurro
(D.C. Bar No. 468922)
Kevin A. Meehan
(D.C. Bar No. 1613059)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 452-7373
Fax: (202) 452-7333
Email: jpizzurro@curtis.com
Email: kmeehan@curtis.com

Juan O. Perla (*pro hac vice*)
101 Park Avenue
New York, NY 10178
Tel.: (212) 696-6000
Fax: (212) 697-1559
Email: jperla@curtis.com

*Attorneys for Defendant*
*Bolivarian Republic of Venezuela*

Dated: August 8, 2019